**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

| | |
|---|---|
| FLORIDA COASTAL SCHOOL OF LAW, INC., | No. _____ |
| Plaintiff, | |
| v. | **Verified Complaint** |
| MIGUEL CARDONA, in his official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION, | **Emergency Injunctive Relief Requested** |
| Defendants. | |

<u>**VERIFIED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF**</u>

Florida Coastal School of Law, Inc. ("FCSL"), by counsel, alleges the following factual allegations against Miguel Cardona, in his official capacity as Secretary of the United States Department of Education ("Secretary") and the United States Department of Education ("Department") as follows:

<u>**INTRODUCTION**</u>

1.    FCSL brings this action under the Administrative Procedure Act ("APA") to prevent the Department from arbitrarily and capriciously ending FCSL's participation in programs offered under Title IV of the Higher Education Act ("Title IV"). As with any institution of higher education, FCSL will imminently close without access to Title IV funds. Its students will be forced to find alternatives to finish their legal training, its faculty and staff will immediately lose

their jobs, and a valuable source of legal professionals in Northeast Florida will disappear.

2.      FCSL has met every proper requirement imposed by the Department, and it even worked in good faith to meet the Department's ultra vires demands. But the Department demonstrated that its true objective was to close a viable school as part of a political agenda against proprietary education, while retaining millions of dollars in security posted by the school's owner.  The owner posted that security, in the form of a $5.6 million letter of credit, because the Department represented that FCSL would remain eligible for Title IV if it did so.  But after taking the letter of credit, the Department nonetheless refused to continue FCSL's eligibility.

3.      The Department's explanations for its devastating actions are so contrary to the evidence and law, that they cannot reasonably be the Department's genuine reasons for destroying a law school which has provided meaningful legal careers to Northeast Florida's most underrepresented communities.

4.      To prevent this irreparable harm, FCLS challenges two final agency actions of the Department.

5.      First, on March 26, 2021, the Department issued its final decision that FCSL's continued Title IV eligibility was conditioned on the ultra vires requirement that all levels of FCSL's ownership sign the school's provisional program participation agreement ("PPA") and assume joint responsibility for any future

liabilities of the school.  Its only explanation was that it was implementing a new and generally applicable "updated standard."  It offered no other rationale.

6.     Absent specific circumstances, the Department does not have authority to require a school's ownership to assume joint liability under a PPA.

7.     Further, one owner, Sterling Capital Partners, LP ("Sterling"), was legally precluded from signing the provisional PPA because its formation agreement did not allow it to guarantee any obligation.  The Sterling was a dissolving fund whose only asset was its ownership in the school.  Its partners offered a $1 million letter of credit to remove the requirement for its signature.  Despite the Department's knowledge that Sterling had no other assets that could be used to satisfy any future liability, the Department turned down $1 million in additional financial security.

8.     Clearly, the Department's goal was not to secure additional financial security.  Instead, it sought to close a viable school and upend the lives FCSL's students and faculty and reduce the value of the hard-earned degrees held by thousands of FCSL graduates.

9.     The second action challenged in this action is the Department's May 13, 2021 denial of FCSL's subsequent application for reinstatement of Title IV Program eligibility and its July 16, 2021 affirmation of that decision (collectively, "the Decisions").  Immediately after the Department discontinued FCSL's Title IV eligibility, Sterling relinquished all ownership interest so FCSL could meet the Department's so-called "updated standard."  Now, with all owners and investors

able to sign the provisional PPA, FCSL applied for reinstatement of its Title IV eligibility.

10.     In the Decisions, the Department manufactured new reasons to keep the school closed. It egregiously mischaracterized FCSL's audited financial statements to question FCSL's ability to continue as a going concern; improperly involved itself in a pending accreditation matter to support a baseless conclusion that FCSL lacked "administrative capability"; and falsely alleged FCSL violated its fiduciary duties to the Department by failing to disclose events that FCSL had no obligation to disclose pursuant to the Department's detailed disclosure requirements.

11.     These factual characterizations and legal positions are so contrary to the law and evidence that the Decisions appear to be calculated to further the Department's goal of closing FCSL while retaining the letters of credit.  Indeed, all of the financial information the Department relied on in the Decision's was known to it when it issued the provisional PPA in November 2020.  Had the Department truly believed what it wrote in the Decision's, it would have never offered The Department's actions fall well short of the APA's requirements to apply the law fairly and consistently.

12.     Moreover, sanctioning FCSL for failing to report information that it was not required to disclose, either by regulation or by specific request from the Department, is an unacceptable violation of FCSL's basic due process rights.  FCSL

had no notice of its obligation to report various accreditation matters and the proposed terms of unconsummated transactions.

13.    For decades, FCSL has demonstrated that is a successfully, law-abiding institution, who provides productive legal careers for its students.   Its closure serves no purpose but to forward the Department's improper agenda against proprietary education.

14.    In order to prevent irreparable harm to FCSL, its students, and its faculty, this Court should vacate the Department's arbitrary and capricious discontinuance of FCSL's Title IV eligibility and subsequent denial of reinstatement.

## **PARTIES**

15.    FCSL is a law school located in Jacksonville Florida.

16.    Mr. Miguel Cardona is the Secretary of the Department. He is being sued in his official capacity in which he has overall responsibility for the operation and management of the Department. As Secretary, Mr. Cardona is responsible for the Department's acts and omissions alleged in the complaint even if he was not personally involved. His official address is 400 Maryland Avenue, S.W., Washington, D.C. 20202.

17.    The Department of Education is an executive agency of the United States Government.  It was created by the Department of Education Organization Act of 1979, 20 U.S.C. § 3401 et seq., Pub. L. No. 96-88, 93 Stat. 668. The

Department is headquartered at 400 Maryland Avenue, S.W., Washington, D.C. 20202.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

19.     This Court has personal jurisdiction over the Department as an executive agency of the United States of America.

20.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district.

## FACTUAL BACKGROUND

**A.     FCSL has been a valuable resource for the legal community for 25 years.**

21.     FCSL was founded in 1996 as is a Jacksonville, Florida law school that currently has 126 currently enrolled students.

22.     It has been fully accredited by the American Bar Association ("ABA") since 2002.

23.     The law school was founded by experienced legal educations who left positions as tenured law professors to create a mission driven law school with the paramount purpose of providing leadership in diversifying a traditionally nondiverse profession.

24.    In the last five years, 43 percent of FCSL's 855 graduates were racial minorities.  During the just completed year nearly 40 percent of its students are minorities and approximately 60 percent were women.

25.    Reflective of its demographics, and among other recognitions, the school has been awarded the INSIGHT into Diversity in Higher Education Excellence in Diversity Award.

26.    FCSL has demonstrated that its students achieve positive outcomes after graduation both with respect to bar examination performance and career placement.

27.    Over the last three years, FCSL's graduates have outperformed their counterparts at peer schools on the Florida Bar Exam.  On the most recent bar exam, in February 2021, the school's first-time pass rate was six percentage points above the state average.

28.    In its most recent outcomes report provided to the ABA, FCSL reported that 90.5 percent of the May 2020 graduating class had full-time employment.  Of those students who had passed the bar exam that year, 100 percent reported as being fully employed.

29.    FCSL's graduates have made a substantial impact throughout the region.

30.    Its students and faculty have contributed more than one million hours of pro bono and clinical hours to the Northeast Florida community. Graduates have become leaders in the state and local bar associations, judges, law partners,

prosecutors, public defenders, and legislators.   Currently, six of the thirteen members of the Board of Governors of the Jacksonville Bar Association are FCSL graduates, including the President and the President-Elect.  The current President of the Young Lawyers Division of the Florida Bar is also a graduate of the school, as is a member of the Executive Committee of the Board of Governors of the Florida Bar.  Coastal graduates are members of the Florida and South Carolina legislatures. Numerous judgeships in several states are held by graduates of the law school.

31.    FCSL is owned by InfiLaw Corporation, whose sole shareholder is InfiLaw Holding, LLC.[1]

32.    As of November 2020 (when the Department offered a proposed provisional PPA, referenced below), Sterling Capital Partners, LP ("Sterling") owned 98.6% of InfiLaw Holding.

33.    At that time, Sterling was a completely passive investor.  It held no voting rights in InfiLaw, nor did it have any right to appoint board members.

34.    InfiLaw previously operated two other independent law schools: Charlotte School of Law ("CSL"), in North Carolina, and Arizona Summit Law School ("ASLS").  Those schools closed in 2017 and 2018, respectively.

**B.    The Department's financial responsibility standards.**

35.    Title IV Program participants must meet the Department's financial responsibility requirements or meet an alternative standard.  *See* 20 U.S.C. §§

---

[1] For ease of reference and simplicity, for the purposes of this Motion, InfiLaw Corporation and Infilaw Holding, LLC will be collectively referred to "InfiLaw."

1099c(a), (c)(3); 34 C.F.R. §§ 668.171, 668.175.

