## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | |
|---|---|
| FLORIDA COASTAL SCHOOL OF LAW,<br><br>　　　　　　　　Plaintiff,<br><br>v.<br><br>MIGUEL CARDONA, in his official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION,<br><br>　　　　　　　　Defendants. | Civil Case No. 3:21-cv-00721<br><br>**Emergency Motion for Temporary Restraining Order and/or Preliminary Injunction and Memorandum of Law**<br><br>**Emergency Injunctive Relief Requested** |

David Burns (Fl. Bar No. 878081)
Ashley A. Dodd (Fl. Bar No. 58517)
FERRELLE BURNS
241 Atlantic Boulevard, Suite 203
Neptune Beach, Florida 32266
Telephone: (904) 372-4177
Facsimile: (904) 853-6984
Email: dburns@ferrelleburns.com
Email: adodd@ferrelleburns.com

Steven M. Gombos (pro hac pending)
David A. Obuchowicz (pro hac pending)
GOMBOS LEYTON, P.C.
11350 Random Hills Rd., Suite 400
Fairfax. Virginia 22030
Telephone: (703) 934-2660
Facsimile: (703) 934-9840
Email: sgombos@glpclaw.com
Email: dobuchowicz@glpclaw.com

Attorneys for Plaintiff

Dated:  July 20, 2021

i

# Table of Contents

**EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION** ......................................................... 1

**Summary** ........................................................................................... 4

   **a.** **The Department's financial responsibility standards.** ............... 11

   **b.** **In reliance on the Department's representation that FCSL could continue to participate in Title IV, InfiLaw posts a $5.6 million letter of credit.** .................................................................. 13

   **c.** **After receiving the letter of credit, and without explanation, the Department imposes impossible requirements on FCSL's continued participation in Title IV.** ............................................ 15

   **d.** **The Department Arbitrarily and Capriciously Denies FCSL's Application for Reinstatement.** ............................................... 188

**Argument** ......................................................................................189

   **I.** **Standard of Review.** .......................................................189

      **A.** **Temporary Restraining Order.** ...................................189

      **B.** **Judicial review under the Administrative Procedures Act.** .19

   **II.** **FCSL is likely to succeed on the merits.** ...................... 20

      **A.** **The Department Arbitrarily and Capriciously refused to continue FCSL in Title IV Programs.** .................................. 20

         **1.** **The Department offered no explanation for its requirement that Sterling sign the provisional PPA.** ........................... 20

         **2.** **The Department's regulations precluded it from demanding Sterling's assumption of personal liability.** ................... 212

         **3.** **The Department's demand for Sterling's signature is contrary to the evidence.** .................................................. 233

      **B.** **The Department's bases for denying FCSL's application for reinstatement are without legal and factual support.** ................ 256

         **1.** **The Department unreasonably misinterpreted audits of InfiLaw's financial statements.** ........................................ 26

         **2.** **The Department improperly relied on routine accreditation findings to bar FCSL from Title IV programs.** ............................ 288

    **a.   The Department is expressly precluded from prematurely interfering in accreditation matters.** ......................................... 299

    **b.   Routine accreditation findings are not sufficient evidence of an institutions failure to meet Title IV financial responsibility and administrative capability requirements**. 311

    **c.   The Department's unreasonable interpretation of the ABA's findings conflicts with the results of its own investigation.** ..................................................................... 323

  **3.   FCSL did not breach its fiduciary duty to the Department**. 334

    **a.   The Department's regulations do not require reporting routine accreditation matters.** ........................................................35

    **b.   Reporting a potential change of ownership eight days before the regulatory reporting requirement is not a breach of fiduciary duty.** ............................................................ 367

    **c.   The Department does not require institutions to disclose preliminary plans to sell or transfer a school** .......................... 389

  **4.   FCSL is financially responsible under the Department's Letter of Credit Alternative.** ............................................... 433

**III.   Unless FCSL's Title IV eligibility is immediately restored, it will be irreparably harmed.** .................................................... 445

**IV.   The balance of the equities and the public interest favor issuance of the requested injunctive relief.** ........................................ 478

**Conclusion** .......................................................................... 50

**Certificate of Service** ............................................................. 50

# Table of Authorities

## Cases

*Armstrong v. Accrediting Council for Continuing Educ. & Training*, 980 F. Supp. 53 (1997) ................................................................ 28, 32

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271 (11th Cir. 2015) .............................................................. 19

*Canterbury Career Sch. v. Riley*, 883 F. Supp. 1097 (D.N.J. 1993) ..................... 44

*Defs. of Wildlife v. United States Dep't of the Navy*, 733 F.3d 1106 (11th Cir. 2013) ................................................................ passim

*DOC v. New York*, 139 S. Ct. 2551 (2019) ................................................. 26

*Edward Waters College, Inc. v. S. Ass'n of Colls. & Schs.*, 2005 U.S. Dist. LEXIS 39443 (M.D. Fla. Mar. 11, 2005) ..................................................... 44

*FCC v. Fox TV Stations, Inc.*, 556 U.S. 502 (2009) ..................................... 8, 20, 34

*Ferrero v. Associated Materials Inc.*, 923 F.2d 1441 (11th Cir. 1991) ................. 46

*Fla. College of Bus. v. Accrediting Council for Indep. Colleges & Sch.*, 954 F. Supp. 256 (S.D. Fla. 1996) .......................................................... 44, 47

*Gayle v. Meade*, 2020 U.S. Dist. LEXIS 100960 (S.D. Fla. June 5, 2020) ........... 18

*High Point, LLLP v. Nat'l Park Serv.*, 850 F.3d 1185 (11th Cir. 2017) ................ 19

*Int'l Junior Coll. of Bus. & Tech., Inc. v. Duncan*, 2013 U.S. Dist. LEXIS 136906 (D.P.R. Sep. 20, 2013) ................................................................ 19

*Jones v. Governor of Fla.*, 950 F.3d 795 (11th Cir. 2020) ............................. 18

*League of Wilderness Defenders/Blue Mts. Biodiversity Project v. Connaughton*, 752 F.3d 755 (9th Cir. 2014) .......................................................... 47

*Meyer v. Nebraska*, 262 U.S. 390 (1923) .................................................. 47

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29 (1983) ................................................................................ 20

*National Nutritional Foods Assoc. v. Weinberger*, 512 F.2d 688 (2d Cir. 1975) . 21

*Nken v. Holder*, 556 U.S. 418 (2009) ...................................................... 47

*Performance Unlimited v. Questar Publishers*, 52 F.3d 1373 (6th Cir. 1995) ..... 45

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) ................................... 48

*Sistema Universitario Ana G. Mendez v. Riley*, 234 F.3d 772 (1st Cir. 2000) ..... 19

*Swann v. Charlotte-Mecklenburg Bd. Of Educ.*, 402 U.S. 1 (1971) ................... 18

*Vestavia Hills, Ltd. v. United States SBA (In re Vestavia Hills, Ltd.)*, 618 B.R. 294 (Bankr. S.D. Cal. 2020) .......................................................... 46

## Statutes

20 U.S.C. § 1099c(c)(2) ...................................................................... 43

20 U.S.C. § 1099b(a) .......................................................................... 29

20 U.S.C. § 1099b(a)(6) ...................................................................... 29

iv

20 U.S.C. § 1099c(c)(1) ....................................................................... 12
20 U.S.C. § 1099c(c)(5) ....................................................................... 11
20 U.S.C. § 1099c(e) ........................................................................ 5, 6
20 U.S.C. § 1099c(e)(1) .................................................................. 20, 22
20 U.S.C. § 1232a ...................................................................... 28, 29, 32
20 U.S.C. § 3403(b) ........................................................... 28, 29, 30, 32
20 U.S.C. §§ 1099c(a) ......................................................................... 11

## Other Authorities

https://studentaid.gov/data-center/school/composite-scores ............................ 12

## Regulations

34 C.F.R § 602.27(a)(6) ...................................................................... 30
34 C.F.R. § 171(f)(3)(b) ..................................................................... 22
34 C.F.R. § 600.21(a) .................................................................... 33, 36
34 C.F.R. § 600.26 ....................................................................... 33, 35
34 C.F.R. § 600.31(a)(2) ................................................................. 15??
34 C.F.R. § 602.20 ............................................................................. 30
34 C.F.R. § 602.25 ............................................................................. 29
34 C.F.R. § 668.13(b)(2) ............................................................... 17, 22
34 C.F.R. § 668.13(c)(1)-(2) (2009) ........................................................ 13
34 C.F.R. § 668.13(c)(1)-(2) (2021) ........................................................ 13
34 C.F.R. § 668.13(c)(2) ...................................................................... 13
34 C.F.R. § 668.13(c)(2)(ii) (2009 code version) ....................................... 13
34 C.F.R. § 668.171(b)(1) .................................................................... 11
34 C.F.R. § 668.171(d)(1) .................................................................... 35
34 C.F.R. § 668.171(f)(1)(iv) ................................................................ 35
34 C.F.R. § 668.171(f)(3) ...................................................................... 5
34 C.F.R. § 668.171(h) .................................................................... 26, 33
34 C.F.R. § 668.174(b) ........................................................................ 40
34 C.F.R. § 668.175(c) ................................................................ 6, 14, 16, 43
34 C.F.R. § 668.175(f) ................................................................... 12, 14
34 C.F.R. § 668.175(f)(3)(B) ................................................................ 21

## EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

Plaintiff, Florida Coastal School of Law ("FCSL"), respectfully moves for a temporary restraining order and/or a preliminary injunction against the United States Department of Education ("Department") and Department Secretary Miguel Cardona, in his official capacity ("Motion").  *See* F.R.C.P. 65. FCSL seeks this remedy to prevent irreparable harm caused by the Department's unlawful and arbitrary and capricious actions to terminate FCSL's participation in programs offered under Title IV of the Higher Education Act ("Title IV Programs").

