# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

| | |
|---|---|
| FLORIDA COASTAL SCHOOL OF LAW, INC., | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. 3:21-cv-721-MMH-JBT |
| MIGUEL CARDONA, in his official capacity as Secretary of Education, *et al.*, | ) ) ) ) ) |
| Defendants. | ) ) |

## DECLARATION OF MICHAEL J. FROLA

I, Michael J. Frola, hereby declare under the penalty of perjury as follows:

1. I am over the age of 18 and competent to testify to matters herein. I am employed by the United States Department of Education ("Department") as the Director of the Department's Multi-Regional and Foreign Schools Participation Division ("MRFSPD"). I have been in my current role since 2012. I have worked for the Department since 2004.

2. I certify that I am duly authorized, am qualified, and have been given authority by the Department to make the statements contained in this Declaration. The statements contained herein are based on my personal

knowledge as an employee of the Department, my supervisory responsibilities, and my review of the pertinent records.

3. My duties as the Director of the MRFSPD include managing two distinct School Participation Teams under the School Eligibility and Oversight Group. One team focuses on the large nationally participating for-profit schools and the other oversees foreign schools participating in the title IV programs. The purpose of the position is to monitor and evaluate the operations of postsecondary schools participating in financial assistance programs authorized by the Higher Education Act of 1965, as amended. These evaluations are intended to ensure the schools comply with the provisions of the Act and the regulations, policies, and procedures issued pursuant to it. My responsibilities include overseeing the overall planning, direction, and timely execution of the Division and the management of all financial and other resources. I'm responsible for developing, assigning, and approving the goals and objectives of four Compliance Managers and provide input for the development and implementation of policy matters, including supporting national compliance goals and objectives.

4. My duties as the Director of the MRFSPD include overseeing the review of applications for changes of ownership resulting in changes of control ("CIO") at Institutions of Higher Education assigned to the MRFSPD

that participate in the Title IV programs. This also includes working with my staff to provide a pre-acquisition review to institutions, owners, and potential buyers who provide detailed information about a planned CIO to determine whether any issues might be present that would impact the approval for the CIO.

5. Until 2017, Florida Coastal School of Law had two sister schools—Arizona Summit Law School, and Charlotte School of Law. All three schools were proprietary institutions of higher education under Section 102(b) of the Higher Education Act, 20 U.S.C. § 1002(b). Each school was owned by a separate for-profit corporation (for example, Florida Coastal School of Law, Inc.), and those corporations were owned by InfiLaw Corporation, which was owned by InfiLaw Holdings, LLC, which was almost entirely owned by a private equity firm called Sterling Capital Partners, L.P.

6. Because of the schools' ownership structure, the Department reviewed the financial statements of their common holding company and assigned a single financial responsibility score under 34 C.F.R. § 668.171(b)(1), which applied to all three schools. For the fiscal years 2015 and 2016, the InfiLaw schools received a passing score of 1.5. For the fiscal year 2017, the composite score of 1.1 was not a passing score, but according

to 34 C.F.R. § 668.175(d) the InfiLaw schools were allowed to participate under the alternative standards of participation known as the Zone.

7. Under the Zone standards, an institution that is not financially responsible solely because its composite score is in the range of 1.0 to 1.4 may continue to participate in Title IV programs for up to three consecutive years if it continues to score in the Zone each year and makes disbursements to students under either the cash monitoring or reimbursement payment method and notifies the Department of certain oversight or financial events.

8. Charlotte School of Law closed in 2017. On December 19, 2016, the Department denied Charlotte School of Law's application for recertification for participation in the Title IV programs. *See* Exh. A. The basis of the denial of recertification was Charlotte School of Law's failure to meet the requirements of its accreditor related to admissions, rigor of education, and admissibility to the legal profession (both graduation and bar passage rates). Additionally, the action was based on Charlotte School of Law's breach of fiduciary duty and administrative capability by substantially misrepresenting the nature of the institution's educational programs. Following a request for reconsideration of the decision filed by Charlotte School of Law, the denial of recertification was affirmed on January 18, 2017. As a result, Charlotte School of Law lost eligibility to participate in the title

IV programs as of December 31, 2016. After the loss of eligibility to receive Title IV funds, Charlotte School of Law continued to operate until its state license expired on August 11, 2017. Its last date of instruction (closure date) was August 10, 2017.

9. Closed school loan discharges were issued to some of Charlotte School of Law's former students who applied and whose loan discharge applications were approved, *see* 34 C.F.R. § 685.214(c)(1), some of which are now the subject of pending administrative appeals brought by InfiLaw on behalf of the defunct school, *see id.* § 668.113. InfiLaw is challenging $1,585,802 of discharges, and is not contesting (but has not paid) another $3,475,261. On May 27, 2021, the Department also assessed additional automatic closed school discharges in accordance with 34 C.F.R. § 685.214(c)(3)(ii), for students who withdrew from Charlotte School of Law within 120 days of its closing and who did not subsequently re-enroll in any Title IV-eligible institution within a three-year period from the date Charlotte School of Law closed. Amounts assessed under the automatic closed school discharge provisions were $330,743. These automatic discharges are still subject to appeal.