36.    The Department reviews the audited financial statements of participating institutions to determine financial responsibility.   20 U.S.C. § 1099c(c)(5).

37.    For the time relevant to this lawsuit, Almich and Associates ("Almich") performed the audits of FCSL's and InfiLaw's financial statements.

38.    Financial responsibility is generally based on an institution's "composite score," which is a weighted average of three ratios: a primary reserve ratio, an equity ratio, and a net income ratio.  34 C.F.R. § 668.171(b)(1).

39.    As stated on the Department's studentaid.gov website, the composite score gauges the financial health of an institution, not the educational quality.[2]

40.    A qualifying composite score of 1.5 or higher indicates that the institution is considered financially responsible, subject to other requirements. *Id.*

41.    Additional requirements include: 1) the ability to provide the services described in the school's official publications and statements; 2) the ability to provide sufficient administrative resources; 3) and the ability to meet financial obligations, including refunds of institutional charges and repayments for liabilities and debts incurred in Title IV programs.  20 U.S.C. § 1099c(c)(1).

42.    If an institution fails to meet those requirements, it is nonetheless deemed to be financially responsible under the "letter of credit alternative" if it

---

[2] https://studentaid.gov/data-center/school/composite-scores

posts an irrevocable letter of credit equal to at least fifty percent of the Title IV funds received in the most recently completed fiscal year.  20 U.S.C. § 1099(c)(3).

43.    The Secretary can also act to put a school on provisional certification. *See* 34 C.F.R. § 668.175(f).  Under that alternative, a school is not considered financially responsible, but can nonetheless continue to participate by, among other things, posting a smaller letter of credit of at least ten percent of Title IV funds received in the most recently completed fiscal year.    34 C.F.R. § 668.175(4)(i)(A).

44.    To place a school on provisional certification the Secretary must specify a provisional certification period. 34 C.F.R. § 668.13(c)(2).

45.    Unless otherwise specified, the Secretary provisionally certifies an institution based on a failure to meet financial responsibility requirements for a period of three years. 34 C.F.R. § 668.13(c)(2)(ii) (2009 code version).[3]

---

[3] The current code version contains an apparent scrivener's error.  When 34 C.F.R. § 668.13(c) was amended on October 29, 2009 (effective July 1, 2010), paragraph (c)(1) was amended to add an additional basis for allowing the Secretary to provisionally certify an institution. *See* 74 FR 55902, 55934. This altered the numbering of the paragraphs in (c)(1), identifying the various bases for provisional certification.  However, paragraph (c)(2), which identifies the corresponding provisional certification periods, was not updated.  Thus, the time periods in the current version of paragraph (c)(2) clearly relate to the numbering in the older version of (c)(1).  For example, the current version of (c)(2) references events under paragraphs (c)(1)(iii), (iv), and (e)(2), which no longer exist in the current regulation but do exist in the older version. *Compare* 34 C.F.R. § 668.13(c)(1)-(2) (2009) *with* 34 C.F.R. § 668.13(c)(1)-(2) (2021).

C.      **FCSL Posts a Letter of Credit.**

46.      In a June 18, 2019 letter, the Department established the terms for FCSL's continued participation in Title IV, which enables students to secure federal funding for their education.  Ex. 1 (June 18, 2019 Letter of Credit Demand Letter).

47.      After reviewing the audit report on InfiLaw's FYE 2018 financial statement, the Department offered to continue FCSL's participation in Title IV if it posted a substantial letter of credit.

48.      The Department offered InfiLaw two choices: (1) post a letter of credit in the amount of 70 percent of the Title IV funds received in the most recently completed fiscal year, in which case InfiLaw and FCSL would be considered financially responsible under the Department's letter of credit alternative at 34 C.F.R. § 668.175(c), or (2) post a 35 percent letter of credit, at which point the Department could require FCSL to enter a new provisional PPA subject to the Department's provisional certification alternative under 34 C.F.R. § 668.175(f).  *Id.* at 2.

49.      In reliance on the Department's promise of continued eligibility, InfiLaw provided the collateral to support a $5,681,255 letter of credit, which, at that time, represented 35% of InfiLaw's FYE 2018 Title IV draw.

50.      To raise the required collateral, several executives pledged their own funds, and one even pledged his own homes and the home of relatives.

51.   InfiLaw had no reason to question its ability to continue. FCSL was a viable school, with strong outcomes, and a growing student body.  And, with the Department's assurance that the letter of credit would secure FCSL's continued participation, InfiLaw had no reason to question the school's ability to continue.

52.   On a standalone basis, FCSL was on solid financial footing and was generating income once non-cash items were removed. (*See* ¶¶ 159 through 164 below).

53.   The school was in good standing with the ABA, and its student outcomes continued to improve.

54.   InfiLaw and FCSL were also working on a transaction with a 110-year-old established nonprofit University with substantial assets that would ensure FCSL's ongoing financial security.  Ex. 2 at 3.  (October 1, 2020 Letter from Campbellsville University re: potential change in ownership).

55.   The Department's letter of credit requirement was based on InfiLaw's FYE 2018 consolidated financial statement, which included InfiLaw's two former schools.  Those law schools had recently closed.  Ex. 2 at 1.

56.   InfiLaw's fiscal year ending July 31, 2018 was its lowest financial point. The closures of the other law schools caused substantial net losses and working capital deficiencies.

57.   Those loses caused InfiLaw to fail the composite score standard under 34 C.F.R. § 668.171(b)(1).  Ex. 1 at 1.

58.     Based on its audit of InfiLaw's FYE 2018 financial statements, Almich concluded that InfiLaw's loses, coupled with the potential liabilities related to CSL's and ASLS's closure, caused it to have substantial doubt about InfiLaw's ability to continue as a going concern. *Id* at 1.

59.     The Department was aware of InfiLaw's financial condition when it agreed to continue FCSL's participation in Title IV on the condition of a letter of credit. *Id.*

60.     Almich's subsequent audit reports confirmed that the substantial doubt no longer existed.  Ex. 3 ¶ 12 (Decl. of Ryan Malouf).

61.     Since posting the letter of credit, FCSL's Title IV usage has dropped substantially. The letter of credit amount was based on InfiLaw's total Title IV draw for all three schools in FYE 2018, which was approximately $19.3 million.

62.     Since FYE 2019, InfiLaw's only operational school has been FCSL.  In FYE 2019, FCSL's Title IV draw was $8,567,588, and in FYE 2020 it was approximately $7,279,812.

63.     The Department issued a new provisional PPA on November 27, 2020. As of that date, the $5.6 million letter of credit accounted for approximately 78 percent of FCSL's Title IV for FYE 2020, which ended July 31, 2020.

64.     Thus, by the Department's own standard, FCSL was financially responsible at that time. *See* Ex. 1 (stating that InfiLaw would be financially responsible if it posted a 70 percent letter of credit); *see also* 34 C.F.R. § 668.175(c).

65.     Prior to the Department's June 18, 2019 letter, InfiLaw had started negotiating with the Department to set the amount of the liabilities associated with CSL's and ASLS's closures in order to pay them.

66.     Under the Department's regulations, FCSL is not responsible for those liabilities. *See* 34 C.F.R. § 668.174(b).

67.     Those liabilities do not affect FCSL's financial responsibility unless they remain unpaid.  *Id.*

68.     InfiLaw wanted to identify and pay those liabilities without FCSL's involvement.

69.     To that end, InfiLaw proposed to post a letter of credit in an amount reasonably covering CSL's and ASLS's liabilities with the goal of entering a payment plan.  The letter of credit would provide security should InfiLaw's fail to make any required payments.

70.     InfiLaw also sought to transfer FCSL to a nonprofit owner.  It believed the letter of credit provided a reasonable backstop to any potential liabilities related to the other schools' closures.

71.     InfiLaw intended to finalize and settle the liabilities of the former schools—with no risk to the Department or taxpayer—and place FCSL's students in the best position.

72.     As further security, InfiLaw agreed that FCSL would remain liable for any settlement amount that remained unpaid.

14

73.     Given the seemingly clear path to a settlement that protected the taxpayers, FCSL, its students, and its faculty, InfiLaw asked the Department to delay the letter of credit requirement.  In the alternative, it asked for a reduced letter of credit while the parties continued to negotiate the CSL and ASLS liabilities and payment terms.

74.     While the Department permitted FCSL to post the letter of credit in installments, it nonetheless refused to enter any settlement or consider InfiLaw's proposal to donate FSCL to a nonprofit until it held the full letter of credit.

75.     The letter of credit allows the Department to draw funds on the letter if, among other things, the Department uses them to "pay any fines, penalties, or liabilities whatsoever owing to the Secretary arising from the institution's participation in programs authorized under [Title IV]."

**D.    FCSL's timely responses to the Department's requests for information.**

76.     Over the next year, InfiLaw and the Department continued to work to settle the liabilities of CLS and ASLS.  InfiLaw wanted to do so without jeopardizing FCSL's Title IV eligibility.