FCSL respectfully requests a ruling as soon as possible, but no later than July 27, 2021. FCSL will close imminently if relief is not granted.  As with most institutions of higher education, Title IV funding provides the overwhelming majority of FCSL's revenue—just over 80 percent.  FCSL cannot continue operations without it.  The school has continued to provide courses, tuition free, over the summer term, but it cannot maintain operations for the Fall term unless emergency relief is granted, and Title IV funding is secured.  Fall classes begin on August 23, 2021, and current students and new enrollees will have to make alternative plans for their education.  Many have already transferred to other schools.

Moreover, FCSL's summer classes end on July 31, 2021.  Unless FCSL can enroll a sufficient number of students by that date, it will no longer be able to offer

classes.  An institution that ceases to provide educational programs automatically loses Title IV eligibility by operation of law. 34 C.F.R. § 600.40(a)(1)(iii).

FCSL brings this action under the Administrative Procedure Act ("APA") to challenge two final agency actions.  First, on November 27, 2021, the Department elected to continue FCSL's participation in Title IV Programs on a provisional basis, but it conditioned FCSL's continued participation on the requirement that every entity holding a direct or indirect ownership in FCSL assume joint liability with the school by co-signing the provisional program participation agreement ("PPA").  The Department lacked authority to make such a demand.  Further, one owner was legally precluded from signing the provisional PPA because its formation agreement did not allow it to guarantee any obligation.  FCSL requested reconsideration of the Department's requirement that all owners assume joint liability, which the Department denied on March 26, 2021 (the "March 26 Decision").  On April 1, 2021, FCSL's participation in Title IV Programs ended.

FCSL respectfully moves this Court to order the Department to (1) vacate its March 26, 2021, and (2) immediately restore FCSL's Title IV eligibility subject to the terms of its prior PPA until this matter is resolved on the merits.

The second decision challenged in this action is the Department's May 13, 2021 denial of FCSL's application for Title IV reinstatement (the "May 13 decision") and July 16, 2021 affirmation of that decision.  Those two decisions relied on factually and legally unsupportable positions, which did not represent a fair and reasonable application of the Department's regulations.

2

FCSL also respectfully asks this Court to order the Department to (1) vacate the May 13 Decision and (2) immediately order the Department to restore FCSL's Title IV Program eligibility pursuant to the terms of its prior PPA until this matter is resolved on the merits.

As discussed more fully in the Memorandum of Law, the Department currently holds a surety in the form of three irrevocable letters of credit totaling $5,681,255. These combined letters of credit are more than sufficient to meet the requirements of F.R.C.P. 65(c). Should it later be determined that the Department was improperly enjoined, any damages suffered by the Department would consist of Title IV Program funds improperly drawn or disbursed by FCSL during that period.  The letters of credit expressly permit the Department to recover funds in such a case.   Thus, no additional security is necessary.

Prior to the July 16, 2021 of the affirmation of the denial of reinstatement, FCSL, through counsel, notified the Department on June 29, 2021 and July 2, 2021 that it intended to seek emergency relief in federal court if the Department did not reverse its denial of FCSL's reinstatement application.  On July 19, 2021, counsel notified Department general counsel, via email, that FCSL would file the instant Motion on July 20, 2021.  Department counsel acknowledged receipt of that email the same day.  On July 20, 2021 Department of Justice counsel, James Bickford notified Counsel for FCSL of his representation of Defendants.  Counsel certifies that it will provide him, via email, this Motion, the contemporaneously filed Complaint, and all other pleadings as soon as they are filed.

3

## MEMORANDUM OF LAW

### Summary

Without emergency injunctive relief from this Court, FCSL will close.  Its students will be forced to find alternatives to finish their legal education. Its faculty and staff will immediately lose their jobs. And a valuable source of legal professionals in Northeast Florida will disappear.  FCSL has met every legal requirement imposed by the Department, and it even worked in good faith to meet the Department's ultra vires demands.  But the Department demonstrated that its true objective is to close a viable school while retaining millions of dollars in security posted by the school.  Seemingly unconcerned with the devastating impact of its action, the Department's justifications are so contrary to the evidence and law, that they cannot reasonably be the Department's genuine reasons for destroying a law school which has provided meaningful legal training to Northeast Florida's most underrepresented communities.  *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019).

In June 2019, the Department set the terms of FCSL's continued participation in Title IV programs. *See* Compl. Ex. 1 at 1 (June 28, 2019 Letter of Credit Demand Letter).  FCSL met those conditions.  Compl. ¶ 49.  With full knowledge of the financial condition of FCSL and its owner, the Department told FSCL that it would remain eligible if it posted a $5.6 million letter of credit.  Compl. Ex. 1 at 1.  It did.  To ensure the survival of the school and to protect its students

and faculty, members of management put up their own money and personal and family member homes to secure the required collateral. Compl. ¶ 50.

But once the Department had the letter of credit, it imposed additional conditions that FCSL could not meet due to pre-existing agreements. The Department demanded, after receiving the personally held capital and without any justification, that all levels of ownership sign a provisional PPA and assume joint responsibility for future liabilities of the school. Compl. Ex. 10 (March 26, 2021 Decision). The Department's only explanation was that it was implementing a new and generally applicable standard. Compl. Ex. 7. It offered no other rationale.

The Higher Education Act ("HEA") and the Department's regulations plainly prohibit such a policy. The Department can only require an institution's ownership to assume personal liability at the **end** of a provisional period and, even then, only when it articulates a reasonable basis that it is necessary to protect the financial interest of the United States. *See* 20 U.S.C. § 1099c(e); 34 C.F.R. § 668.171(f)(3). Here, the Department demanded joint liability at the **beginning** of the provisional period, which is contrary to the law. And it did so without explaining why it was necessary.

Nonetheless, all owners and investors agreed to sign the provisional PPA with one exception. Compl. ¶ 99. The owner of FCSL's parent company, Sterling Capital Partners, LP ("Sterling"), was legally prohibited from signing the provisional PPA based on the terms of its formation documents. Compl. Ex. 8 (January 6, 2021 letter from Sterling). On March 26, 2021, the Department

notified FCSL that without Sterling's signature on the PPA, its eligibility would end as of April 1, 2021. Compl. Ex. 10.

As an alternative, Sterling's partners pledged an additional $1 million letter of credit as financial security, which the Department rejected, proving that the requirement was not about financial security. Compl. Ex. 11 (March 30, 2021 email re: Sterling signature requirement). As the Department was aware, Sterling's only asset was its ownership interest in FCSL's parent company, which would offer little—if any—additional financial protection to the Department. *See* Compl. Ex. 5 (June 16 response to request for additional information). Instead, the Department recklessly ended FCSL's eligibility, jeopardizing the futures of its students, faculty, and alumni.

Imposing the requirement that Sterling co-sign the PPA was unnecessary because FCSL's continued participation in Title IV Programs posed no present risk to the financial interest of the United States. *See* 20 U.S.C. § 1099c(e) (providing the Department can only require the assumption of joint liability "to the extent necessary to protect the financial interest of the United States.") FCSL's financial statements demonstrate its viability with solid financial footing. *See* Compl. ¶¶ 159-164). Moreover, the $5.6 million letter of credit adequately covers any potential risk from FCSL's continued participation. According to the Department's regulations, FCSL is a financially responsible institution based on the letter of credit. *See* 34 C.F.R. § 668.175(c).

Moreover, FCSL's financial position has only improved since posting the

letter of credit in 2019, and it reduced its Title IV Program usage substantially.  *See* Compl. ¶¶ 159-164.  Nonetheless, the Department suddenly changed its terms and ended FCSL's eligibility to participate while retaining the letter of credit.  This is arbitrary and capricious and crosses the line into bad faith.

Further demonstrating the pretextual nature of the requirement for Sterling's signature, the Department continued to deny FCSL's eligibility even after Sterling gave up its ownership interest.  Immediately after receiving notice that FCSL's Title IV Program participation had ended, Sterling relinquished all ownership interests, and FCSL applied for reinstatement.  Compl. Ex. 12 (April 15 Equity Forfeiture Notice); Compl. Ex. 13 (April 5 emails re: reinstatement).  This time, all remaining owners and investors agreed to sign the provisional PPA in order to meet the Department's so-called "updated standard."  Compl. ¶ 112.

But the Department instead contrived new reasons to keep the school closed. In a May 13, 2021 decision denying FCSL's application for reinstatement, the Department claimed that it had relied on Sterling's signature as financial security but said nothing about its decision to decline the $1 million letter of credit Sterling offered. Compl. Ex. 14 at 4. The Department's contention that Sterling's exit eliminated important financial security is specious given its refusal of security that far exceeded the value of Sterling's signature, because Sterling had no assets.

The Department also grossly mischaracterized FCSL's audited financial statements to question FCSL's ability to continue as a going concern; improperly involved itself in a pending accreditation matter to support a baseless conclusion

that FCSL lacked "administrative capability"; and falsely alleged FCSL violated its fiduciary duties to the Department by failing to disclose events that FCSL had no obligation to disclose pursuant to the Department's detailed disclosure requirements. *See* Compl. Ex. 14.