10. Arizona Summit Law School closed in 2018, after the institution was informed that the American Bar Association intended to withdraw its

accreditation. On June 8, 2018, the Council of the Section of Legal Education and Admissions to the Bar of the American Bar Association issued a memorandum regarding its determination to withdraw the approval of Arizona Summit Law School.

11. Just prior to the start of the fall term in 2018, Arizona Summit entered into individualized teach-out plans with several law schools to allow its students to complete their studies at those institutions in order to receive Arizona Summit Law School degrees. The last date Arizona Summit Law School offered instruction was August 17, 2018.

12. InfiLaw is liable for (but has not paid) $130,427 of closed school discharges for Arizona Summit Law School. The lower liability amounts compared to CSL are attributable in large part to smaller enrollments and the timing of the closure that permitted many students to be taught out by, or transfer to, other law schools.

13. In sum, InfiLaw is responsible for $3,605,688 in unchallenged discharges, another $1,585,802 in discharges under appeal, and another $330,743 in automatic discharges subject to appeal. In addition, former students of InfiLaw schools have applied for "borrower defense to repayment" discharges, alleging that they were defrauded by the schools.

InfiLaw's potential liability from those pending applications totals approximately $167 million.

14. In 2016, Florida Coastal School of Law applied to renew its program participation agreement, which was set to expire in June of that year. *See* Exh. B. Because the renewal application was timely filed as provided in 34 C.F.R. §668.13, the participation agreement was automatically extended on a month-to-month basis until the Department reached a decision regarding renewal. In the meantime, the financial responsibility of the InfiLaw consortium of law schools was assessed each year.

15. For the fiscal year 2018—which included the closing of Charlotte School of Law and ended weeks before Arizona Summit Law School also closed—the InfiLaw schools for the first time received a failing financial responsibility score under 34 C.F.R. § 668.171(b)(1). *See* Exh. C. The schools received a -1.0, the lowest possible score, which they also received for fiscal years 2019 and 2020.

16. As a result of the first failing score, the Department required InfiLaw to post an irrevocable letter of credit to continue Florida Coastal's participation in the Title IV programs. The Department offered InfiLaw the choice between a letter of credit for $11,362,511—approximately seventy percent (70%) of the Title IV, HEA program funds received by InfiLaw during

the previous fiscal year, which would have allowed the institutions to continue to qualify as financially responsible—or half that amount, $5,681,255. Under the latter option, InfiLaw would "acknowledge[] that it has not met the Department's standards of financial responsibility," and subject itself to additional regulatory burdens and reporting requirements. The Department noted that "InfiLaw has faced substantial regulatory and operational difficulties that have resulted in the closure of two of its institutions."

17. InfiLaw chose to post the smaller amount, split between three letters of credit that the Department received from September 13 to November 6, 2019. *See* Exh. D. (received Sept. 13, 2019); Exh. E (received Nov. 5, 2019); Exh. F (received Nov. 6, 2019); Exh. G (renewing Exh. E). Each of the three letters identifies all three InfiLaw schools and provides security against the obligations of all three schools, which include the $3,605,688 in unchallenged discharges, $1,916,545 in discharges under appeal (or subject to appeal), and any potential discharges to come. If the pending (and any future) administrative appeals are unsuccessful, InfiLaw's letters of credit will exceed its debts to the Department by less than $160,000.

18. While Florida Coastal's application to renew its participation agreement was pending, InfiLaw discussed many potential transactions with the Department of Education. None came to fruition. In 2018, the parties discussed the possibility of a corporate restructuring that would free the still-operational InfiLaw school (or schools) from the liabilities of the closed school (or schools). The following year, InfiLaw asked the Department to conduct an abbreviated pre-acquisition review of a transaction in which Florida Coastal would be acquired by PhoenixLaw Foundation, a new Arizona nonprofit corporation with no financial statements to submit for review. Because of the lack of any financial statements, the Department determined that this transaction would require PhoenixLaw Foundation to post an irrevocable letter of credit for 25% of Florida Coastal's Title IV funding from the previous year. The proposed transaction with PhoenixLaw Foundation did not take place.

19. Later that year, in September 2019, the parties began to discuss the possibility that InfiLaw would sell Florida Coastal to Campbellsville University, a nonprofit institution in Kentucky. The proposed transaction was initially described at a high level in a conference call between me and some of my staff and with some InfiLaw staff on September 25, 2019. This possible transaction was also discussed on October 22, 2019. On December

17, 2019, InfiLaw submitted questions regarding this possible transaction by e-mail.