77.     Throughout the process, InfiLaw made good faith efforts to respond to any requests for information, and promptly notified the Department of any events that required disclosure under its regulations.

78.     For example, on April 22, 2020, Sterling waived its voting rights and its right to appoint board members in InfiLaw.  InfiLaw did not believe this waiver

constituted a change of control, which would require formal notice and application under 34 C.F.R. § 600.31(a)(2).

79.     But it nonetheless notified the Department two days later (eight days before expiration of the ten-day reporting requirement under § 600.31(a)(2)), and sought confirmation that FCSL would not need to submit a change in control application.  Ex. 4 (April 24, 2020 notice to the department re: Sterling waiver and response to request for information).  The Department later asked for additional documentation, which FCSL provided.  Ex. 5 (June 16 response to request for additional information).

80.     InfiLaw also continued to work with the Department in good faith on calculating the liabilities related to the closure of CSL.  While InfiLaw and the Department agreed on some of those liabilities, others remain under appeal with the Department's Office of Hearings and Appeals.  That appeal remains pending as of the filing of this Complaint.

81.     After a year of negotiations that resulted in what appeared to be a substantially completed settlement agreement, in September of 2020, the Department suddenly notified InfiLaw that it was breaking off negotiations.

82.     This came as a surprise to InfiLaw, which, in large part through the personal resources of executives, had already devoted millions of dollars demonstrating its good faith intent to resolve CSL's liabilities.

**E.     The Department imposes impossible, unnecessary conditions inconsistent with its prior representation.**

83.     Institution's do not become eligible to participate in Title IV until both the institution and the Department sign a PPA. 34 C.F.R. § 668.14.

84.     When issuing a PPA, the Department is required to specify the period for which the institution may participate.  34 C.F.R. § 668.13(b)(1).

85.     At the end of that period, so long as the institution submits a materially complete application for recertification at least 90 days prior, the PPA continues—under the same terms—until the Department issues a decision on the recertification application and the parties sign a new PPA.   34 C.F.R. § 668.13(b)(2).

86.     FCSL's most recent PPA expired June 20, 2016.   FCSL timely submitted its application for recertification as required by 34 C.F.R. § 668.13.  But the Department did not issue its decision on that application until November 27, 2020, over four years later.

87.     While the Department generally evaluates an institution's financial responsibility based on the audited financial statements for the most recently completed fiscal year, the Department continued to rely on InfiLaw's FYE 2018 audit, notwithstanding the completion of the 2019 and 2020 fiscal years in the interim.

88.     Because InfiLaw's FYE 2018 financial statements failed to meet financial responsibility requirements for that period, the Department recertified FCSL for a period of three years, albeit on a provisional basis.

89.    The provisional period was to start on the date of signature and was set to expire on September 30, 2023. Ex. 6 at 1 (November 27, 2020 provisional PPA).

90.    The provisional PPA required InfiLaw to maintain the current letter of credit.  When InfiLaw posted the letter of credit in 2019, it was 35 percent of its Title IV draws in FYE 2018.  However, by November 27, 2020, that letter of credit represented approximately 78 percent of FCSL's Title IV for FYE 2020 due to its lower Title IV usage.

91.    Although the Department previously determined that FCSL would be deemed financially responsible if it posted a 70 percent letter of credit, the provisional PPA required FCSL to maintain a 35 percent letter of credit.

92.    The Department offered no explanation for why the required surety in late 2020 was tied to FYE 2018 instead of the more relevant FYE 2019 or FYE 2020 amount.

93.    The Department also required FCSL's ownership, including Sterling, to sign the provisional PPA and assume joint liability for any future FCSL liabilities.

94.    The Department's regulations only authorize it to require the assumption of joint liability if an institution is still failing to meet financial responsibility standards at the end of its provisional period—not the beginning. 34 C.F.R 668.175(f)(3).

95.    Because this was FCSL's first provisional period, the Department did

18

not have authority to require Sterling's—or any other owner's—signature on the PPA.

96.    When FCSL asked the Department about the basis for this requirement, it stated only that "it is an updated standard the Department is applying for institutions with multiple levels of ownership.  The Department is now requiring the signature of each entity of 100% ownership or with a significant majority ownership percentage.  This requirement is also not unique to FCSL."  Ex. 7 (December 4, 2020 email from the Department).

97.    Upon information and belief, the Department has not issued any notice or guidance regarding this "updated standard."

98.    With respect to imposing the updated standard on FCSL, the Department did not explain why additional security was necessary on top of the 78 percent letter of credit already held.

99.    Nonetheless, all of FCSL's owners agreed to sign the provisional PPA, with the exception of Sterling.

100.    Sterling is a fixed-term equity fund, whose term had expired on October 15, 2017.  Ex. 8 (January 6, 2021 letter from Sterling).  Since that date, Sterling has been in dissolution, meaning that its primary focus is to sell, transfer, or otherwise dispose of all assets.  *Id.*

101.    Pursuant to the terms of Sterling's limited partnership agreement, Sterling was expressly prohibited from extending financial guarantees while in dissolution.  *Id.*

102.   FCSL notified the Department of this fact in December 2020 and asked that Sterling's name be removed from the provisional PPA.  It explained that Sterling had no voting rights or board representatives at FCSL or InfiLaw.  Ex. 9 (December 28, 2020 letter).

103.   InfiLaw's attorney had previously notified the Department that Sterling's only remaining asset was it interest in InfiLaw.  Ex. 5 at 2.

104.   After the Department requested additional information, Sterling provided a letter from counsel as well as copies of the relevant agreements precluding Sterling from signing the PPA.  Ex. 8.

105.   Pursuant to 34 C.F.R. § 668.13(b)(2), the Department continued FCSL's original PPA on a month-to-month basis while it considered FCSL's request.

106.   But on March 26, 2021, the Department notified FCSL that it would not reconsider its demand for Sterling's signature. Ex. 10 (March 26, 2021 Decision).

107.   Without citing any regulatory basis for that requirement, the Department demanded that all levels of ownership sign a provisional PPA by March 31, 2021 or else FCSL's original PPA would expire April 1, 2021. Ex. 10.

108.   As an alternative to the Department's requirement, Sterling's partners also offered to post an additional $1 million letter of credit, which the Department declined. Ex. 11 (March 30, 2021 email re: Sterling signature requirement).

109.   Because Sterling was legally prohibited from signing the agreement, it did not do so, and the PPA expired.   As of April 1, 2021, FCSL was declared no longer eligible to participate in Title IV programs.

### F.    The Department continues to deny Title IV eligibility.

110.   Shortly thereafter, and to resolve what the Department had identified as the only impediment to FCSL's Title IV eligibility, Sterling immediately relinquished all ownership interest in InfiLaw, making InfiLaw the sole owner of FCSL.  Ex. 12 (April 5, 2021 Equity Forfeiture Notice).

111.   FCSL notified of the Department of this development via email.  To which the Department replied, "To re-establish eligibility, FCSL must submit an application for reinstatement for Title IV HEA programs under its current ownership structure." Ex. 13 (April 5, 2021 emails re: reinstatement).

112.   Because all of the then-existing entities with direct or indirect ownership of FCSL were able to sign a PPA, FCSL applied for reinstatement of Title IV eligibility on April 8, 2021.

113.   Even though FCSL had had been continuously meeting the requirements for continuing eligibility, the Department denied FCSL's request for reinstatement on May 13, 2021.  Ex. 14 (May 13, 2021 Denial of Reinstatement).

114.   In that denial, the Department took legally and factually unsupportable positions to keep the school closed.

115.   The Department claimed that it had relied on Sterling's assumption of liability as an important source of financial security, but it said nothing about its

decision to decline the $1 million letter of credit.  Ex 14 at 4.

116.    The Department's contention that Sterling's exit eliminated important financial security is specious given its refusal of security that far exceeded the value of Sterling's signature, which the Department knew Sterling was prohibited from giving).

117.    The Department also grossly mischaracterized FCSL's audited financial statements to question FCSL's ability to continue as a going concern. *Id.* at 2-3.

118.    The May 13, 2021 decision also improperly involved itself in a pending accreditation matter to support a baseless conclusion that FCSL lacked "administrative capability." *Id.* at 3-4.

119.    Moreover, the Department falsely alleged that FCSL violated its fiduciary duties to the Department by not reporting matters which FCSL had no obligation to report.  *Id.* at 5.

120.    The Department also claimed FCSL breached its fiduciary duty by reporting Sterling's waiver of voting rights in InfiLaw two days after the waiver occurred. *Id.*

121.    FCLS, through counsel, requested reconsideration of the May 13, 2021 Decision in a May 24, 2021 letter.

122.    On June 29, 2021 FCSL's counsel sent a letter to the Department seeking a response by July 2, 2021.

123.    FCSL provided a declaration from its auditor with that letter,

explaining that the Department was inaccurate in claiming that InfiLaw's FYE 2019 and FYE 2020 audit reports disclosed substantial doubt about InfiLaw's ability to continue as a going concern. *See* Ex. 3 (Decl. of Ryan Malouf).