These factual mischaracterizations and arbitrary legal positions are so contrary to the law and evidence that its decision appears to have been calculated to further a goal of closing FCSL while retaining the letters of credit. Indeed, all the financial information the Department relied on in its May 13 Decision was known to it when it issued the provisional PPA in November 2020. Had the Department truly believed what it wrote in the May 13 decision, it would have never offered to recertify FCSL's participation just a few months prior.

Moreover, sanctioning FCSL for failing to report information that it was not required to disclose, either by regulation or by specific request from the Department, blatantly violates FCSL's basic due process rights. *See FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012). FCSL had no notice of an obligation to report various accreditation matters and the proposed terms of unconsummated transactions.

The pretextual nature of the Department's decision is further demonstrated in its July 16, 2021 Affirmation of the Denial ("Affirmation"). Compl. Ex. 15. Apparently recognizing the arbitrary nature of its prior findings, the Department combed years of accreditation records to generate new, after-the-fact justifications that were never raised before. The Department does not explain when it obtained

this information or whether it was before the Department when it undertook to close the school.

That is concerning because the Department's prior written explanations did not reference or consider this newly proffered information.  The Department's after-the-fact fabrication of support for its earlier findings casts serious doubt as to whether the written decisions reflect the true reasons for revoking FCSL's Title IV. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575-76 (2019) ) (explaining the APA's "reasoned explanation" requirement ensures "that agencies offer **genuine** justifications for important decisions" and "[a]ccepting contrived reasons would defeat the purpose") (emphasis added). To be sure, this new information also fails to provide a legally sufficient justification for its decisions.

The Department's actions fall well short of the APA's requirements to apply the law fairly and consistently.  To prevent irreparable harm to FCSL and its students this Court must vacate the March 26 Decision pending a decision on the merits and order the Department to restore FCSL's access to Title IV Programs, pursuant to its original PPA.  Alternatively, this Court must vacate the May 13 Decision and Affirmance and restore FCSL's Title IV eligibility.

## Background

FCSL was founded in 1996.  It is a Jacksonville, Florida-based law school with 126 currently enrolled students.  Compl. ¶ 21.  It has been fully accredited by the American Bar Association ("ABA") since 2002. *Id.* ¶ 22.

The school's founders were legal educators who, after searching unsuccessfully for a traditional university that would support a mission of helping to diversify the nation's least diverse profession, turned to private capital to finance their undertaking. *Id.* ¶ 23. FCSL, over the quarter century of its existence, has held firm to this mission. *Id.* In the last five years, 43 percent of FCSL's 855 graduates have been racial minorities. *Id.* ¶ 24. In the academic year just ended, approximately 40 percent of its students are minorities and approximately 60 percent are women. *Id.* Reflective of these achievements, and among other recognitions, the school has been nationally recognized and has earned awards for its commitment to diversity and inclusion. *Id.* ¶ 25.

FCSL's students leave well-prepared to succeed in their careers. *Id.* ¶ 26. Over the last three years, FCSL's graduates have outperformed those of peer institutions on the Florida Bar Exam. *Id.* ¶ 27. The school's pass rate on the most recent bar exam, in February 2021, exceeded the state average by six percentage points. *Id.* In its most recent ABA outcomes report, 90.5 percent of FCSL's 2020 graduating class had full-time employment. *Id.* ¶ 28. 100% of the members of the 2020 graduating cohort who passed the bar exam in 2020 reported as fully employed. *Id.*

The FCSL community makes a profound social and professional impact throughout the region. *Id.* ¶ 29. Students and faculty have contributed more than one million hours of pro bono and clinical hours to the Northeast Florida community. *Id.* ¶ 30. Alumni have become leaders in the state and local bar

associations, judges, law partners, prosecutors, public defenders, and legislators. *Id.* Currently, six of the thirteen members of the Board of Governors of the Jacksonville Bar Association are FCSL graduates, including the President and the President-Elect. *Id.* The current President of the Young Lawyers Division of the Florida Bar is a FCSL graduate, as is a member of the Executive Committee of the Board of Governors of the Florida Bar. *Id.* Among the many distinguished alumni of the school are members of the Florida and South Carolina state legislatures, as well as numerous state court judges. *Id.*

FCSL is owned by InfiLaw Corporation, whose sole shareholder is InfiLaw Holding, LLC.[1] *Id.* ¶ 31. As of November 2020 (when the Department offered the proposed provisional PPA), Sterling owned 98.6% of InfiLaw Holding. *Id.* ¶ 32. At that time, Sterling was a passive investor. It held no voting rights in InfiLaw, nor did it appoint any board members. *Id.* ¶ 33.

### a. The Department's financial responsibility standards.

The Department's stated reasons for closing FCSL are, in part, based its erroneous contention that FCSL is not a financially responsible institution. Title IV Program participants must meet the Department's financial responsibility requirements or meet an alternative standard. *See* 20 U.S.C. §§ 1099c(a), (c)(3); 34 C.F.R. §§ 668.171, 668.175. The Department reviews the audited financial statements of participating institutions to determine financial responsibility. 20

---

[1] For ease of reference and simplicity, for the purposes of this Motion, InfiLaw Corporation and InfiLaw Holding, LLC will be collectively referred to "InfiLaw."

U.S.C. § 1099c(c)(5).

Financial responsibility is generally based on an institution's "composite score," which is a weighted average of three ratios: a primary reserve ratio, an equity ratio, and a net income ratio.  34 C.F.R. § 668.171(b)(1).  As stated on the Department's studentaid.gov website, the composite score gauges the financial health of an institution, not the educational quality.[2]  A qualifying composite score of 1.5 or higher indicates that the institution is considered financially responsible, subject to other requirements. *Id.*

Additional requirements include: 1) the ability to provide the services described in its official publications and statements; 2) the ability to provide sufficient administrative resources; 3) and the ability to meet financial obligations, including refunds of institutional charges and repayments for liabilities and debts incurred in Title IV programs.  20 U.S.C. § 1099c(c)(1).

If an institution fails to meet the financial responsibility requirements, it is nonetheless deemed to be financially responsible under the "letter of credit alternative" if it posts an irrevocable letter of credit equal to fifty percent or more of the Title IV funds received in the most recently completed fiscal year.  20 U.S.C. § 1099(c)(3).  For reference, FCSL's $5.6 million letter of credit represents 78 percent of the Title IV funds it received in the fiscal year ended ("FYE") July 31, 2020.

---

[2] https://studentaid.gov/data-center/school/composite-scores

The Secretary can also act to put a school on provisional certification. *See* 34 C.F.R. § 668.175(f). Under that alternative, a school is not considered financially responsible, but can nonetheless continue to participate by, among other things, posting a smaller letter of credit of at least ten percent of Title IV funds received in the most recently completed fiscal year. 34 C.F.R. § 668.175(4)(i)(A).

To place a school on provisional certification the Secretary must specify a provisional certification period. 34 C.F.R. § 668.13(c)(2). If the Secretary provisionally certifies an institution based on a failure to meet financial responsibility requirements, the provisional period expires three years from the date the Secretary acts to provisionally certify the school, unless the Secretary designates a shorter time. 34 C.F.R. § 668.13(c)(2)(ii) (2009 code version).[3]

**b. In reliance on the Department's representation that FCSL could continue to participate in Title IV, InfiLaw posts a $5.6 million letter of credit.**

---

[3] The current code version contains an apparent scrivener's error. When 34 C.F.R. § 668.13(c) was amended on October 29, 2009 (effective July 1, 2010), paragraph (c)(1) was amended to add an additional basis for allowing the Secretary to provisionally certify an institution. *See* 74 FR 55902, 55934. This altered the numbering of the paragraphs in (c)(1), identifying the various bases for provisional certification. However, paragraph (c)(2), which identifies the corresponding provisional certification periods, was not updated. Thus, the time periods in the current version of paragraph (c)(2) clearly relate to the numbering in the older version of (c)(1). For example, the current version of (c)(2) references events under paragraphs (c)(1)(iii), (iv), and (e)(2), which no longer exist in the current regulation. *Compare* 34 C.F.R. § 668.13(c)(1)-(2) (2009) *with* 34 C.F.R. § 668.13(c)(1)-(2) (2021).

In a June 18, 2019 letter, the Department established the terms for FCSL's continued participation in Title IV.  Compl. Ex. 1.  After reviewing Almich's audit report on InfiLaw's FYE 2018 financial statement, the Department concluded that FCSL could continue to participate in Title IV if InfiLaw posted a substantial letter of credit.  *Id.* at 1.  The Department offered InfiLaw two choices: (1) it could post a letter of credit in the amount of 70 percent of the Title IV received in the most recently completed fiscal year, in which case FCSL would be considered financially responsible under the Department's letter of credit alternative at 34 C.F.R. § 668.175(c), or (2) it could post a 35 percent letter of credit, at which point the Department could require FCSL to sign a new provisional PPA subject to the Department's provisional certification alternative under 34 C.F.R. § 668.175(f).  *Id.* at 2.