20. Schools considering a change of ownership resulting in a change of control may request that the Department conduct a pre-acquisition review to determine whether the school would remain eligible to participate in Title IV programs after the transaction and whether it might be required to provide a letter of credit. The pre-acquisition review is voluntary and not required under the Department's regulations. Institutions may also request an abbreviated pre-acquisition review that only advises the parties as to whether a letter of credit will be required to be submitted based upon a review of the new owner's financial statements.

21. On April 24, 2020, InfiLaw notified the Department that it planned to move forward with a Joint Marketing Agreement with Campbellsville and that Dr. Keith Spears, Vice President and Assistant to the President, would be appointed to the Florida Coastal School of Law Board of Directors.

22. On June 1, 2020, Department counsel contacted InfiLaw's outside counsel after learning that Florida Coastal School of Law had been placed on show-cause with the American Bar Association, asking a number of questions about FCSL's status, and requesting an update on the Campbellsville proposed transaction.

23. On June 16, 2020, InfiLaw's outside counsel responded and confirmed the execution of the Joint Marketing Agreement, the seating of the board director, and a request to the ABA for acquiescence to formally present the change in ownership application while on show-cause. At various times, the parties also discussed the possible settlement of InfiLaw's obligations to reimburse the Department for discharged loans made to students of Arizona Summit Law School and Charlotte School of Law but the Department ended these discussions without limiting the potential liabilities for the InfiLaw schools. InfiLaw's obligations for Arizona Summit Law School and Charlotte School of Law still have not been settled.

24. On November 30, 2020, the Department offered to approve Florida Coastal's application to renew its program participation agreement, which had been pending since 2016, so long as InfiLaw Corporation, InfiLaw Holding, LLC, and Sterling Capital Partners, L.P. each agreed "to be jointly and severally liable for the performance by the institution of its obligations under this agreement." *See* Exhs. H & I. Florida Coastal objected to the requirement for Sterling Capital Partners to sign the PPA, asserting that the corporation was prohibited from doing so. Florida Coastal's existing participation agreement remained on a month-to-month basis while the parties discussed whether the school's owners would agree to assume this

11

liability. In a letter dated March 26, 2021, *see* Exh. J, after reviewing material submitted by FCSL, the Department disputed this prohibition, reiterated the requirement for Sterling Capital to sign the PPA, and informed Florida Coastal that if its new PPA was not signed and returned to the Department by March 30, its existing agreement would expire the following day as provided in 34 C.F.R. §668.13(b)(2)—which it did.

25. On March 30, instead of returning a signed participation agreement, InfiLaw provided the Department with a draft agreement of sale under which Florida Coastal would be sold Campbellsville University for one dollar. A schedule appended to that draft agreement provided to the buyer summarized various concerns raised by the American Bar Association regarding Florida Coastal's compliance with ABA standards of accreditation. Despite the parties' regular communications regarding Florida Coastal and its ongoing effort to obtain approvals for a change of ownership transaction from the ABA, the Department had not been informed about a number of issues on the summary provided to the buyer.

26. On April 5, Sterling Capital relinquished its ownership of InfiLaw Holding, LLC.. The Department does not know who or what entity presently owns InfiLaw Holding, LLC. Florida Coastal applied for reinstatement to Title IV participation shortly thereafter. The Department denied the

application on May 13. *See* Ex K. The denial letter was issued by the Department's Administrative Actions and Appeal Division.

27. In its denial letter, the Department explained that Florida Coastal did not meet the standards of financial responsibility or administrative capability, and had fallen short of the fiduciary standard of conduct. As to financial responsibility, the Department noted that Florida Coastal (as an InfiLaw school) had received a failing score of -1.0 under 34 C.F.R. § 668.171(b)(1), and explained that the ABA's concerns indicated that Florida Coastal was "not providing the instructional, library, and career services that it advertises."[1] *See* 20 U.S.C. § 1099c(c)(1)(A) (explaining that "whether an institution has the financial responsibility required by [Title IV]" depends in part on "whether the institution is able . . . to provide the services described in its official publications and statements").

28. As to the fiduciary standard of conduct, the Department cited several failures of candor in Florida Coastal's dealings with the Department. And the Department concluded that Florida Coastal had also failed to meet the standards of administrative capability, in light of its failure to keep the Department apprised of those developments. *See* 34 C.F.R. § 668.16.

---

[1] The Department also erroneously suggested that Florida Coastal's auditor had raised a substantial doubt about the school's ability to continue as a going concern.

13

29. Florida Coastal sought reconsideration by letter dated May 24, *see* Exh. L, and the Department affirmed its denial on July 16, *see* Exh. M. The July 16 letter affirming the Denial of Reinstatement was issued by the Department's Administrative Actions and Appeal Division.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 28, 2021.

_____
Michael J. Frola