124.    FCSL further notified the Department that, if it did not reinstate FCSL Title IV eligibility, it would seek emergency relief in Federal Court.

125.    The Department responded on July 1, 2021, indicating that it intended to provide its reconsideration decision by July 19, 2021.

126.    In that letter, the Department also raised new issues.  Apparently to create a new basis for its prior denial, it erroneously claimed that FCSL's website contained misleading information about its accreditation status.  Specifically, the website stated that FCSL was "fully approved" by the ABA.

127.    FCSL **is** fully approved by the ABA and has been continuously since 2002.

128.    On July 2, 2021, FCSL reminded the Department that it intended to seek emergency injunctive relieve absent a prompt decision.

129.    On Friday July 16, 2021, the Department issued its Affirmation of Denial of Reinstatement ("Affirmation").  Ex. 15.

130.    Apparently recognizing the weaknesses and lack of foundation in its prior findings, the Department combed years of accreditation records to generate new, after-the-fact justifications that were never raised before.  The Department does not explain its actions, including when it obtained this information or whether it was before the Department when it undertook to close the school.

23

131.   The following Monday, July 19, 2021, FCSL's counsel emailed the Department that it intended to file a Complaint and Motion for Temporary Restraining Order and/or Preliminary Injunction on July 20, 2021.

## I.   The Law School challenges the Department's arbitrary and capricious requirement that Sterling sign the PPA.

### a. The Department lacked a basis to require Sterling the sign provisional PPA.

132.   The APA requires agencies to articulate satisfactory explanations for their actions.

133.   The Department failed to provide a legally sufficient explanation for requiring Sterling to sign the provisional PPA.

134.   When a party signs a PPA, it assumes joint liability for any future liabilities of the institution.

135.   Congress substantially limits on the Department's authority to require assumption of personal liability by an institution's ownership.  The Department can only require an institution to assume personal liability to the "extent **necessary** to protect the financial interest of the United States." 20 U.S.C. § 1099c(e) (emphasis added).

136.   In other words, the Department does not have unfettered discretion to require school owners to sign a PPA.  It can only do so if it can articulate a legitimate basis that the owner's assumption of personal liability is necessary to protect the financial interest of the United States.

137.   The Department failed to offer any explanation for why Sterling's

24

signature on the PPA was necessary to protect the financial interest of the United States.

138.   When FCSL sought clarification from the Department about why it required Sterling's signature, the only explanation given was that the Department had an "updated standard" for institutions with multiple levels of ownership.  That new "standard" requires "the signature of each entity at 100% ownership or with a significant majority ownership percentage."   Ex. 7 (December 4, 2021 Email explaining PPA signature requirement).  The Department represented that this requirement is "not unique to FCSL." *Id.*

139.   The Department's reference to an "updated standard" is not a sufficient explanation for why Sterling's assumption of personal liability was necessary to protect the financial interest of the United States.

140.   After FCSL requested reconsideration of the requirement and provided documentation of the limiting terms in Sterling's partnership agreement, the Department only responded by stating that, in its view, the terms of Sterling's partnership agreement did not create a legal prohibition for its signature.  Ex. 10 (March 26, 2021 DOE letter).

141.   Though given several requests, the Department declined to provide a legally sufficient basis for requiring Sterling's signature on the PPA.

142.   The Department's failure to articulate a satisfactory, legally sufficient explanation for requiring Sterling to sign the PPA is arbitrary and capricious.

143.   Nor did the Department explain the reasoning behind its purported new policy of requiring that 100 percent of an institution's ownership interest sign PPAs.

144.   The Department's failure to provide a reasoned basis for its sudden change in policy (requiring all institutions' ownership to personally sign their schools' PPAs) is arbitrary and capricious.

### b. In requiring Sterling's assumption of personal liability, the Department exceeded regulatory authority.

145.   In addition to the HEA's limitations, the Department's own regulations limit the circumstances in which it may require owners to assume personal liability.  Under those regulations, an owner can be required to assume personal liability, but only "at the end of the period for which the Secretary provisionally certified the institution, the institution is still not financially responsible."  34 C.F.R. § 668.175(f)(3)(B).

146.   FCSL was fully certified when the Department offered the proposed provisional PPA requiring Sterling's signature in November 2020.

147.   It was only then that the Department first acted to continue FCSL's participation in Title IV on a provisional basis.

148.   In other words, the Department violated its regulations by requiring Sterling's signature at the **beginning** of the provisional period, rather than at the **end**. *Id.*

149.   The last PPA FCSL signed was dated June 15, 2011.  It granted FCSL

full certification.

150.   The PPA expired on June 30, 2016, but continued on a month-to-month basis,  under the same terms, until the Department issued its decision on FCSL's original 2016 application for recertification.  34 C.F.R. § 668.13(b)(2).

151.   The Department did not issue the decision until over four years later on November 27, 2020. Ex. 16 (November 27, 2020 Recertification Decision).

152.   The Recertification Decision stated that FCSL could continue participating in Title IV, subject to the terms of the June 18, 2019 letter (Ex. 1), on a provisional basis for a term ending September 30, 2023.  Ex. 16.

153.   If, at the end of that term, the Department determined Sterling's assumption of liability was necessary to protect the financial interest of the United States, it could then—and only then—require its signature.  34 C.F.R. § 171(f)(3)(b); 20 U.S.C. § 1099c(e)(1).

### c. The Department's demand for Sterling's signature is factually unsupported.

154.   To the extent the Department believed Sterling's signature on the PPA was necessary to protect the financial interest of the United States, that conclusion runs counter to the information that was before the Department and was contrary to its own prior statements.

155.   Other than the liabilities InfiLaw has been seeking to settle with the Department, FCSL has never failed to pay a liability assessed by the Department.

156.   To the extent the Department had any concerns about FCSL's ability

to pay future liabilities, it already holds a $5.6 million letter of credit, representing 78 percent of the Title IV funds FCSL received in the most recently completed fiscal year (FYE 2020).

157.   In June of 2019, the Department indicated that this level of security was more than enough to protect its financial interests going forward. Ex. 1 at 1-2.

158.   Since posting the letter of credit, FCSL's financial condition has further improved.

159.   Almich concluded in its reports on InfiLaw's FYE 2019 and FYE 2020 financial statements that it no longer had substantial doubt about FCSL's ability to continue as a going concern.  Ex. 3 ¶¶12-14 (Decl. of Ryan Malouf).

160.   Moreover, FCSL's FYE 2019 audit shows that it had a positive cash flow in that year.

161.   FCSL had a net operating loss $1,229,259 as a result of the non-cash depreciation and amortization expenses of $1,895,658.

162.   FCSL had a net operating income of $666,399 when the noncash expenses are excluded, and net cash from operating activities of $888,105.

163.   Further, FCSL's most recent audit shows that it had a positive cash flow in FYE 2020.

164.   The cash balance improved by an additional $406,415 over the previous year, and its operating income was $246,724 after noncash charges are removed.

165.   In the May 13, 2021 decision, the Department cites InfiLaw's

consolidated audits to justify its erroneous finding that Almich expressed doubt about FCSL's ability to continue as a going concern.  Ex. 14 at 2-3.

166.    But the Department's reliance on InfiLaw's consolidated audits says little about the continued viability of FCSL.

167.    InfiLaw's two other law schools have not been operational for several years.  They are not relevant to FCSL's financial condition with respect to the Department.

168.    The net losses and working capital deficiencies cited by the Department in its May 13, 2021 decision were caused by losses stemming from InfiLaw's writing off of the substantial value of those other schools.

169.    These paper losses do not negatively impact the future operation of FCSL.

170.    In fact, the Department is supposed to exclude these losses when calculating an institution's financial responsibility ratios.  34 C.F.R. § 668.172(c).

171.    Although they were not required to do so, Infilaw, Holding, and FCSL, Inc. also agreed to assume joint liability with FCSL, guaranteeing additional financial security to the Department.  See 34 C.F.R. § 668.171(f)(3); see also 20 U.S.C. § 1099(e)(1).

172.    The Department failed to explain what changed between June 2019 and November 2020 that required additional security, in the form of Sterling's signature on the provisional PPA, to protect the financial interest of the United States.

173.    Nor did the Department explain why the 78 percent letter of credit already in its possession was not adequate, when just a year earlier, the Department determined that level of security was sufficient. Ex. 1 at 1-2.

174.    Upon information and belief, the Department failed to inquire whether requiring Sterling's assumption of personal liability would provide additional security at all.  The Department never asked Sterling for any financial statements or otherwise asked about assets or resources that would be available to satisfy any future liabilities.