As a sign of remarkable good faith, InfiLaw's management personally provided the collateral to support a $5,681,255 letter of credit, which, at that time, represented 35 percent of InfiLaw's FYE 2018 Title IV receipts.  Compl. ¶ 49.  To raise the required collateral, executives pledged their personal funds. *Id.* ¶ 50. One of those executives pledged his own home and the home of a relative.  *Id.*

At that time, InfiLaw was at its lowest point financially.  *Id.* ¶ In fact, Almich's report on the FYE 2018 financial statements disclosed substantial doubt about InfiLaw's ability to continue as a going concern. Compl. Ex. ?? at 1. This was a primary reason the Department required the letter of credit.  *Id.*

But on a standalone basis, FCSL was on solid financial footing and was generating income. *Id.* ¶¶ 159-164.  It was in good standing with the ABA, and its student outcomes continued to improve. *Id.* ¶ 53.  InfiLaw and FCSL were also working towards transferring FCSL to a 110-year-old nonprofit University, which had substantial assets that would further ensure FCSL's financial security indefinitely.  *Id.* ¶ 54.  InfiLaw and FCSL had every reason to believe that the personal sacrifices made to fund the letter of credit would ensure FCSL's survival, thereby allowing its students to continue their educations, its faculty and staff to keep their jobs, the alumni to maintain the value of their degrees, and the community to retain a valuable resource.  *Id.* ¶ 51.

### c. After receiving the letter of credit, and without explanation, the Department imposes impossible requirements on FCSL's continued participation in Title IV.

FCSL had been waiting years for the Department to decide whether to recertify FCSL's Title IV eligibility, which, according to the terms of the Department's June 18, 2019 letter, appeared to be resolved when InfiLaw posted the letter of credit.  Compl. ¶ 82; *see* Compl. Ex. 1 at 1.  Nonetheless, the Department waited until November 27, 2020 before offering FCSL a provisional PPA subject to the terms of that letter.  Compl. Ex. 6 (November 27, 2021 provisional PPA). But then, without explanation, the Department imposed an additional condition requiring all owners to sign the agreement and assume joint liability.  Compl. Ex 16 (November 27, 2020 Recertification Decision).

15

Other than that condition, the provisional PPA tracked the terms of the June 2019 letter.  Compl. Ex. 6.  FCSL was required to post a 35 percent letter of credit.  *Id.*  But, without explanation, the Department continued to base the letter of credit amount on the FYE 2018 financial statements.  *Id.* But based on the updated Title IV numbers for FYE 2020, the letter of credit now represented roughly 78 percent of FCSL's Title IV—well above, the Department's stated 70 percent threshold to establish full financial responsibility. Compl. ¶ 90.  Nonetheless, the Department designated a three-year provisional period set expire on September 30, 2023.  Compl. Ex. 6.

When FCSL asked the Department why it was requiring co-signers to the PPA, the Department told FCSL that "it is an updated standard the Department is applying for institutions with multiple levels of ownership.  The Department is now requiring the signature of each entity of 100% ownership or with a significant majority ownership percentage.  This requirement is also not unique to FCSL."  Ex. 7 (December 4, 2020 email from the Department).  The Department has never issued any notice or guidance regarding this "updated standard."  Nor did it explain why, specifically, FCSL's owner's signatures were necessary.  Indeed, considering the 78 percent letter of credit currently held, FCSL had eliminated the need for additional security.  *See* 34 C.F.R. § 668.175(c).

With the exception of Sterling, all of FCSL's owners agreed to sign the provisional PPA.  Compl. ¶ 99.  Sterling is a fixed-term equity fund, whose term had expired on October 15, 2017.  Compl. Ex. 8 at 1.  Since that date, Sterling has

16

been in dissolution, meaning that its primary focus is to sell, transfer, or otherwise dispose of all assets. *Id.* at 1-2 Pursuant to the terms of its limited partnership agreement, Sterling was expressly prohibited from extending financial guarantees while in dissolution. *Id.*

FCSL notified the Department of this fact in December 2020 and asked that Sterling's name be removed from the provisional PPA. Compl. Ex. 9 (December 28, 2020 letter). It explained that Sterling had no voting rights or board representatives at FCSL nor InfiLaw. *Id.* In response to the Department's request for additional information, Sterling provided a letter from counsel as well as copies of the relevant agreements demonstrating that Sterling was precluded from signing the PPA. Compl. Ex. 8.

For the next 3 months, pursuant to 34 C.F.R. § 668.13(b)(2), FCSL's participation continued (consistent with the terms of the previous PPA) on a month-to-month basis while the Department considered the information FCSL provided and its request that Sterling not be required to co-sign the PPA. But on March 26, 2021, the Department notified FCSL that it would not reconsider its demand for Sterling's signature—despite knowing that Sterling was legally barred from providing it. Compl. Ex. 10. Without citing any regulatory basis, it explained that absent all required signatures on the provisional PPA by March 31, 2021, FCSL's PPA would expire as of April 1, 2021. *Id.* Because Sterling was legally prohibited from signing the agreement, the PPA expired and FCSL was no longer eligible for Title IV. Compl ¶ 109.

### d. The Department Arbitrarily and Capriciously Denies FCSL's Application for Reinstatement.

In order to resolve what FCSL believed was the only impediment to its Title IV eligibility, Sterling relinquished all ownership interest in InfiLaw. Compl. Ex. 5. FCSL notified the Department via email, to which the Department replied, "To re-establish eligibility, FCSL must submit an application for reinstatement to Title IV HEA programs under its current ownership structure." Ex. 13 (April 5, 2021 emails re: reinstatement application). With all the then-existing entities with direct or indirect ownership of FCSL agreeing to sign the provisional PPA, FCSL applied for reinstatement of its Title IV eligibility. Compl. ¶ 112.

Even though FCSL had continuously met every requirement the Department placed on continuing eligibility, the Department denied its request in a May 13, 2020 decision. Compl. Ex. 14. FCSL promptly requested reconsideration of that Decision on May 24, 2021. Compl. Ex. 19. And two months later, the Department issued its July 16, 2021 Affirmance (Compl. Ex. 15), leaving FCSL no choice but to seek emergency relief in this Court.

**Argument**

### I.     Standard of Review.

### A. Temporary Restraining Order.

A district court may grant preliminary injunctive relief when a party establishes each of four separate requirements: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the

injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *Jones v. Governor of Fla.*, 950 F.3d 795, 806 (11th Cir. 2020).

In considering whether to issue a preliminary injunction "district courts are empowered with broad equitable power—particularly in these uncertain times—to grant a remedy that may present the only adequate remedy." *Gayle v. Meade*, 2020 U.S. Dist. LEXIS 100960, at *44 (S.D. Fla. June 5, 2020) (citing *Swann v. Charlotte-Mecklenburg Bd. Of Educ.*, 402 U.S. 1, 15-16 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.").

### B. Judicial review under the Administrative Procedures Act.

The Department's determination of an institution's Title IV eligibility constitutes an informal adjudication subject to judicial review as set out in the APA. *Int'l Junior Coll. of Bus. & Tech., Inc. v. Duncan*, 2013 U.S. Dist. LEXIS 136906, at *43 (D.P.R. Sep. 20, 2013) (citing *Sistema Universitario Ana G. Mendez v. Riley*, 234 F.3d 772, 777 (1st Cir. 2000)). "Under the Administrative Procedure Act, [the Court] must 'hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1288 (11th Cir. 2015). Similarly,

Courts must set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *High Point, LLLP v. Nat'l Park Serv.*, 850 F.3d 1185, 1193 (11th Cir. 2017).

An agency action is arbitrary and capricious "where the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Defs. of Wildlife v. United States Dep't of the Navy*, 733 F.3d 1106, 1115 (11th Cir. 2013).

## II. FCSL is likely to succeed on the merits.

### A. The Department Arbitrarily and Capriciously refused to continue FCSL in Title IV Programs.

#### 1. The Department offered no explanation for its requirement that Sterling sign the provisional PPA.

The Department imposed ultimate sanction on FCSL—removal from Title IV programs—because Sterling could not co-sign the PPA. But the Department failed to explain *why* it needed Sterling to assume joint liability for FCSL's potential future liabilities. Thus, the Department's refusal to countersign the PPA violated the most basic requirement of agency decision making: to "examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

To be sure, the Department does not have unfettered authority to require school owners to assume joint liability whenever it chooses. Congress only allows

the Department to impose such requirements "to the extent necessary to protect the financial interest of the United States." 20 U.S.C. § 1099c(e)(1). This means the Department cannot require the assumption of joint liability as a matter of course, as it appears to suggest with its "updated standard." And even if it could, the Department has not met the APA's requirement to provide a reasoned explanation for its apparent change in policy. *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009) ("An agency may not, for example, depart from a prior policy *sub silentio*. . . . And of course, the agency must show that there are good reasons for the new policy").

Because the Department failed to offer any justification for why Sterling's signature was **necessary** to protect the financial interest of the United States, the decision is arbitrary and capricious as a matter of law.  *National Nutritional Foods Assoc. v. Weinberger*, 512 F.2d 688 (2d Cir. 1975) ("even under the 'arbitrary and capricious' standard agency action will not be upheld where inadequacy of explanation frustrates review").

### 2. The Department's regulations precluded it from demanding Sterling's assumption of personal liability.

In addition to the HEA's limitations, the Department's own regulations limit the circumstances in which it may require owners to assume personal liability. Under those regulations, the Department may only require an owner to assume personal liability if "at the end of the period or which the Secretary provisionally

certified the institution, the institution is still not financially responsible." 34 C.F.R. § 668.175(f)(3)(B).

FCSL was fully certified when the Department offered the proposed provisional PPA requiring Sterling's signature in November 2020. It was only then that the Department to action to continue FCSL's participation in Title IV on a provisional basis. In other words, the Department violated its regulations by requiring Sterling's signature at the **beginning** of the provisional period, rather than at the **end**. *Id.*

Indeed, the last PPA FCSL executed was dated June 15, 2011, and granted FCSL full certification. Compl. ¶ 86. When that PPA expired on June 30, 2016, it continued, month-to-month and with the same terms, until the Department issued its decision on FCSL's original 2016 application for recertification. *See* 34 C.F.R. § 668.13(b)(2).