175.    In fact, as communicated to the Department, Sterling "has been in dissolution to allow for an orderly sale, transfer, or disposition of the fund's investments and ultimately a termination of the fund." Ex. 8 (January 6, 2021 Letter from Sterling).

176.    The Department was also aware that Sterling's only asset was its interest in InfiLaw, which had already agreed to sign the provisional PPA.  *See* Ex. 5 at 2

177.    Because Sterling had no additional assets, there is basis to conclude that Sterling's signature was necessary to protect the financial interests of the United States.

178.    Additionally, the Department arbitrarily and capriciously refused to consider an offer from Sterling's partners to provide an additional $1 million letter of credit on the condition FCSL could continue participation in Title IV without Sterling's assumption of liability.

179.   The Department also arbitrarily and capriciously refused to consider evidence that Sterling was legally precluded from executing the PPA.

180.   The Department's failure to explain how Sterling's signature to the PPA was "necessary to protect the financial interest of the United States" renders its requirement for Sterling's signature arbitrary and capricious.

181.   Moreover, any implicit finding made by the Department that Sterling's signature on the PPA was necessary to protect the financial interest of the United States is contrary to the evidence.  The Department had ample security for any potential liabilities of FCSL, and it offered no explanation why this security was not sufficient.

182.   Because the Department's demand for Sterling's signature was based on an unexplained, new policy—and not based on a consideration of FCSL's total financial circumstances and the legitimate need to protect the financial interests of the United States—the Department's refusal to continue FCSL's Title IV participation was arbitrary and capricious, not supported by substantial evidence, and contrary to the law.

## II.   The Law School challenges the Department's denial of reinstatement.

### a. The Department ignores the findings in InfiLaw's audited financial statements.

183.   In its May 13, 2021 decision, the Department fabricated disclosures in InfiLaw's FYE 2019 and FYE 2020 audited financial statements to bolster its

erroneous conclusion that FCSL does not meet financial responsibility requirements.

184. Under 34 C.F.R. § 668.171(h), the Department may deem an institution not financially responsible if its audited financial statements "contain a disclosure in the notes [] that there is substantial doubt about the institution's ability to continue as a going concern as required by accounting standards."

185. The Department's regulations are clear that any such disclosure must be made "as required by accounting standards."  34 C.F.R. § 668.171(h).

186. Had Almich concluded that substantial doubt existed about InfiLaw's ability to continue as a going concern, it was required to disclose that opinion in a section titled "Substantial Doubt about the Entity's Ability to Continue as a Going Concern." Ex. 3  (Decl. of Ryan Malouf ¶ 17).

187. InfiLaw's financials contained no such section.  *Id.*

188. The Department could not reasonably have believed Almich disclosed substantial doubt about InfiLaw's or FCSL's ability to continue as a going concern. The Department's fundamental misapplication of its financial responsibility regulations cannot be a mistake or a difference of opinion.   Rather, the Department's unsupportable position evidences the pretextual nature of the Decision.

189. Subsequent to FCSL's March 24, 2021 request for reconsideration, FCSL provided the Department an affidavit from Almich that plainly explained

32

that the FYE 2019 and FYE 2020 audit reports did not contain going concern qualifiers. *See* Ex. 3.

190. Almich's declaration plainly exposes the Department's mischaracterization the May 13 decision. Therefore, in its Affirmance, the Department had no choice but to concede that it failed to properly interpret the financial statement.

191. Of even more concern, the Department admitted that it came to its erroneous conclusion without examining relevant evidence. Ex. 15 at 2 ("the Department will conduct a further review that includes obtaining the audit work papers concerning the going concern issue").

192. In other words, the Department determined there was substantial doubt about FCSL's ability to continue as a going concern without a valid auditor disclosure and without looking at the relevant documents. *See Id.*

### b. Routine accreditation violations are not a valid basis to bar FCSL from Title IV programs.

193. The Department cites February 21, 2021 ABA findings of noncompliance with various accreditation standards (which, on their own) do not alter FCSL's status as a fully approved law school) to conclude that FCSL is not providing services to its students. Ex. 14 at 3-4; Ex. 15 at 2-6.

194. Notably, the Department does not identify any instance where the ABA took adverse action or sanctions against the school for those findings.

195. Nonetheless, without any independent fact finding of its own, the

Department cites those same findings as a basis for denying FCSL's Title IV eligibility. *See Id.*

196. The ABA, and not the Department, is responsible for overseeing FCSL's compliance with the ABA's requirements. *See* 20 U.S.C. § 3403(b); 20 U.S.C. § 1232a.

197. The Department has no authority to impose sanctions where the ABA did not. *Id.*

198. Accreditors, including the ABA, routinely cite institutions participating in Title IV programs for failing to meet one or more standards of accreditation. Ex. 17 at ¶ 8 (Decl. of Donald Polden).

199. The mere existence of these findings is not sufficient evidence to conclude that an institution's accreditation status is in jeopardy or that the institution is not capable of providing services to its students. *Id.* ¶ 1.

200. In fact, the types of findings relied on by the Department in denying FCSL's eligibility are not unusual in ABA accreditation process. *Id.* ¶¶ 19-20

### i. The Department is expressly precluded from prematurely interfering in accreditation matters.

201. Both the HEA and the Department's regulations prohibit the Department's involvement in accreditation matters until an accreditor initiates adverse action against an institution or specifically notifies the Department of failures to meet Title IV requirements. *See* 20 U.S.C. § 3403(b); 34 C.F.R. § 668.171(c)(1)(iii).

202.   Congress expressly barred the Department from interfering in an accrediting agency's assessment of institutions.  *See* 20 U.S.C. § 3403(b) ("No provision of a program administered by the Secretary or by any other officer of the Department shall be construe to authorize the Secretary or any such officer to exercise and direction, supervision, or control . . . over any accrediting agency or association"); *see also* 20 U.S.C. § 1232a (precluding Department interference in the curriculum, program of instruction, or personnel of any institution).

203.   Moreover, the HEA and the Department's implementing regulations require accreditors to provide substantial due process to an institution before it can take adverse action.  20 U.S.C. § 1099b(a)(6); 34 C.F.R. § 602.25.

204.   These requirements protect institutions against the loss of Title IV eligibility before being given the opportunity to address an accreditor's findings and take corrective measures.

205.   Accrediting agencies must adopt review procedures that afford due process and, specifically, "sufficient opportunity for a written response . . . regarding any deficiencies identified by the agency," to be considered by the agency within a timeframe determined by the agency, and before any adverse action is taken. 20 U.S.C. § 1099b(a)(6); 34 C.F.R. § 602.25.

206.   The Department's regulations also require that when the accreditor determines an institution is out of compliance, it must "require the institution to take appropriate action to bring itself into compliance with the agency's standards within a time period that must not exceed . . . two years." 34 C.F.R. § 602.20.

207.   These due process requirements are important because accreditation standards are rarely bright line requirements and often involve subjective assessments of an institution's ability to develop and implement complicated policies and procedures.  Ex. 17 ¶ 15.

208.   The accreditation process requires substantial back and forth between institutions and their accreditors, and Congress prohibits the Department's premature interference in that process. *Id.* at ¶ 16; 20 U.S.C. § 3403(b).

209.   Those limitations would be meaningless if the Department is permitted, at its whim and without due process, to independently determine at any time whether an institution is meeting the requirements established by its accreditor.

210.   In fact, an accreditor is expressly required to notify the Department if has reason to believe an institution is not meeting Title IV requirements.  34 C.F.R § 602.27(a)(6).

211.   The Department does not contend that it ever received such notice from the ABA.

212.   Absent that notice, the Department cannot reasonably conclude that the ABA's findings provide evidence that FCSL is unable to provide the services described in its official publications and statements and to provide the administrative resources necessary to comply with Title IV requirements. Ex. 14 at 3-4; Ex. 15 at 2.

ii. **Routine accreditation findings are not sufficient evidence of an institutions failure to meet Title IV financial responsibility and administrative capability requirements.**

213. Originally, the Department based its decision to deny FCSL's eligibility based on a bare list of ABA findings. Ex. 14 at 3.

214. When FCSL sought approval of its transaction with a nonprofit institution, it provided the Department the asset purchase agreement as part of the Department's voluntary pre-acquisition review process.

215. That agreement contained a schedule ("Schedule 2.22(a)") identifying various ABA accreditation Standards with which FCSL was found not to be in compliance. Ex. 18 (Schedule 2.22(a)).

216. However, Schedule 2.22(a) only listed those Standards. *Id.* It did not identify the reasons for the findings, the severity of the findings, or the ABA's requirements for demonstrating corrective action. *Id.*

217. In its May 13, 2021, Decision, the Department concluded, citing Schedule 2.22(a) **only**, that FCSL is not capable of providing the services described in its official publications and statements. Ex. 14 at 3-4.