The Department waited until November 27, 2020 to issue that decision, which determined that FCSL could continue participation in Title IV (subject to the June 18, 2019 terms) on a provisional basis for a term that expired on September 30, 2023. Ex. 16 (November 27, 2020 Recertification Decision). If, at the **end** of that term, the Department determined Sterling's assumption of liability was necessary to protect the financial interest of the United States, it could then— and only then—require its signature. 34 C.F.R. § 171(f)(3)(b); 20 U.S.C. § 1099c(e)(1).

### 3. The Department's demand for Sterling's signature is contrary to the evidence.

There is significant evidence that the financial interests of the United States are amply protected without Sterling's assumption of joint liability. *See Defs. of Wildlife*, 733 F.3d at 1115 (an agency action is arbitrary and capricious if its decision runs counter to the evidence before it). At the outset, other than the liabilities InfiLaw has been trying to settle with the Department related to the closure of its two former schools, FCSL has never failed to pay any liability assessed by the Department. Compl. ¶ 155. And to the extent the Department had any concerns about FCSL's ability to pay future liabilities it already held a $5.6 million letter of credit, representing 78 percent of the Title IV funds FCSL received in the most recently completed fiscal year. *Id.* ¶ 49.

The Department previously said this level of security was more than enough to protect its financial interests going forward. Compl. Ex. at 1. Less than a year earlier, in June of 2019, the Department determined that a 70 percent letter of credit would be sufficient to demonstrate financial responsibility. *Id.* At that time, the Department was aware of all potential liabilities associated with the closure of InfiLaw's other schools and the then-current financial conditions of both InfiLaw and FCSL. *Id.* The Department now holds more protection than what it previously deemed sufficient in 2019.

And FCSL's and InfiLaw's financial position have improved substantially since June 2019. Notably, Almich concluded in its reports on InfiLaw's FYE 2019

and FYE 2020 financial statements that it no longer had substantial doubt about FCSL's ability to continue as a going concern. Ex. 3   ¶¶ 12-14 (Decl. of Ryan Malouf).

This is significant because after FYE 2018, when InfiLaw's ability to continue operations was in doubt, the Department considered a 35 percent letter of credit a sufficient level of security. But when InfiLaw's and FCSL's improved financial condition eliminated that doubt in FYE 2019 and FYE 2020, the Department concluded that a 78 percent letter of credit was **not sufficient**. That makes no sense. And the Department has certainly not offered a reasonable explanation for these irreconcilable positions.

FCSL's FYE 2019 and 2020 audits also show that it has a positive cash flow notwithstanding a net operating loss caused by non-cash expenses. Compl. ¶¶ 160 - 164. Put another way, FCSL continued to show that it is a viable operation.

The Department's reliance on InfiLaw's consolidated audits says little about the continued viability of the school. Its two other law schools have not been operational for several years. *Id.* ¶ 34. And the net losses and working capital deficiencies cited by the Department (about which it has known since June 2019) were caused by losses stemming from InfiLaw's writing off of the substantial value of those schools. *Id.* ¶ 168. These paper losses do not negatively impact the future operation of FCSL. In fact, the Department is supposed to exclude these losses when calculating an institutions financial responsibility ratios. 34 C.F.R. § 668.172(c).

24

In addition to FCSL's letter of credit and improved financial position, all others with ownership interests agreed to sign the PPA, providing even more security to the Department.  Compl. ¶ 112.

It is also telling that the Department never sought to determine whether Sterling's assumption of joint liability would provide any security at all.  The Department did not seek financial statements, ask about assets, or otherwise inquire about Sterling's ability to pay liabilities.  In fact, the Department was informed that Sterling's only asset was its ownership in InfiLaw.  Compl. Ex. 5 at 2 (June 16, 2020 Response to Additional Requests re: Sterling Waiver Letter).  Thus, there is no evidence that Sterling's signature—even if it was not prohibited from doing so—would do anything to protect the financial interests of the United States.

The Department's failure to consider Sterling's offer of $1 million in guaranteed security when it knew Sterling had no assets was itself arbitrary and capricious.  *See Defs. of Wildlife*, 733 F.3d at 1115 (an agency action is arbitrary and capricious where it "entirely failed to consider an important aspect of the problem").

### B. The Department's bases for denying FCSL's application for reinstatement are without legal and factual support.

To complete its efforts to close FCSL, the Department took legally and factually unsupportable positions in denying FCSL's application for reinstatement. With Sterling relinquishing its ownership interest, the only roadblock to continuing FCSL's participation had been removed: FCSL now had 100 percent of

25

its ownership interest as signatories on the provisional PPA.  And between November 27, 2020 (when the Department determined to recertify FCSL on a provisional basis) and April 8, 2021 (the date of FCSL's application for reinstatement), nothing else happened that could reasonably have affected the Department's analysis of FCSL's fitness to participate in Title IV.

But the Department nonetheless refused to budge.  Because it had no new information to support its decision, it arbitrarily fabricated new grounds to remove FCSL from Title IV. The Department's strained interpretations of governing law and unreasonable factual positions taken in its decision leave little doubt that the decision was mere pretext for its pre-determined goal of closing the school.  *See DOC v. New York*, 139 S. Ct. 2551, 2575-76 (2019).

### 1.  The Department unreasonably misinterpreted audits of InfiLaw's financial statements.

First, in its May 13, 2021 decision, the Department fabricated disclosures in InfiLaw's audited financial statements to bolster its erroneous conclusion that FCSL does not meet financial responsibility requirements.  Under 34 C.F.R. § 668.171(h), the Department may deem an institution not financially responsible if its audited financial statements "contain a disclosure in the notes [] that there is substantial doubt about the institution's ability to continue as a going concern as required by accounting standards."

Neither Holding's nor FCSL's audited financial statements can reasonably be read to contain such a disclosure.  *See* Compl. Ex. 3. The Department's

regulations are clear that any such disclosure must be made "as required by accounting standards."  34 C.F.R. § 668.171(h).  Had Almich concluded that substantial doubt existed about InfiLaw's ability to continue as a going concern, it was required to disclose that opinion in a section titled "Substantial Doubt about the Entity's Ability to Continue as a Going Concern." Compl. Ex. 3 ¶ 17.  InfiLaw's financials contain no such section.  *Id.*

It defies logic that the Department reasonably believed Almich disclosed substantial doubt about InfiLaw's or FCSL's ability to continue as a going concern.  The Department's fundamental misapplication of its financial responsibility regulations cannot be a mistake or a difference of opinion.   Rather, the Department's unsupportable position indicates the pretextual nature of the Decision.

Presented with a declaration from Almich plainly exposing the Department's mischaracterization (*see* Compl. Ex. 3), the Department had no choice but to concede that it failed to properly interpret the financial statement.  Compl. Ex. 15 at 1.  Of more concern, the Department admitted that it came to its erroneous conclusion without examining relevant evidence.  *Id.* at 2 ("the Department will conduct a further review that includes obtaining the audit work papers concerning the going concern issue"); *see Defs. of Wildlife*, 733 F.3d at 1115.  In other words, the Department determined there was substantial doubt about FCSL's ability to continue as a going concern without a valid auditor disclosure and **without**

**looking at the relevant documents**.  Compl. Ex. 15 at 2.  Indeed, these are

inquiries the Department must make **before** it closes a school—not after.

> ### 2. The Department improperly relied on routine accreditation findings to bar FCSL from Title IV programs.

Next, the Department cites February 21, 2021 ABA findings of

noncompliance with various accreditation standards to conclude that FCSL is not

providing services to its students.  Compl. Ex. 14 at 3-4; Compl. Ex. 15 at 2-6.

Notably, the Department does not identify any instance where the ABA took

adverse action or sanctions against the school for those findings.  Nonetheless,

without any independent fact finding of its own, the Department cites those same

findings as a basis for denying FCSL's Title IV eligibility.  *See Id.*  But only the ABA

is responsible for overseeing FCSL's compliance with the ABA's requirements.  *See*

20 U.S.C. § 3403(b); 20 U.S.C. § 1232a.  The Department has no authority to

impose sanctions where the ABA did not.  *Id.*

In fact, accreditors, including the ABA, routinely cite institutions for failing

to meet one or more standards of accreditation.  Compl. Ex. 17 at ¶ 8 (Declaration

of Donald Polden).  The mere existence of these findings is not sufficient evidence

to conclude that an institution's accreditation status is in jeopardy or that the

institution is not capable of providing services to its students.  *Id.* ¶ 1.  In fact, the

types of findings relied on by the Department in denying FCSL's eligibility are not

unusual in ABA accreditation process.  *Id.* ¶¶ 19-20.

### a. The Department is expressly precluded from prematurely interfering in accreditation matters.

Both the HEA and the Department's regulations prohibit the Department's involvement in accreditation matters until an accreditor initiates adverse action against an institution or specifically notifies the Department of failures to meet Title IV requirements. *Armstrong v. Accrediting Council for Continuing Educ. & Training*, 980 F. Supp. 53, 63 (1997) ("While the Secretary has the authority to decide whether a particular accreditor's standards warrant approval as a reliable indicator of educational quality, 20 U.S.C. § 1099b(a), the Department itself is barred from interfering in an accrediting agency's assessment regarding individual schools. 20 U.S.C. § 3403(b)").