218. Without conducting any apparent factfinding, the Department cited Schedule 2.22(a) and the list of standards to bolster its findings that FCSL is not financially or administratively capable. *Id.*

219. FCSL pointed out the gross insufficiency of this "evidence" in its May 24, 2021, Response. Ex. 19 at 8-9 (May 24, 2021 letter to the Department re: FCSL

denial of reinstatement).

220.   Then, in the Affirmation, the Department attempted to cure this failure by relating only slightly more information about the findings.  *See* Ex. 15 at 2-6.

221.   But it is apparent that the Department engaged in no independent factfinding of its own.  *See Id.*

222.   In other words, where the ABA itself determined FCSL's compliance issues did not warrant sanctions, the Department—on the ABA's description of those issues alone—determined that the ultimate sanction of a termination of Title IV eligibility was appropriate.

223.   The Department's usurpation of the ABA's authority violates the express limitations of the HEA.  *See* 20 U.S.C. § 3403(b); *see also* 20 U.S.C. § 1232a.

224.   Moreover, FCSL was in the process of resolving the ABA's concerns prior to being terminated.

225.   As recognized by Congress, the ABA—not the Department—is in the best position to determine whether FCSL's efforts in that regard are sufficient to reestablish compliance with all Standards or whether adverse action is warranted.

### iii.  The Department's unreasonable interpretation of the ABA's findings conflicts with the results of its own investigation.

226.   The Department asserts that the February 21, 2021, ABA findings show that it is not administratively capable of complying with Title IV requirements.  Ex. 14 at 3; Ex. 15 at 2.

227.   FCSL is providing all advertised services to its students.

228.   In the May 13, 2021 decision and the Affirmation, the Department fails to identify any instance of a student being denied services at the school.

229.   Moreover, on September 10, 2020, the Department issued the final report on its own investigation into FCSL's administration of Title IV programs and concluded FCSL is administratively capable of complying with Title IV requirements.   Ex. 20 at 4-5. (September 10, 2020, Final Program Review Determination).

230.   That report followed an August 2019 Program Review in which the Department assessed "FCSL's compliance with the statutes and regulations as they pertain to the institution's administration of the Federal student aid programs under [Title IV, HEA]."  Ex. 21 at 1.

231.   In the final report, the Department expressly found that "FCSL has taken the corrective actions necessary to resolve Finding[] #1. Lack of Administrative Capability[]."  Ex. 20 at 8.

232.   Put simply, the Department concluded that it had no basis to find FCSL was not administratively capable of complying with Title IV requirements. *See Id.*

233.   The ABA's findings are not a sufficient basis for the Department to disregard its own investigation into FCSL's administrative practices and independent determination that FCSL is administratively capable of complying with Title IV requirements.

### c.  FCSL did not breach its fiduciary duty to the Department.

234.   The Department's regulations detail specific requirements about what events must be reported and when.  *See, eg*. 34 C.F.R. § 600.26; 34 C.F.R. § 600.21(a); 34 C.F.R. §668.171(h).

235.  In both the May 13, 2021 decision and the Affirmation, the Department cited none of those regulations but nonetheless found that FCSL withheld information in violation of a fiduciary duty. *See* Ex 14; Ex. 15.

236.   FCSL has sought to keep the Department informed of every reportable change in ownership and accreditation action as required by the Department's regulations.

237.  FCSL provided information in each instance the Department requested it.

238.   Nonetheless, the Department faults FSCSL for failing to report events which are not required to be reported by the Department's regulations.

239.  Neither the May 13, 2021 decision nor the Affirmation cite any instance where the Department asked FCSL or InfiLaw for specific information that was not provided.

240.  Sanctioning FCSL for failing to report information that it was not required to disclose, either by regulation or by specific request, violates FCSL's basic due process rights.

241.  FCSL had no notice of any obligation to report the accreditation matters or the proposed plans of various unconsummated transactions.

242.  The Department first claims that FCSL had an obligation to report the February 2021 ABA findings, for which no sanctions were imposed.

243.  Next, it claims that FCSL had an obligation to report an instance where Sterling waived certain voting rights, which it did two days later.

244.  Finally, the Department spends the majority of the Affirmation discussing the ABA's consideration of FCSL's application for its approval of a transfer of the school to a nonprofit entity.

### i. The Department's regulations do not require reporting routine accreditation matters.

245.  The Department's regulations are explicit about when an institution must report accreditation matters to the Department. Institutions are only required to notify the Department when an accreditor "issue[s] an order, such as a show cause order or similar action, that, if not satisfied, could result in the withdrawal, revocation or suspension of institutional accreditation for failing to meet one or more of the agency's standards."  34 C.F.R. § 668.171(f)(1)(iv); 34 C.F.R. § 668.171(d)(1).

246.    Had the exchange of information between FCSL and the ABA resulted in that level of commission action, both FCSL and ABA would have been required to notify the Department. *See Id.*; 34 C.F.R. § 600.26 (requiring accreditors to report adverse accreditation actions).

247.    The ABA never took any adverse action based on the matters raised by the Department.

248.    FCSL has maintained its status as a fully approved law school throughout the period at issue.

249.    Nonetheless, the Department contends that FCSL had an obligation to disclose routine accreditation findings.  Ex. 14 at 4-6.

250.    Upon information and belief, the Department does not require other Title IV institutions to disclose accreditation matters other than those required by its regulations.  *See* 34 C.F.R. § 668.171(d)(1).

251.    The Department's imposition of a reporting requirement that it does not impose on any other institution further demonstrates the lack of fairness in the Department's treatment of FCSL  and reveals the bad faith, pretextual nature of the Department's Decision.

### ii.  FCSL met the Department's reporting requirements with respect to a potential change in control.

252.    Sterling waived its voting rights, and other rights, in InfiLaw on April 22, 2020.  Ex. 4 at 5 (April 24, 2020 Notice to the Department re: Sterling's waiver).

253.   FCSL notified the Department of the change two days later on April 24, 2020. *Id.*

254.   The Department's regulations require institutions to notify the Department of changes of control events within ten days.[4]  34 C.F.R. § 600.21(a).

255.   Nonetheless, the Department found that FCSL breached a fiduciary duty by reporting that event eight days **before** that deadline. Ex. 14 at 5.

256.   The Department's finding that FCSL breach a fiduciary duty to the Department by disclosing Sterling's waiver two days after it happened—and eight days before the regulatory reporting deadline—is arbitrary and capricious.

257.   The Department also asserts that FCSL did not provide documentation of the changes until June 1, 2020, despite requesting the information on May 12. *Id.*

258.   But the Department fails to explain why, if the information was so vital that it had to be disclosed with 48 hours, it waited eighteen days after it received notice to request the documentation.

259.   Indeed, in the Affirmation, the Department contends this information was critical to its "prompt" determination of how the waiver affected FCSL's Title IV participation.  Ex. 15 at 15.

260.   The Department did not impose any deadline in its May 12, 2020, request.  Ex. 4.

---

[4] FCSL does not concede that Sterling's waiver of its ownership interest as a change in control event under the Department's regulations.

261.   When the Department first followed up on the request, on June 1, 2020, FCSL's counsel provided all requested information on that same day and provided additional information just two weeks later. Ex. 4; Ex. 5.

262.   The Department never explained why it was unreasonable for FCSL to take eighteen days to respond.

263.   To this day, the Department has not notified FCSL of that determination.

264.   Notwithstanding FCSL's alleged breach of fiduciary duty, the Department sought to continue FCSL's participation just months later without raising the issue at all.

265.   The Department's findings that FCSL's reporting of Sterling's waiver constituted a breach of fiduciary duty are incongruent with the record evidence.

266.   The Department never explained how FCSL's reporting of Sterling's waiver eight days before it was required to constitutes a breach of fiduciary duty.

267.   The Department's explanation for finding a breach of fiduciary duty based FCSL's conduct in reporting Sterling's waiver is not a genuine justification.

### iii.  The Department does not require institutions to disclose preliminary plans to sell or transfer a school.

268.   The Department's regulations require institutions to report a change of control event within 10 days of occurrence.  34 C.F.R. § 600.21(b)(6).

269.   The Department's regulations do not require the disclosure of any information regarding a transaction before it happens.  *Id.*

270.   In 2019, FCSL sought to transfer the school to an over 100-year-old nonprofit university with substantial assets and unassailable financials. *See* Ex. 2 at 2 (October 1, 2020 letter from Campbellsville University).

271.   This transaction would have further ensured the continued financial health of the school, resolving any concerns the Department had about its ongoing financial responsibility.

272.   Before FCSL could close the transaction it first had to obtain approval from the ABA.

273.   After multiple reviews, hearings, and exchanges of information, the ABA ultimately denied its approval.

274.   At no point in that process did the ABA find that FSCL intentionally withheld any information or otherwise violated any ABA Standard.

275.   The Department offers a voluntary pre-acquisition review process, which allows institutions the opportunity to receive feedback from the Department about potential issues with a transaction.  64 Fed. Reg. 58608, 58612 (Oct. 29, 1999).