Indeed, Congress expressly barred the Department from interfering in an accrediting agency's assessment of institutions. *See* 20 U.S.C. § 3403(b) ("No provision of a program administered by the Secretary or by any other officer of the Department shall be construe to authorize the Secretary or any such officer to exercise and direction, supervision, or control . . . over any accrediting agency or association"); *see also* 20 U.S.C. § 1232a (precluding Department interference in the curriculum, program of instruction, or personnel of any institution).

Moreover, the HEA and the Department's implementing regulations require accreditors to provide substantial due process to an institution before it can take adverse action. These requirements protect institutions against the loss of Title IV eligibility before being given the opportunity to address an accreditor's findings

and take corrective measures.  Accrediting agencies must adopt review procedures that afford due process and, specifically, "sufficient opportunity for a written response . . . regarding any deficiencies identified by the agency," to be considered by the agency within a timeframe determined by the agency, and before any adverse action is taken. 20 U.S.C. § 1099b(a)(6); 34 C.F.R. § 602.25. The Department's regulations also require that when the accreditor determines an institution is out of compliance, it must "require the institution to take appropriate action to bring itself into compliance with the agency's standards within a time period that must not exceed . . . two years." 34 C.F.R. § 602.20.

These due process requirements are important because accreditation standards are rarely bright line requirements and often involve subjective assessments of an institution's ability to develop and implement complicated policies and procedures.  Compl. Ex. 17 ¶ 15.  The accreditation process requires substantial back and forth between institutions and their accreditors, and Congress prohibits the Department's premature interference in that process. Compl. Ex. 17 at ¶ 16; 20 U.S.C. § 3403(b).  Those limitations would be meaningless if the Department is permitted, at its whim and without due process, to independently determine at any time whether an institution is meeting the requirements established by its accreditor.

In fact, an accreditor is expressly required to notify the Department if it has reason to believe an institution is not meeting Title IV requirements.  34 C.F.R § 602.27(a)(6).  The Department does not contend that it ever received such notice

from the ABA.   Absent that notice, the Department cannot reasonably conclude that the ABA's findings provide evidence that FCSL is unable to provide the services described in its official publications and statements and to provide the administrative resources necessary to comply with Title IV requirements. Compl. Ex. 14 at 3-4.  Compl. Ex. 15 at 2

> **b.    Routine accreditation findings are not sufficient evidence of an institutions failure to meet Title IV financial responsibility and administrative capability requirements**.

Originally, the Department denied FCSL's eligibility based on a bare list of ABA findings.  Compl. Ex. 14 at 3.  When FCSL sought approval of its transaction with a nonprofit institution, it provided the Department the asset purchase agreement as part of the Department's voluntary pre-acquisition review process. Compl. ¶ 214.   That agreement contained a schedule ("Schedule 2.22(a)") identifying various ABA accreditation Standards with which FCSL was found not to be in compliance.  Compl. Ex. 18 (Schedule 2.22(a)).  However, Schedule 2.22(a) only listed those Standards.  *Id.* It did not identify the reasons for the findings, the severity of the findings, or the ABA's requirements for demonstrating corrective action.  *Id.*

In its May 13, 2021, Decision, the Department remarkably concluded, citing Schedule 2.22(a) **only**, that FCSL is not capable of providing the services described in its official publications and statements. Ex. 14 at 3-4.  Without any apparent factfinding of its own, the Department cited Schedule 2.22(a) and the list of

standards to bolster its findings that FCSL is not financially or administratively capable. *Id*.

FCSL pointed out the gross insufficiency of this "evidence" in its May 24, 2021, Response. Compl. Ex. 19 at 8-9. In the Affirmation, the Department attempted to cure this failure by relating slightly more information about the findings. *See* Compl. Ex. 15 at 2-6. But it is apparent that the Department engaged in no independent factfinding of its own. *See Id*. In other words, where the ABA itself determined FCSL's compliance issues did not warrant sanctions, the Department—using the ABA's description of those issues alone—determined that nothing short of termination of Title IV eligibility was appropriate. The Department's usurpation of the ABA's authority violates the HEA's express limitations. *See* 20 U.S.C. § 3403(b); *see also* 20 U.S.C. § 1232a.

Moreover, since the ABA and FCSL began the process of addressing the concerns raised by the site visit team, FCSL made substantial efforts to ABA's concerns prior to being terminated. Comp. ¶ 224. As recognized by Congress, the ABA—not the Department—is in the best position to determine whether FCSL's efforts in that regard are sufficient to reestablish compliance with all Standards or whether adverse action is warranted. *See Armstrong*, 980 F. Supp. at 63.

> **c.** **The Department's unreasonable interpretation of the ABA's findings conflicts with the results of its own investigation**.

The Department asserts that the February 21, 2021 ABA findings show that it is not administratively capable of complying with Title IV requirements. Compl.

Ex. 14 at 3; Compl. Ex. 15 at 2.  To be clear, FCSL is providing all advertised services to its students.  The Department has not identified any instance of a student being denied services at the school.  Moreover, the Department recently issued the final report on its own investigation into FCSL's administration of Title IV programs, and it determined FCSL is administratively capable of complying with Title IV requirements.  Compl. Ex. 20 at 4-5. (September 10, 2020, Final Program Review Determination).

That report, issued in September 2020, followed an August 2019 Program Review in which the Department assessed "FCSL's compliance with the statutes and regulations as they pertain to the institution's administration of the Federal student aid programs under [Title IV, HEA]." Compl. Ex. 21 at 1. In the final report, the Department expressly found that "FCSL has taken the corrective actions necessary to resolve Finding[] #1. Lack of Administrative Capability[]." Ex. 20 at 8.  Put simply, the Department concluded that it had no basis to find FCSL was not administratively capable of complying with Title IV requirements.  *Id.*

The ABA's findings are not sufficient evidence for the Department to disregard its own investigation into FCSL's administrative practices and independent determination that FCSL is administratively capable of complying with Title IV requirements. *See Defs. of Wildlife*, 733 F.3d at 1115 (an agency action is arbitrary and capricious if its decision runs counter to the evidence before it).

### 3.  FCSL did not breach its fiduciary duty to the Department.

The Department's regulations detail specific requirements about what events must be reported and when. *See, e.g.,* 34 C.F.R. § 600.26; 34 C.F.R. § 600.21(a); 34 C.F.R. §668.171(h). Tellingly, the Department has not cited any of those regulations in finding that FCSL withheld information in violation of a fiduciary duty. FCSL has sought to keep the Department informed of every reportable change in ownership and accreditation action as required by the Department's regulations. Compl. ¶ 236. And whenever the Department requested additional information from the FCSL, FCSL provided it. *Id.* ¶ 237.

Nonetheless, to bolster its factually unsupportable action, the Department created new disclosure requirements out of whole cloth and claimed that FCSL breached its fiduciary duties when it failed to follow them. That is not only arbitrary and capricious, but it is a violation of FCSL's basic due process rights. *See FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012) ("Even when speech is not at issue, the void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way.")

The Department first claims that FCSL had an obligation to report the February 2021 ABA findings, for which no sanctions were imposed. Next, it claims that FCSL had an obligation to report an instance where Sterling waived certain voting rights, which FCSL **did** disclose eight days before it was required to by

regulation.   Finally, the Department spends the majority of the Affirmation discussing the ABA's consideration of FCSL's application for its approval of a transfer of the school to a nonprofit entity.   As discussed below, the Department has no reasonable basis to claim that FCSL's communication of this information in any way violated any controlling requirement.

### a.   The Department's regulations do not require reporting routine accreditation matters.

The Department's regulations are explicit about when an institution must report accreditation matters to the Department. Institutions are only required to notify the Department when an accreditor "issue[s] an order, such as a show cause order or similar action that, if not satisfied, could result in the withdrawal, revocation or suspension of institutional accreditation for failing to meet one or more of the agency's standards."   34 C.F.R. § 668.171(f)(1)(iv); 34 C.F.R. § 668.171(d)(1).  No such order or action was issued by the ABA.

Had the exchange of information between FCSL and the ABA prompted the accrediting commission to take any action to imperil FCSL's accreditation, both FCSL and ABA would have notified the Department. *See Id*.; 34 C.F.R. § 600.26 (requiring accreditors to report adverse accreditation actions).  But, with regard to the matters raised by the Department, the ABA did not take action to sanction FCSL or require it to show cause why its accreditation should not be withdrawn. FCSL has maintained its status as a fully approved law school since 2002. Compl. ¶ 22.

35

Nonetheless, the Department arbitrarily contends that FCSL had an obligation to disclose routine accreditation findings. Compl. Ex. 14 at 4-6. Upon information and belief, the Department does not require other Title IV institutions to disclose accreditation matters other than those required by its regulations. *See* 34 C.F.R. § 668.171(d)(1). The Department's imposition of a reporting requirement not applicable to any other institution further demonstrates the lack of fairness afforded to FCSL and reveals the bad faith and pretextual nature of the Department's decision. *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996) ("A long line of precedent has established that an agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently").

       b.      **Reporting a potential change of ownership eight days before the regulatory reporting requirement is not a breach of fiduciary duty**.