276.   There is no requirement, nor is it expected, that an institution will submit a "materially complete" application during this process. *Id.*

277.   The process is not binding, and there is no affirmative obligation to participate. *Id.*

278.   It is for the institution's benefit, only.

279.   Nonetheless, the Department appears to suggest that FCSL had an obligation to disclose every aspect FCSL's proposed transaction when it submitted its 2019 preacquisition review request in the summer of 2019.  Ex. 15 at 12.

280.   FCSL's request was submitted through the Department's Abbreviated Preacquisition Review ("APAR") process option, which "only focuses on whether the Department will require an irrevocable 25% letter of credit [] to be posted because the Institution's new owner cannot submit two years of financials to comply [with application requirements]."  Ex. 22 at 1 (August 7, 2019 APAR letter).

281.   FCSL had no obligation during that process—fiduciary or otherwise—to disclose any information that did not bear on the sufficiency of the proposed new owner's financial statements.

282.   Moreover, from the summer 2019 through September 2020, the Department and InfiLaw communicated frequently, seeking to reach a settlement agreement of potential liabilities associated with the closure of InfiLaw's other two schools.

283.   These liabilities were not attributable to FCSL unless they remained unpaid. *See* 34 C.F.R. § 668.174(b).

284.   It was important to InfiLaw that it be able to pay them without jeopardizing FCSL or its transfer to a nonprofit.

285.   Throughout the settlement negotiations the Department was free to ask for any relevant information it wanted.

286.   FCSL consistently provided the Department with any information it requested.

287.   The nonprofit seeking to acquire FCSL sent the Department a letter on October 1, 2020, which explained to the Department the general terms of the deal.  Ex. 2 at 2.

288.   In that letter, the nonprofit explained that the transaction included the assumption of certain debt obligations.   It also explained that the debt obligations had yet to be finalized and "would be disclosed on the same day audited balance sheet submitted after closing [pursuant to the Department's change in ownership application process]." *Id.*

289.   Thus, the Department was informed that that the material terms of the transaction would not be disclosed before closing.

290.   Without asking for any information about the debt obligations, the Department issued a provisional PPA for FCSL's continued participation just two months later. *See* Ex. 16 (November 27, 2020 Recertification Decision).

291.   The Affirmance discusses how InfiLaw's debt would be paid and how vital that information was to its consideration of FCSL as an eligible institution. *See* Ex. 15.

292.    When the Department was told by the nonprofit that information about the transaction would be provided pursuant to the Department's published requirements (*i.e.*, after the transaction), the Department did not object, nor did it ask for additional information.

293.   Instead, the Department offered to continue FCSL's participation in Title IV for three more years.

294.   The concerns stated by the Department in the May 13, 2021 decision about the terms of a proposed transaction with a nonprofit are not legitimate in light of facts.

295.   In the Affirmance, the Department tries to justify its position by stating that InfiLaw's desire to settle and pay liabilities assessed to the closed schools created a heightened obligation to provide information.  Ex. 15 at 12.

296.   But the Department does not explain why that is the case.

297.   InfiLaw never conditioned any settlement agreement on the Department's approval of the transaction.

298.   In fact, the terms of the proposed settlement were clear that InfiLaw remained liable for the closed schools' liabilities whether or not FCSL changed ownership.

299.   The only term that substantially deviated from the default regulatory requirements was a proposed payment plan that would prevent the Department from drawing on the letter of credit.

300.   There was nothing insidious about this arrangement.  InfiLaw only sought to pay what it owed to prevent FCSL from being burdened by the other law school's past performance obligations.

301.   Ultimately, the Department's ability to approve or disapprove a final transaction (if one ever took place) would remain unchanged under the requirements of 34 C.F.R. § 668.31.

302.   It would only be then that FCSL would have a fiduciary duty to disclose all material term of the transaction.

303.   The Department's findings that FCSL violated its fiduciary duties are unsupported by law and fact.

304.   The utter lack of support for the Department's findings that FCSL breached its fiduciary duties demonstrates the decision was not the product of reasoned administrative decision making.

305.   Those findings are pretextual and demonstrate a failure to undertake a good-faith review of FCSL's application for reinstatement.

306.   Moreover, the Department provided FCSL no notice of its obligation to report the terms of the proposed transaction with the nonprofit, either through regulation or specific request. The Department's decision to sanction FCSL for failing to report those matters was arbitrary and capricious and deprived FCSL of due process.

### d.  FCSL is financially responsible.

307.   FCSL is financially responsible under the Department's letter of credit alternative by virtue of its posted letter of credit totaling almost 80 percent of the Title IV funds received by FCSL in FYE 2020.  *See* 34 C.F.R. § 668.175(c).

308.   The letter of credit alternative provides that an institution that posts a satisfactory letter of credit is financially responsible notwithstanding its inability to meet other financial responsibility requirements.  *Id.*

309.   Even if the Department had legitimate reasons to believe FCSL failed to meet other financial responsibility requirements, FCSL is nonetheless financially responsible so long as the Secretary deems the letter of credit acceptable. *Id.*

310.   In June 2019, the Department concluded that by posting a letter of credit in an amount representing 70 percent of the Title IV program funds received by the institution in the most recent fiscal year, the institution would qualify as a financially responsible institution.  Ex. 1 at 2.

311.   Because the Department holds a letter of credit totaling nearly 80 percent of FCSL's Title IV draws in the most recently completed fiscal year (FYE 2020), FCSL meets the Department's pre-determined requirement for the letter of credit alternative under 34 C.F.R. §668.175(c).

312.   Thus, under the Department's regulations, FCSL is financially responsible.

313.   Neither the May 13, 2021 nor the Affirmation explain why the 78 percent letter of credit is not sufficient to meet the requirements of the letter of credit alternative under 34 C.F.R. § 668.175(c).

314.    Congress requires the Department to consider an institution's total financial circumstances in determining the level of security required under the letter of credit alternative.  20 U.S.C. § 1099c(c)(2).

315.    The Department's decisions evidence no such inquiry, nor do they offer any basis to require more security that what the Department deemed sufficient in June 2019.

316.    Indeed, as discussed above, FCSL's financial condition has improved while its receipt of Title IV funds has dropped.

317.    The Department's failure to consider FCSL's letter of credit in finding FCSL is not financially responsible renders the Decision arbitrary and capricious.

318.    Both the HEA and the Department's regulations require consideration of the letter of credit alternative when determining whether an institution is financially responsible.

### III.    The Department's arbitrary and capricious refusal to continue FCSL's participation in Title IV is causing FCSL irreparable harm to the school and its students.

319.    Like most institutions of higher education, FCSL cannot survive without Title IV funding.

320.    In FYE 2020, approximately 79 percent of the school's funding came from Title IV, and FCSL estimates that, for FYE 2021, Title IV funds accounted for just over 80 percent of its revenue.

321.    Nonetheless, FCSL has continued to offer tuition-free courses for its summer students to protect them while the school challenges the Department's

actions.   Notwithstanding a loss of $1.2 million in tuition for these courses (amounting to 20 percent of the school's annual revenue), FCSL has continued to pay its staff and faculty.

322.   However, FCSL cannot endure that financial burden any longer.

323.   Absent relief, FCSL will be forced to close prior to commencing the fall term which would start August 23, 2021.

324.   FCSL's currently enrolled students are in limbo and will soon be forced to withdraw, attend other schools as transient students or seek to transfer to other schools.

325.   Students cannot continue to wait to the end of July before seeking alternative schools to complete their programs.

326.   If FCSL's eligibility is immediately restored, it believes it can reenroll approximately 90 of its current students.

327.   Moreover, without Title IV eligibility, FCSL cannot enroll any new first-year students.

328.   At the time Department allowed FCSL's PPA to expire, applications for Fall 2020 entering class were up 38 percent over the previous year at the same time.

329.   Based on prior trends, FCSL was on target for a fall entering class of 150, compared to 92 and 68 the previous two years.

330.   If immediately reinstated, FCSL believes it could enroll a fall class of 70 first year students.  This would provide sufficient revenue to fund continued operations and prevent closure.

331.   The loss of Title IV will also result in the loss of employment for dozens of staff and faculty members.

332.   Four staff members have already been terminated because of the impending closure.  Absent relief from this Court, all faculty will conclude their employment on July 31.

333.   FCSL has reached an agreement with a 100-year-old nonprofit institution with more than $147 million in assets and composite scores of 3.0 for both FYE 2018 and 2019—well above the Department's 1.5 requirement.

334.   Subject to that agreement, the nonprofit would take over ownership of FCSL while the Department and InfiLaw work to resolve CSL and ASLS's liabilities.

335.   FCSL cannot stay in business long enough to consummate that transaction absent immediate relief from this Court.

336.   Further, FCSL's Title IV eligibility is a material condition of the proposed transaction.

## CAUSES OF ACTION

### Count I – Administrative Procedures Act

337.   Paragraphs 1 through 336 are incorporated by reference as if set forth in full herein.

338.     The Administrative Procedures Act ("APA") prohibits agency action that is contrary to law or arbitrary and capricious.