Worse still, the Department claims that FCSL breached its fiduciary duty by reporting an event eight days **before** the regulatory deadline. Compl. Ex. 14 at 5; Compl. Ex. 15 at 13. As the Department noted in its decision, Sterling waived its voting rights on April 22, 2020. Compl. Ex. 14 at 5; Compl. Ex. 15 (April 24, 2020 Notice to the Department re: Sterling's waiver and June 1, 2020 response to information requests). FCSL notified the Department of the change on April 24, 2020—**just two days later**. *Id.* The Department's regulations require institutions

to notify the Department of changes of control events within ten days.[4]  34 C.F.R. § 600.21(a).  Nonetheless, the Department shockingly found that FCSL breached a fiduciary duty by reporting that event eight days before that deadline. Compl. Ex. 14 at 5.  The Department cannot reasonably claim that FCSL breached a fiduciary duty to the Department by disclosing Sterling's waiver two days after it happened and eight days before the regulatory deadline.

To further bolster its case, the Department notes that FCSL did not provide documentation of the changes until June 1, 2020, despite requesting the information on May 12.  *Id*.  But the Department fails to explain why, if the information was so vital that it had to be disclosed with 48 hours, it waited eighteen days after it received notice to request the documentation.  Indeed, in the Affirmation, the Department contends this information was critical to its "prompt" determination of how it affected FCSL's Title IV participation.  Compl. Ex. 14 at 15.

Also, the Department did not impose any deadline in its May 12, 2021, request.  Compl. Ex. 4 at 2-3.  In the Department's initial follow up to the request, on June 1, 2020, FCSL's counsel provided all requested information on that same day, and he provided additional information just two weeks later. *See* Compl. Ex. 4; Compl. Ex. 5.  Further still, considering the Department took eighteen days to request the information, the Department does not explain why it was unreasonable for FCSL to take eighteen days to respond.

---

[4] FCSL does not concede that Sterling's waiver of its ownership interest as a change in control event under the Department's regulations.

And, although the Department said the information was critical to its "prompt" determination, to this day the Department has not notified FCSL of that determination. Compl. ¶ 263.

The insincerity of the Department's contention is further laid bare by the fact that, notwithstanding FCSL's alleged egregious breach of fiduciary duty, it sought to continue FCSL's participation just months later without raising the issue at all. *See* Compl. Ex. 16. If FCSL's reporting of Sterling's waiver amounted to a breach of fiduciary duty, it raises the question of why the Department nonetheless offered a provisional PPA in November 2020. And why is it only now that the Department has first voiced its dissatisfaction with FCSL's response from over a year ago? Again, the Department seeks to justify its pretextual decision "with an explanation for agency action that is incongruent with what the record reveals about the agency's priorities and decisionmaking process." *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019)

### c. The Department does not require institutions to disclose preliminary plans to sell or transfer a school.

Finally, the Department asserts that FCSL had an affirmative obligation to disclose every detail about every **proposed** transaction. That simply inconsistent with the Department's regulations. Those regulations are clear: an institution must disclose a change of control event within 10 days **after** it happens. 34 C.F.R. § 600.21(b)(6). The Department does not require the disclosure of any information regarding a transaction before it happens. *Id.*

In 2019, FCSL made substantial efforts to transfer the school to an over 100-year-old nonprofit university with substantial assets and unassailable financials. Compl. ¶ 270. This transaction would have ensured the continued financial viability of the school, resolving any concerns the Department had about its financial responsibility. Before FCSL could close the transaction and apply for a change in ownership under the Department's regulations, it first had to obtain approval from the ABA. *Id.* ¶ 272. After multiple reviews, hearings, and exchanges of information, the ABA ultimately denied its approval. *Id.* ¶ 273. At no point in that process did the ABA find that FSCL intentionally withheld any information. *Id.* ¶ 274.

The Department also offers a voluntary pre-acquisition review process, which provides the opportunity to get feedback from the Department about potential issues with a transaction. 64 Fed. Reg. 58608, 58612 (Oct. 29, 1999). There is no requirement, nor is it expected, that an institution submit a "materially complete" application for this process. *Id.* The process is not binding, and there is no affirmative obligation to participate. *Id.* It is for the institution's benefit only.

Nonetheless, the Department appears to suggest that FCSL had an obligation to disclose every aspect of FCSL's proposed transaction when it submitted its 2019 preacquisition review request in the summer of 2019. Compl. Ex. 15 at 12. Equally concerning is that the Department conspicuously downplays the fact that FCSL's request was submitted through the Department's Abbreviated Preacquisition Review ("APAR") process option. This option "only focuses on

whether the Department will require an irrevocable 25% letter of credit [] to be posted because the Institution's new owner cannot submit two years of financials to comply [with application requirements]." Compl. Ex. 22 at 1 (August 7, 2019 APAR letter). The Department cannot reasonably contend that as part of that limited review process, FCSL had an obligation—fiduciary or otherwise—to give any information that did not bear on the sufficiency of the proposed new owner's financial statements.

Moreover, from the summer of 2019 through September 2020, the Department and InfiLaw communicated frequently while seeking settlement of potential liabilities associated with the closure of InfiLaw's other two schools. Compl. ¶ 282. These liabilities were not attributable to FCSL unless they went unpaid (*see* 34 C.F.R. § 668.174(b)), and it was important to InfiLaw that it be able to pay them without jeopardizing FCSL or its transfer to a nonprofit. *Id.* ¶ 284. Throughout that process the Department could have asked for any information it wanted about the terms of the proposed transaction. And it stands to reason the Department did ask for any information that it genuinely wanted. Indeed, FCSL consistently provided the Department with any information it requested. *Id.* ¶ 286.

In fact, the nonprofit seeking to acquire FCSL sent the Department a letter on October 1, 2020, which explained to the Department the general terms of the deal. Compl. Ex. 2 at 2. The nonprofit explained that the transaction would involve its assumption of certain debt obligations. *Id.* at 2. It also explained that these had

yet to be finalized and "would be disclosed on the same day audited balance sheet submitted after closing [pursuant to the Department's change in ownership application process]." *Id.*

Clearly, the Department was aware that the material terms of the transaction would not be disclosed before closing. Which is why it is significant that it nonetheless issued a provisional PPA for FCSL's continued participation just two months later.  The Affirmation spends many pages discussing how InfiLaw's debt would be paid and how vital that information was to FCSL's consideration as an eligible institution.  But when the Department was told that information would be provided pursuant to the Department's published requirements (*i.e.*, **after** the transaction), it made no objections, asked for no additional information, and even offered to continue FCSL's participation in Title IV for three more years. It is outrageous that the Department now claims that FCSL had any obligation to provide the information earlier.

Yet in the Affirmation, the Department brazenly suggests that InfiLaw's desire to settle and pay liabilities assessed to the closed schools created a heightened obligation to provide information that even the Department did not deem important enough to request. Compl. Ex. 15 at 12.  But the Department never explains **why** that is the case.   InfiLaw never conditioned any settlement agreement on the Department's approval of the transaction.  Compl. ¶ 297.  In fact, the terms of the proposed settlement were clear that InfiLaw remained liable for the closed schools' liabilities whether or not FCSL changed ownership. *Id.* ¶ 298.

41

Really, the only term that substantially varied the default regulatory requirements was acceptance of a payment plan that would prevent the Department from drawing on the letter of credit that was collateralized by personal homes and funds. *Id.* ¶ 299.  There was nothing insidious about this arrangement.  To the contrary, InfiLaw only sought to pay what it owed. *Id.* ¶ 300.

Ultimately, the Department's ability to approve or disapprove a final transaction would remain unchanged under the requirements of 34 C.F.R. § 668.31.  Then, and only then, would FCSL have a fiduciary duty to disclose all material term of the transaction.  *Id.*  The Affirmance spends many pages discussing concerns about debt payments and service agreements with other entities contemplated by the proposed transaction submitted to the ABA.  But the ABA's findings are not binding on the Department, which would always be free to deny the transaction if those arrangements failed to meet the Department's requirements.  *Id.*  Indeed, an institution may be wise to provide as much information to the Department during the preacquisition review process prior to closing a potentially irreversible transaction, but it does not have to.

As with the ABA communications and the Sterling waivers, the Department has gone out of its way to characterize a mundane action in a nefarious way. The Department's findings that FCSL violated its fiduciary duties are unsupported by law and fact.  *See New York v. United States DOC*, 351 F. Supp. 3d 502, 518 (S.D.N.Y. 2019) ("the APA does require that [] an agency . . . must . . . comply with all applicable procedures and substantive laws; and articulate the facts and reasons

42

— **the real reasons** — for that decision). There is simply no way these findings are the result of fair, reasoned administrative decision making.  Instead, they are pretextual and demonstrate a failure to undertake a good-faith review of FCSL's application for reinstatement.  Thus, they are contrary to the law.  *See Id.*

### 4. FCSL is financially responsible under the Department's Letter of Credit Alternative.

FCSL is financially responsible under the Department's letter of credit alternative by virtue of its posted letter of credit totaling almost 80 percent of the Title IV received by FCSL in FYE 2020.  *See* 34 C.F.R. § 668.175(c).  The letter of credit alternative provides that an institution that posts a satisfactory letter of credit is financially responsible notwithstanding its inability to meet other financial responsibility requirements.  *Id.*

So even if the Department had legitimate reasons to believe FCSL failed to meet certain requirements, FCSL is nonetheless financially responsible once the Secretary accepts the letter of credit.  *Id.*

And, in fact, the Secretary already determined that FCSL's letter of credit is sufficient to meet financial responsibility requirements.  In June 2019, the Department concluded that by posting a letter of credit in an amount representing 70 percent of the Title IV program funds received by the institution in the most recent fiscal year, the institution would qualify as a financially responsible institution.  Ex. 1 at 2.