339.     The Department's March 26, 2021 decision that FCSL could not continue participating in Title IV programs unless all ownership signed the provisional PPA must be vacated and set aside pursuant to 5 U.S.C. § 706 because it was contrary to the law; in excess of statutory authority and limitations and short of statutory right; and arbitrary and capricious.

340.     The Department's March 26, 2021 decision was arbitrary and capricious because, among other things, the Department did not sufficiently explain its reasons for the decision and the decision was contrary to the evidence.

341.     The March 26, 2021 decision was contrary to the law, and in excess of statutory authority and limitations and short of statutory right, because, among other things, FCSL's ownership's assumption of joint liability was not necessary to protect the financial interest of the United States and because the Department's regulations precluded the Department from requiring ownership's assumption of joint liability.

342.     The Department's May 13, 2021 decision and the Affirmance (collectively "the Decisions") denying FCSL's application for reinstatement in Title IV programs must be vacated and set aside pursuant to 5 U.S.C. § 706 because those findings are contrary to the law; contrary to constitutional right; in excess of statutory authority and limitations and short of statutory right; and arbitrary and capricious.

343.    The Decisions are arbitrary and capricious because, among other things, they:

a.    Unreasonably misinterpreted audits FCSL's and InfiLaw's financial statements;

b.    Improperly rely on routine accreditation findings to find that FCSL is not administratively and financial responsible;

c.    Impermissibly usurp the authority of the ABA to supervise and enforce FCSL's compliance with accreditation Standards;

d.    Conflict with the results of the Department's own investigation into FCSL's administrative capability;

e.    Unreasonably find that FCSL breached fiduciary duties by not reporting routine accreditation matters;

f.    Unreasonably find that FCSL breached fiduciary duties by reporting a potential change of ownership eight days before required by regulation;

g.    Unreasonably find that FCSL breached fiduciary duties by not reporting the details of preliminary plans to sell or transfer the school;

h.    Impermissibly find that FCSL is not financially responsible;

i.    Fail to consider relevant evidence of, among other things, FCSL's financial condition;

j.    Considered factors Congress did not intend it to consider;

k.    Offered explanations that run counter to the evidence before the Department;

l.     Offer explanations that are so implausible that they could not be ascribed to a difference in view or the product of agency expertise;

m.     Rely on pretextual findings that do not reflect the Department's genuine basis denying FCSL's application for reinstatement; and

n.     Fail to fairly and reasonably apply the law.

344.     The Decisions are contrary to the law, and in excess of statutory authority and limitations and short of statutory right, because, among other things, they:

a.     Deny FCSL due process by failing to provide notice of reporting obligations before taking sanctions against the school;

b.     Impermissibly usurp the authority of the ABA to supervise and enforce FCSL's compliance with accreditation Standards;

c.     Fail to properly apply statues and regulations;

345.     The Decisions are contrary to constitutional rights because, among other things, they deny FCSL due process by failing to provide notice of reporting obligations before taking sanctions against the school.

a.     FCSL is therefore entitled to an order and judgment from this Court declaring that:

(1)     the Department's March 26, 2021 decision requiring FCSL's ownership to assume joint liability as a condition for continued participation in Title IV programs violated the law, exceeded the Department's statutory and regulatory authority, denied due process and was arbitrary and capricious within

the meaning of 5 U.S.C. § 706, and ordering the Department to reinstate FCSL's eligibility in Title IV programs; and

(2)    the Department's Decision's denying FCSL's application for reinstatement of eligibility for participation in Title IV programs be vacated and set aside pursuant to 5 U.S.C. § 706 because those findings are contrary to the law; contrary to constitutional right; in excess of statutory authority and limitations and short of statutory right; and arbitrary and capricious.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff FCSL respectfully requests the following relief:

(A)    Entry of a temporary restraining order and preliminary injunction vacating the May 26, 2021 decision requiring FCSL's ownership to assume joint liability as a condition for continued participation in Title IV programs;

(B)    Entry of a temporary restraining order and preliminary injunction vacating the Decisions denying FCSL's application for reinstatement;

(C)    Entry of a temporary restraining order and preliminary injunction ordering the Department to immediately reinstated FCSL's Title IV eligibility;

(D)    Entry of a permanent injunction vacating the May 26, 2021 decision requiring FCSL's ownership to assume joint liability as a condition for continued participation in Title IV programs;

(E)    Entry of enter a permanent injunction vacating the Decisions denying FCSL's applications for reinstatement;

(F)     Entry of a permanent injunction ordering the Department to reinstate

FCSL's Title IV eligibility;

(G)     Entry of an order retaining jurisdiction over this matter to enforce the

foregoing injunctive relief; and

(H)     An award of such other relief as may seem just and proper.

Dated this July 20, 2021.

Respectfully submitted,

/s/ David D. Burns
David Burns (Fl. Bar No. 878081)
Ashley A. Dodd (Fl. Bar No. 58517)
FERRELLE BURNS
241 Atlantic Boulevard, Suite 203
Neptune Beach, Florida 32266
Telephone: (904) 372-4177
Facsimile: (904) 853-6984
Email: dburns@ferrelleburns.com
Email: adodd@ferrelleburns.com

/s/ Steven M. Gombos
Steven M. Gombos (*pro hac vice* to be filed)
David A. Obuchowicz (*pro hac vice* to be
filed)
GOMBOS LEYTON, P.C.
11350 Random Hills Road, Suite 400
Fairfax, Virginia 22030
Telephone: (703) 934-2660
Facsimile: (703) 934-9840
Email:  sgombos@glpclaw.com
Email:  dobuchowicz@glpclaw.com

*Attorneys for Plaintiff*

## **VERIFICATION**

I, C. Peter Goplerud, a citizen of the United States and a resident of the State of Florida, have read the forgoing Verified Complaint for Declaratory and Injunctive Relief, and declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746 that the forgoing is true and correct to the best of my knowledge and belief.

Executed this 20th day of July, 2021

/s/C. Peter Goplerud*
C. Peter Goplerud
President and Dean of FCSL
Board Member of InfiLaw Corporation

 *I certify that I have the signed original of this document that is available for inspection during normal business hours by the court or a party to this action.

/s/ David A. Obuchowicz
Attorney for Florida Coastal School of Law

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

FLORIDA COASTAL SCHOOL OF LAW, INC.,

                Plaintiff,

v.

MIGUEL CARDONA, in his official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION,

                Defendants.

No. _____

**Verified Complaint**

**Emergency Injunctive Relief Requested**

### Plaintiff's Exhibit List

| | Description | Bates Stamp Number |
|---|---|---|
| 1. | June 18, 2019 Ltr of Credit Demand Letter | FCSL – 000001-000005 |
| 2. | October 1, 2020 Ltr from Campbellsville Re: Proposed Change of Ownership | FCSL – 000006-000008 |
| 3. | Declaration of Ryan Malouf, CPA | FCSL – 000009-000012 |
| 4. | April 24, 2020 Notice to Department re: Sterling Waiver & Response to Information Requests | FCSL – 000013-000017 |
| 5. | June 16, 2020 FCSL Response to the Department's June 1, 2020 Information Request | FCSL – 000018-000020 |
| 6. | November 27, 2020 Provisional PPA | FCSL – 000021-000038 |
| 7. | December 4, 2020 Email re: Reason for Sterling Signature | FCSL – 000039 |
| 8. | January 6, 2021 Ltr from Sterling | FCSL – 000040-000048 |
| 9. | December 28, 2020 Ltr re: Sterling | FCSL – 000049-000050 |
| 10. | March 26, 2021 Decision | FCSL – 000051-000052 |
| 11. | March 30, 2020 Email re: Sterling signature requirement | FCSL – 000053-000054 |
| 12. | April 5 2021 Equity Forfeiture Notice | FCSL – 000055-000056 |

1

| 13. | April 5, 2021 Emails re: reinstatement | FCSL – 000057-000058 |
| 14. | May 13, 2021 Denial | FCSL – 000059-000065 |
| 15. | July 16, 2021 Affirmation of Denial | FCSL – 000066-000080 |
| 16. | November 27, 2020 Recertification Decision | FCSL – 000081-000082 |
| 17. | Declaration of Donald Polden | FCSL – 000083-000088 |
| 18. | APA Schedule 2.22a | FCSL – 000089 |
| 19. | May 24, 2021 Ltr to DOE re: Denial of FCSL's Eligibility | FCSL – 000090-000099 |
| 20. | September 10, 2020 Final Program Review Determination | FCSL – 000100-000155 |
| 21. | September 11, 2019 FCSL Program Review Report | FCSL – 000156-000183 |
| 22. | August 7, 2019 APAR Letter | FCSL – 000184-000195 |