Neither the May 13, 2021 nor the Affirmation explain why the 78 percent letter of credit is not sufficient to meet the requirements of the letter of credit alternative under 34 C.F.R. § 668.175(c).  Congress requires the Department to consider an institution's total financial circumstances when determining the level of security required under the letter of credit alternative.  20 U.S.C. § 1099c(c)(2).  The Department's decisions evidence no such inquiry, nor do they offer any basis to require more security that what the Department deemed sufficient in June 2019.  Indeed, as discussed above, FCSL's financial condition has improved while its receipt of Title IV funds has dropped.

The Department's failure to consider FCSL's letter of credit in finding that FCSL is not financially responsible renders the May 13, 2013 decision and Affirmance arbitrary and capricious.  *Defs. of Wildlife*, 733 F.3d at 1115 (an agency action is arbitrary and capricious when the agency failed to consider an important aspect of the problem). Both the HEA and the Department's regulations require consideration of the letter of credit alternative when determining whether an institution is financially responsible.

### III.    Unless FCSL's Title IV eligibility is immediately restored, it will be irreparably harmed.

Courts have widely recognized that loss of Title IV eligibility is an existential threat to an institution that, on its own, demonstrates clear irreparable harm.  *See e.g., Fla. College of Bus. v. Accrediting Council for Indep. Colleges & Sch.*, 954 F. Supp. 256, 259-60 (S.D. Fla. 1996) ("[The plaintiff] will suffer irreparable harm if

44

an injunction is not issued[ because,] [w]ithout accreditation, [the plaintiff] cannot receive Title IV funding, and therefore, [the plaintiff] cannot continue daily operations and must close immediately").[5]

Like almost any institution of higher education, FCSL cannot survive without Title IV funding.  Compl. ¶ 319.  In FYE 2020, 79 percent of the school's funding came from Title IV.  Compl. 320.  FCSL estimates that, for FYE 2021, Title IV funds accounted for just over 80 percent of its revenue.  *Id.*

Despite the revenue cost, FCSL has continued to offer tuition-free courses for its summer students.  *Id.* ¶ 321.  Notwithstanding a loss of $1.2 million in tuition for these courses (amounting to 20 percent of the school's annual revenue), FCSL has continued to pay its staff and faculty in good faith.  *Id.* However, it simply cannot endure that financial burden any longer.  *Id.* ¶ 322.  Absent relief, FCSL will be forced to close prior to commencing the fall term.  *Performance Unlimited v. Questar Publishers*, 52 F.3d 1373, 1382 (6th Cir. 1995) ("[economic harm resulting in the loss the movant's business] is precisely the type of harm which necessitates the granting of preliminary injunctive relief pending [litigation], because the

---

[5] *Accord Edward Waters College, Inc. v. S. Ass'n of Colls. & Schs.*, 2005 U.S. Dist. LEXIS 39443, *12 (M.D. Fla. Mar. 11, 2005) ("[T]he Court found that the College demonstrated a substantial threat of irreparable injury by its showing that 'critical federal funding of the school and its students may be immediately jeopardized"); *Canterbury Career Sch. v. Riley*, 883 F. Supp. 1097, 1105 (D.N.J. 1993) ("[W]here denial of an injunction would result in a school no longer receiving income provided by student financial aid programs and where such income is necessary to continue operating the school, this would constitute irreparable injury.").

[resolution of the matter] will be a meaningless or hollow formality unless the status quo is preserved.")

Unless access to Title IV is immediately restored, FCSL will not be able to enroll any students for the fall term, which is scheduled to start on August 23, 2021. Compl. ¶ 324.  FCSL's currently enrolled students are in limbo and will soon be forced to withdraw, attend other schools as transient students, or seek to transfer to other schools.  *Id.*  It is unreasonable to expect students to continue to wait until the end of July before seeking alternatives. *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991) (finding irreparable harm due to loss of good will and customers).  If FCSL immediately regains access to Title IV, it believes it can retain 90 of its currently active students.  *Id.* ¶ 326.

Moreover, without Title IV eligibility, FCSL cannot enroll any new first-year students. Id. ¶ 327. At the time Department allowed FCSL's PPA to expire, applications for Fall 2020 entering class were up 38 percent over the previous year at the same time.  *Id.* ¶ 328. Based on prior trends, FCSL was on target for a fall entering class of 150, compared to 92 and 68 the previous two years. *Id.* ¶ 328.  If immediately reinstated, FCSL believes it could yield a fall class of 70 first year students.  *Id.* ¶ 329.

The loss of Title IV will also result in the loss of employment for dozens of staff and faculty members.  *Id.* ¶ 330 Four staff members have already been terminated because of the impending closure.  Absent relief from this Court, all faculty will conclude their employment on July 31.  *Id.* ¶ 331.

Lastly, FCSL has reached an agreement with a 100-year-old nonprofit institution with more that $147 million in assets and composite scores of 3.0 for both FYE 2018 and 2019—well above the Department's 1.5 requirement.  Id. ¶ 332; Compl. Ex. 2.  Subject to that agreement, the nonprofit would take over ownership of FCSL while the Department and InfiLaw work to resolve CSL and ASLS's liabilities, which are more than covered by the $5.6 million letter of credit held by the Department.  FCSL cannot stay in business to consummate that transaction absent immediate relief from this Court.  *See Vestavia Hills, Ltd. v. United States SBA (In re Vestavia Hills, Ltd.)*, 618 B.R. 294, 306 (Bankr. S.D. Cal. 2020) (finding irreparable harm where a senior housing community was barred from federal COVID-19 relief funds that would have allowed continued operation while seeking to sell the facility as a going concern).

## IV.    The balance of the equities and the public interest favor issuance of the requested injunctive relief.[6]

FCSL has demonstrated its value to the Jacksonville community and region.  Its graduation rates, bar passage rates, and employment rates show that an FCSL law degree provides a substantial benefit to its students.  FCSL also prides itself on nurturing a diverse student body and readying them for a profession that historically has fallen short on inclusiveness.  The public plainly has an interest in

---

[6] The balance of the equities and the public interest merge when the government is a party.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  These factors primarily address the impact of the injunction on non-parties. *League of Wilderness Defenders/Blue Mts. Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014).

keeping schools like FCSL open, especially in an environment where focus on ratings precludes access for well-qualified law school applicants (particularly historically disadvantaged minorities). *Fla. College of Bus.*, 954 F. Supp. at 854-55; *see also*, *Meyer v. Nebraska*, 262 U.S. 390, 400 (1923) ("The American people have always regarded education and acquisition of knowledge as matters of supreme importance which should be diligently promoted").

For the reasons stated above, FCSL's students will be substantially harmed without emergency relief.  Further, FCSL's more than 6,000 alumni will see the perception and value of their law degrees plummet because the Department seeks to punish FCSL for reasons that should have no bearing upon the life of the school or its students.  *Id.* at 855 (finding the public has an interest in protecting the investment the government has made in students whose employment prospects and likelihood of repaying their loans would drop if their school lost eligibility). And the public similarly has an interest in protecting the jobs and resources FCSL offers to its faculty and staff, and the economic impact FCSL brings to the Jacksonville community via the patronage of its students.  *Id.*

It would be cruel, unfair, and against public interest for FCSL and its stakeholders to endure that type of damage—from which recovery would be impossible—if it were ultimately determined that the Department's actions were improper.  *Id.*

On the other hand, requiring the Department to follow its own regulations is not against the public interest. *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th

Cir. 2013) ("[The government] cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns").  As discussed above, FCSL's most recent audited financial statements demonstrate that there is minimal to no risk of closure due to financial concerns. To the extent there is any such risk, the Department is fully protected by virtue of the substantial letter of credit in its possession.  Put simply, FCSL does not pose a financial risk to the Department.

FCSL remains fully accredited, and should FCSL be reinstated to Title IV, it will be able to begin the process of seeking necessary approvals to transfer its ownership to a well-established nonprofit.  The Department cannot dispute that that the nonprofit institution's ownership will ensure FCSL's financial security indefinitely.

## Conclusion

FCSL respectfully asks this Court to vacate the Department's March 26, 2021 final decision to require Sterling's signature as a condition of Title IV participation and, pending a decision on the merits, order the Department to restore FCSL's access to Title IV, pursuant to its original PPA.

Alternatively, FCSL requests that this Court vacate the Departments' May 13, 2021, denial FCSL's reinstatement application and restore FCSL's Title IV eligibility pending a decision on the merits.

Dated this July 20, 2021.

Respectfully submitted,

/s/ David D. Burns
David Burns (Fl. Bar No. 878081)
Ashley A. Dodd (Fl. Bar No. 58517)
FERRELLE BURNS
241 Atlantic Boulevard, Suite 203
Neptune Beach, Florida 32266
Telephone: (904) 372-4177
Facsimile: (904) 853-6984
Email: dburns@ferrelleburns.com
Email: adodd@ferrelleburns.com

/s/ Steven M. Gombos
Steven M. Gombos (pro hac vice pending)
David A. Obuchowicz (pro hac vice pending)
GOMBOS LEYTON, P.C.
11350 Random Hills Road, Suite 400
Fairfax, Virginia 22030
Telephone: (703) 934-2660
Facsimile: (703) 934-9840
Email: sgombos@glpclaw.com
Email: dobuchowicz@glpclaw.com

*Attorneys for Plaintiff*

## Certificate of Service

I hereby certify that on this 20th day of July, 2021, this Emergency Motion for Temporary Restraining Order and/or Preliminary Injunction was filed and served via Middle District of Florida Courts E-filing upon all counsel registered to receive electronic notifications, and also to counsel for Defendants via email at James.Bickford@usdoj.gov

*/s/ David D. Burns*
Attorney