

## DEC 1 9 2016

Mr. Chidi Ogene
President
Charlotte School of Law
201 South College Street, Suite #400
Charlotte, NC 28244

Sent Via UPS
Tracking #:  1Z37X7Y30198482316

Re:  Denial of Recertification Application to Participate in the Federal Student Financial
Assistance Programs – Charlotte School of Law, 201 South College Street, Suite #400,
Charlotte, NC 28244; OPEID 04143500.

Dear Mr. Ogene:

The U.S. Department of Education (Department) has reviewed the application for recertification
submitted by Charlotte School of Law (CSL) to continue to participate in the student financial
assistance programs authorized pursuant to Title IV of the Higher Education Act (HEA) of 1965,
as amended, 20 U.S.C. §§ 1070 *et seq*. (Title IV programs).  CSL's most recent Program
Participation Agreement (PPA) expired on June 30, 2015.  CSL, however, timely submitted its
recertification application prior to that date.  As a result, the Department extended CSL's PPA on
a month-to-month basis while evaluating the application and related matters.  *See* 34 C.F.R. §
668.13(b)(2).  This notice is to inform you that the Department has concluded its review and
hereby denies CSL's application for continued participation.  CSL's participation in Title IV
programs will therefore conclude at the end of this month, on December 31, 2016.

For purposes of evaluating a recertification application, the Department reviews an institution's
performance as a participant in the Title IV programs and must ensure that the institution has met
the standards of administrative capability and financial responsibility, has complied with Title IV
program requirements, and has operated under the high standards of care, trust, and diligence
required of a fiduciary.  A denial of an institution's recertification application is warranted if the
Department determines that the institution does not meet all requirements and standards set forth
in Title IV and regulations issued thereunder.  HEA § 498, 20 U.S.C. § 1099c; 34 C.F.R. §
668.13.

In reaching a decision on CSL's recertification application, the Department reviewed all
materials submitted by CSL in support of its application.  The Department also reviewed other
relevant documents and information, including but not limited to the institution's history as a
participant in the Title IV programs and documents associated with the actions taken by the
Council of the Section of Legal Education and Admissions to the Bar of the American Bar



Mr. Chidi Ogene
Charlotte School of Law
Page 2

Council of the Section of Legal Education and Admissions to the Bar of the American Bar Association (the Council) and the Accreditation Committee of the Council (Committee). Collectively, the Council and the Committee will be referred to herein as the ABA.

CSL was founded in 2004 as a member institution of The InfiLaw System, a consortium of for-profit law schools that includes Florida Coastal School of Law and Arizona Summit Law School. Each of the three InfliLaw schools is owned by InfiLaw Holding, LLC. According to the InfiLaw schools, nearly all of the voting units of InfiLaw Holding, LLC are held by Sterling Capital Partners, L.P. The ABA provisionally approved CSL in 2008 and granted full approval in 2011. CSL first began participating in the Title IV programs through its execution of a provisional PPA in February 2009. CSL executed its most recent PPA in July 2011.

As a participating institution in Title IV, HEA programs, CSL drew $ 65,238,752 in Title IV funds during the 2014-15 award year and $48,537,250 for the 2015-16 award year. With respect to the 2015-16 award year, those funds included $29,434,902 in Direct, Graduate PLUS loans and $19,102,348 in Direct Stafford Unsubsidized loans. During this same award year, CSL enrolled 946 students who received Title IV aid. For purposes of its participation in Title IV programs, the school is approved only to offer a juris doctor program.

As described below, the ABA has determined that CSL is, and has been, out of compliance with certain ABA standards and that this noncompliance was "substantial" and "persistent." CSL also made substantial misrepresentations regarding the nature of its academic program in violation of the prohibition on substantial misrepresentations. 34 C.F.R Part 668, Subpart F. For the reasons discussed below, CSL's noncompliance with its accreditor's standards constitutes an independent basis for the Secretary to deny CSL's application for recertification, as does each of CSL's substantial misrepresentations. *See* generally HEA § 498, 20 U.S.C. § 1099c; 34 C.F.R. § 668.13.

Due to this denial, CSL is no longer eligible to participate in the Title IV programs, effective December 31, 2016. *See* 34 C.F.R. § 668.13(b)(2). This includes all Title IV programs listed on CSL's most current Eligibility and Certification Approval Report, including: Federal Work-Study (FWS), Federal Perkins Loan (Perkins Loan), and William D. Ford Federal Direct Loan (Direct Loan) programs. The Direct Loan program includes the Federal Direct Unsubsidized Stafford/Ford Loan program and the Federal Direct PLUS Program.

## CSL Violated the HEA, the Department's Regulations and its PPA by Failing to Meet the Requirements Established by its Nationally Recognized Accreditor

As a condition of eligibility to participate in Title IV programs, an institution must be accredited by an accreditor recognized by the Secretary. HEA §§ 101, 102(a)(1)(A), 102(b)(1)(D), 20 U.S.C. §§ 1001, 1002(a)(1)(A), 1002(b)(1)(D). *See also* 34 C.F.R. § 600.5(a)(6). In addition to that eligibility requirement, as a separate condition of initial and continued participation, an institution must "meet the requirements established by" its accreditor. HEA § 487(a)(21), 20 U.S.C. § 1094(a)(21). Under Part H of Title IV, all accrediting agencies are required to have, apply, and enforce standards for accredited institutions of higher education. *See* HEA §§ 496(a)(4)-(6), 20 U.S.C. §§ 1099b(a)(4)-(6) (including the requirement that accrediting agencies

Mr. Chidi Ogene
Charlotte School of Law
Page 2

Association (the Council) and the Accreditation Committee of the Council (Committee).
Collectively, the Council and the Committee will be referred to herein as the ABA.

CSL was founded in 2004 as a member institution of The InfiLaw System, a consortium of for-profit law schools that includes Florida Coastal School of Law and Arizona Summit Law School.
Each of the three InfiLaw schools are owned by InfiLaw Holding, LLC. According to the
InfiLaw schools, nearly all of the voting units of InfiLaw Holding, LLC are held by Sterling
Capital Partners, L.P. The ABA provisionally approved CSL in 2008 and granted full approval
in 2011. CSL first began participating in the Title IV programs through its execution of a
provisional PPA in February 2009. CSL executed its most recent PPA in July 2011.

As a participating institution in Title IV, HEA programs, CSL drew $ 65,238,752 in Title IV
funds during the 2014-15 award year and $48,537,250 for the 2015-16 award year. With respect
to the 2015-16 award year, those funds included $29,434,902 in Direct, Graduate PLUS loans
and $19,102,348 in Direct Stafford Unsubsidized loans. During this same award year, CSL
enrolled 946 students who received Title IV aid. For purposes of its participation in Title IV
programs, the school is approved only to offer a juris doctor program.

As described below, the ABA has determined that CSL is, and has been, out of compliance with
certain ABA standards and that this noncompliance was "substantial" and "persistent." CSL also
made substantial misrepresentations regarding the nature of its academic program in violation of
the prohibition on substantial misrepresentations. 34 C.F.R Part 668, Subpart F. For the reasons
discussed below, CSL's noncompliance with its accreditor's standards constitutes an
independent basis for the Secretary to deny CSL's application for recertification, as does each of
CSL's substantial misrepresentations. *See* generally HEA § 498, 20 U.S.C. § 1099c; 34 C.F.R. §
668.13.

Due to this denial, CSL is no longer eligible to participate in the Title IV programs, effective
December 31, 2016. *See* 34 C.F.R. § 668.13(b)(2). This includes all Title IV programs listed on
CSL's most current Eligibility and Certification Approval Report, including: Federal Work-Study (FWS), Federal Perkins Loan (Perkins Loan), and William D. Ford Federal Direct Loan
(Direct Loan) programs. The Direct Loan program includes the Federal Direct Unsubsidized
Stafford/Ford Loan program and the Federal Direct PLUS Program.

**CSL Violated the HEA, the Department's Regulations and its PPA by Failing to Meet the
Requirements Established by its Nationally Recognized Accreditor**

As a condition of eligibility to participate in Title IV programs, an institution must be accredited
by an accreditor recognized by the Secretary. HEA §§ 101, 102(a)(1)(A), 102(b)(1)(D), 20
U.S.C. §§ 1001, 1002(a)(1)(A), 1002(b)(1)(D). *See also* 34 C.F.R. § 600.5(a)(6). In addition to
that eligibility requirement, as a separate condition of initial and continued participation, an
institution must "meet the requirements established by" its accreditor. HEA § 487(a)(21), 20
U.S.C. § 1094(a)(21). Under Part H of Title IV, all accrediting agencies are required to have,
apply, and enforce standards for accredited institutions of higher education. *See* HEA §§
496(a)(4)-(6), 20 U.S.C. §§ 1099b(a)(4)-(6) (including the requirement that accrediting agencies
establish procedures that provide for written specification of "requirements, including clear

Mr. Chidi Ogene
Charlotte School of Law
Page 3

standards for an institution of higher education or program to be accredited"). *See also* 34 C.F.R. § 668.14(b)(23) (noting that "[b]y entering into a program participation agreement, an institution agrees that … [i]t will meet the requirements established pursuant to part H of Title IV of the HEA by the Secretary and nationally recognized accrediting agencies"). In its PPA, CSL expressly agreed to this latter condition, certifying that it would meet the requirements set by its accreditor pursuant to Part H of Title IV. PPA at 5 ¶ 23.

Between March 16 and 19, 2014, an ABA "site team" conducted an on-site Three-Year Interval evaluation of CSL. During the course of this site visit, the team met with Rick Inatome (CEO of InfiLaw Holding, LLC), Jay Conison (Dean of CSL), Don Lively (then-President of CSL), numerous CSL administrators, members of the institution's accreditation self-study Committee, CSL faculty, CSL staff, and CSL students. Members of the site team also visited a significant majority of the classes taught during its visit.

On September 15, 2014, the ABA provided CSL with a 72-page Inspection Report (Report) and invited the school to provide comments and note factual errors. The ABA informed CSL that the Report would provide the basis for its determination on whether CSL's programs were operating in compliance with the ABA Standards for the Approval of Law Schools (Standards). Among its topics, the Report discussed CSL's program of legal education (pp. 6-24), students (including both admissions qualifications and output metrics, including a discussion of bar passage statistics) (pp. 34-49), and financial operations (pp. 67-71). In October 2014, CSL responded in writing to the Report.

At its January 2015 meeting, the Committee reviewed both the Report and CSL's written response. Following that meeting, the Committee issued a decision (the "First Committee Decision") announcing that it had "reason to believe" that CSL had "not demonstrated compliance" with certain ABA standards. The Committee also "request[ed] additional information to make a determination" as to CSL's compliance with additional standards and interpretations, including Standards 301(a), 501(a), and 501(b), and Interpretation 501-1, which are foundational to the educational enterprise and the nature of the educational program offered by CSL.[1] Those additional standards and interpretation are:

> **Standard 301(a):** "A law school shall maintain a rigorous program of legal education that prepares its students, upon graduation, for admission to the bar and for effective, ethical, and responsible participation as members of the legal profession."

---

[1]    As discussed *infra*, compliance with these standards is materially important to students and prospective students. Moreover, we note that versions of current Standards 301 and 501 have been in effect since the ABA first adopted and published the Standards and Rules of Procedures in 1973. Even as the ABA has amended its standards and interpretations, such amendments have highlighted the importance of these particular standards. For example, in a recent revision of Standard 301(a), effective for the 2014-15 year, the ABA moved the word "rigorous" from an interpretation to a standard (as it now exists in the language above) to "place[]upfront" the importance of the program of legal education. *See* ABA Section of Legal Education and Admission to the Bar Explanation of Changes (April 2014) (*available at* http://www.americanbar.org/content/dam/aba/administrative/legal_education_and_admissions_to_the_bar/201404_s rc_meeting_materials_proposed_standards.authcheckdam.pdf). In that same revision, the ABA also expanded the scope of former Interpretation 501-3 and renumbered it as current Interpretation 501-1 (shown above), highlighting the importance of this particular interpretation.

Mr. Chidi Ogene
Charlotte School of Law
Page 4

> **Standard 501(a):** "A law school shall maintain sound admission policies and practices consistent with the Standards, its mission, and the objectives of its program of legal education."

> **Standard 501(b):** "A law school shall not admit an applicant who does not appear capable of satisfactorily completing its program of legal education and being admitted to the bar."

> **Interpretation 501-1:** "Among the factors to consider in assessing compliance with this Standard are the academic and admission test credentials of the law school's entering students, the academic attrition rate of the law school's students, the bar passage rate of its graduates, and the effectiveness of the law school's academic support program."

In December 2015, CSL provided the additional information requested by the Committee. On February 3, 2016, the Committee issued its second decision regarding CSL (the "Second Committee Decision"). In this decision, the Committee made twenty factual findings, thirteen of which pertained to the Committee's request for additional information to determine CSL's compliance with Standards 301(a), 501(a), and 501(b) and Interpretation 501-1. Although the Committee concluded that CSL was in compliance with the particular standards that previously led the Committee to assert its "reason to believe" that CSL was noncompliant with those standards, the Committee concluded that CSL was "not in compliance" with other standards, specifically with:

> Standards 301(a), 501(a), 501(b), and Interpretation 501-1, in that
> the Law School has not demonstrated that it is maintaining a
> rigorous program of legal education that prepares its students, upon
> graduation, for admission to the bar and for effective, ethical, and
> responsible participation as members of the legal profession;
> maintaining sound admissions policies and practices consistent
> with the Standards, its mission, and the objectives of its program of
> legal education; or is admitting applicants who do not appear
> capable of satisfactorily completing its program of legal education
> and being admitted to the bar.

Second Committee Decision at 6 (citing Findings of Fact 8-20).

In the Second Committee Decision, the Committee also requested that CSL provide additional information consisting generally of "all relevant information necessary to demonstrate compliance" with Standards 301(a), 501(a), and 501(b), as well as specific information about students "between and including the fall 2010 entering class and the spring (May) 2016 entering class" that would show, with respect to individual students who had LSAT scores or undergraduate GPAs at or below CSL's 25th and 50th percentiles, enrollment status (including attrition information) and bar passage information.[2] The Committee also requested that CSL's

---

[2] ABA Interpretation 501-1 establishes that academic and admission test credentials, attrition rates, and bar passage rates are among the factors considered when the ABA assesses compliance with Standard 501.

Mr. Chidi Ogene
Charlotte School of Law
Page 5

President and Dean appear before its June 2016 hearing, the purpose of which was "to determine whether to impose sanctions in connection with the Law School's noncompliance with the Standards." Second Committee Decision at 7.

In May 2016, CSL submitted a 62-page report, later described by CSL as "very comprehensive,"[3] accompanied by 29 pages of student-specific information, which, taken together, the school claimed "show[s] that the School of Law is in compliance with Standards 301(a), 501(a), and 501(b), and Interpretation 501-1." On June 23, 2016, the Committee held a hearing at which you and Dean Jay Conison appeared, along with CSL's Associate Dean for Academics, Associate Dean for Enrollment Management, and Shared Services Director of Bar Preparation.

Following that hearing, in July 2016, the Committee issued another decision (the "Third Committee Decision") again finding CSL to be out of compliance with Standards 301(a), 501(a), and 501(b) and Interpretation 501-1. In this decision, the Committee also announced its conclusion that "the issues of non-compliance with Standards 301(a), 501(a), and 501(b), and Interpretation 501-1 *are substantial and have been persistent.*" Third Committee Decision at 12 (emphasis added). The Committee also found that CSL's "plans for bringing itself into compliance with the Standards have not proven effective or reliable." *Id.*

The Third Committee Decision was expressly based on 44 factual findings, on topics such as admissions, programming for admitted students, mentoring and related opportunities, the writing program, academic support, faculty, summer and intersession changes, attrition, bar preparation during law school, post-graduation bar preparation, and bar examinations. Among its factual findings, the Committee concluded:

- With respect to CSL's admissions policies, "[i]t was not clear to the Committee how [CSL's] admission practices demonstrate that applicants with low academic and admission test credentials appear capable of completing the Law School's program of legal education and being admitted to the bar." (Finding 11)

- "Attrition for the 25[th] and 50[th] percentile LSAT individuals for those who started in 2010 was 13%. It rose to 14% for those who started in 2011; 15% for those who started in 2012; 20% for those who started in 2013; 35% for those who started in 2014; and 24% for those who started in 2015. At the hearing, the Associate Dean for Academics indicated that 74 first-year students out of a class of 223 (33%) that began studies in the fall of 2015 were academically attrited in December 2015. In May 2016, 26 students attrited, with 21 of them being spring semester starts of the entering class of 77 (27%). *This attrition is substantial and suggests that the Law School's admissions process is not*

---

[3]     *See* June 23, 2016 ABA Committee Hearing Transcript at 9:10-11 (Conison).

Mr. Chidi Ogene
Charlotte School of Law
Page 6

> *as predictive of academic success as it might be.*  The attrition target range for 2016-17 is
> 13%-17%" (Finding 23) (emphasis added).[4]

- "The Law School's bar passage rates ... remain *low, often significantly so.*" (Finding 41)
  (emphasis added).

- "For the February 2016 bar examination in North Carolina, the state first-time pass rate
  for first-time takers was 51.1%.  The Law School's first-time February 2016 rate was
  *34.7%* (75 takers), which placed it fifth in the state.  This deviation is *more than 15 points*

---

[4]      This finding is consistent with data made public by the ABA, which requires institutions to report attrition
each year and to categorize the type of attrition.  In the reports submitted to, and made publicly available by, the
ABA, CSL reported that:

- 49.2% (or 174 out of 354 students) of first-year CSL students left due to attrition as reported for 2016.  As
  reported for 2015, 44.6% (or 203 out of 455 students) of first-year CSL students left due to attrition.

- Of the 174 first-year CSL students who attrited as reported for 2016, 130 students (or more than 36% of the
  entering class) left due to academic attrition.  Similarly, as reported in 2015, of the 203 first-year CSL
  students who attrited, 121 students (or more than 25% of the entering class) left due to academic attrition.

- Of the 208 law schools accredited by the ABA as reported for 2016, CSL has the largest number (130) and
  highest percentage (36.7%) of first-year students attriting for academic reasons.  (The school with the
  second highest number of first-year students leaving for academic reasons was InfiLaw's Florida Coastal
  School of Law with 77 students.)  CSL also had the largest number (174) and highest percentage (49.2%)
  of total first-year attrition.

*See* Standard 509 Information Report for Charlotte School of Law & "All Schools Data" compilation report for 2015
& 2016. (Available at http://www.abarequireddisclosures.org).  In addition to the 2015 & 2016 figures, data
submitted to and made publicly available by the ABA establishes that both the total attrition percentage and the
academic attrition percentage of CSL students have been increasing in recent years.  According to the ABA:

| ABA REPORT YEAR | CSL 1ST YEAR TOTAL ATTRITION % | CSL 1ST YEAR ACADEMIC ATTRITION % |
|---|---|---|
| 2016 | 49.2% | 36.7% |
| 2015 | 44.6% | 26.6% |
| 2014 | 32.1% | 18.3% |
| 2013 | 22.6% | 8.34% |

*See* Standard 509 Information Reports for Years 2013-2016 (available at http://www.abarequireddisclosures.org/).
The ABA's reports show the percentage of total attrition and raw numbers of the various types of attrition.  The
percentage of first year academic attrition was calculated by applying the percentage of academic attrition to the
total attrition percentage.  Academic attrition is defined by the ABA as referring to "those students who discontinued
their education at a time when they were not in good academic standing (typically a g.p.a. below 2.0). It includes
both students who have been dismissed because they did not satisfy the minimum standards of progress established
by the law school in order to continue their legal studies at that school, and students who discontinued their
enrollment at the school at a time when their g.p.a was below that required for good academic standing as of the end
of the first year." 2016 Annual Questionnaire Instructions Part II Admissions & Enrollment Information (available
at
http://www.americanbar.org/content/dam/aba/administrative/legal_education_and_admissions_to_the_bar/governan
cedocuments/2016_aq_part2.authcheckdam.pdf).

Mr. Chidi Ogene
Charlotte School of Law
Page 7

> *below the average first-time bar passage rates* for graduates of ABA-approved law
> schools taking the bar examination in these same jurisdictions." (Finding 42) (emphasis
> added).[5]

- The Law School's ultimate bar passage rates were in compliance for 2011, 2012, and
  2013. The school "may be in compliance for 2014, but the 17% missing or never passed
  could affect that compliance. It is *not in compliance for 2015 at this point, with 43%
  either missing or never [having] passed the bar.*" (Finding 44) (emphasis added).

In the Third Committee Decision, the Committee also directed CSL to take a series of remedial
actions, including developing and submitting, by September 1, 2016, a plan to come into
compliance with the Standards. The Committee further required CSL to supply the Committee
with additional data and information, required CSL to disclose the Committee's decision to
students and the public, and provided for the appointment of a fact finder to review an array of
topics, including CSL's admissions policies, academic rigor, bar examination results, student
loan default rates, and graduate employment outcomes.

In August 2016, CSL appealed aspects of the Third Committee Decision to the Council and, on
October 21, 2016, the Council held a hearing at which you and Dean Conison testified on CSL's
behalf. At that hearing, Dean Conison testified that CSL is "not appealing that conclusion of
noncompliance with Standards 301 and 501," despite the school's "disappointment" with the
conclusion. Oct. 21, 2016 Council Hearing Transcript at 7:2-6 (Conison). CSL did, however,
through Dean Conison, make four requests of the Council, that the Council (1) overturn the
Committee's finding that CLS's noncompliance was "substantial and persistent"; (2) eliminate
the requirement that CSL publicly disclose the findings of noncompliance or, in the alternative,
delay such disclosure for one year; (3) start the two-year remediation period in July 2016, rather
than in February 2016; and (4) provide "greater clarity" as to what was expected of CSL. *Id.* at
17:11-25.

On November 14, 2016, the Council issued a decision (the "Council Decision") informing CSL
that it had reviewed the Third Committee Decision, all material considered by the Committee in
rendering that decision, the August 2016 appeal letter, a subsequent submission made by CSL on
October 4, 2016, and the transcript of the October 21, 2016 hearing. After reviewing that record,
the Council concluded, for the same reasons stated by the Committee, that CSL was "not in
compliance" with Standards 301(a), 501(a), and 501(b), that the issues of noncompliance with
these standards "are substantial and have been persistent," and that CSL's "plans for bringing
itself into compliance with the Standards have not proven effective or reliable." The Council

---

[5]     Here too, the ABA's findings are consistent with publicly available data. For example, in July 2016, 45.2%
of CSL graduates who took the North Carolina bar exam for the first time passed. The statewide average, including
CSL and repeat takers who were unsuccessful on their first attempt, was 65.9%, almost 50% higher. *See*
http://www.charlottelaw.edu/gainful-employment-aba-required-disclosures.html (last visited December 1, 2016).
The Department also notes that, although CSL's first-time bar passage rates for the North Carolina Bar increased
between February and July 2016, the rates have trended downward since July 2010, and the July 2016 first time
passage rate remains below the July 2015 rate.

Mr. Chidi Ogene
Charlotte School of Law
Page 8

ordered remedial actions, including public disclosure, and placed CSL on probation, effective November 14, 2016.[6]

The facts recited above make clear that on three separate occasions, in February 2016, July 2016, and November 2016, the ABA announced its determination that CSL was out of compliance with ABA Standards 301(a), 501(a), and 501(b), and Interpretation 501-1. CSL has conceded the noncompliance findings and certain remedial requirements. Per ABA Rule of Procedure for Approval of Law Schools No. 4, the ABA Appeals Panel does not have authority to consider an appeal of the Council Decision, thus rendering that decision final. Each of these decisions was made after the ABA provided CSL notice and an opportunity to submit evidence. The decisions announced in July 2016 and November 2016 were made after CSL officials presented testimony to the Committee and Council, respectively.

In reviewing this matter, the Department carefully considered the extent of process that the ABA afforded the institution when making its determinations, including the numerous opportunities CSL was given to present evidence and provide testimony. The Department also considered the particular accreditation standards that CSL was found to be noncompliant with, *see supra* 3-4 & n.1, the nature of those standards, the fact that the ABA found the noncompliance to be both "substantial" and persistent," the fact that the ABA found CSL's "plans for bringing itself into compliance with the Standards have not proven effective or reliable," the fact that ABA believed the noncompliance to be so severe as to merit placing the institution on probation,[7] corroborative evidence of the noncompliance, *see supra* at n.4 – n.5, and the institution's administrative capability and fiduciary conduct.

After concluding the review, and based on the particular facts set out herein, the Department finds that CSL's statutory, regulatory, and contractual failure to "meet the requirements" established by the ABA is of sufficient severity to merit the denial of recertification.[8]

---

[6]    *See* Letter from B. Currier, ABA Managing Director of Accreditation and Legal Education to C. Ogene & J. Conison (Nov. 14, 2016), attaching the Council Decision. The Council Decision is publicly available at http://www.americanbar.org/content/dam/aba/administrative/legal_education_and_admissions_to_the_bar/PublicNo ticeAnnouncements/2016_november_charlotte_probation_public_notice.pdf.

[7]    Not only is the probation sanction the most severe sanction that can be imposed by the ABA, short of withdrawal of accreditation, *see* ABA Standards & Rules of Procedure for Approval of Law Schools at Rule 16(b)-(c), the Department is unaware of any instance in the last 10 years which the ABA has placed an accredited law school on probation.

[8]    The Department's denial of CSL's application for recertification should not be read to suggest that the Department will reach the same conclusion each time an accreditor finds an institution noncompliant with the accreditor's standard. As it did in this case, the Department will continue to review, in the context of a recertification application, any finding of noncompliance by an institution's accreditor in light of the specific facts regarding that finding, other relevant facts regarding the institution under review, and the appropriate statutory and regulatory standards.

Mr. Chidi Ogene
Charlotte School of Law
Page 9

### CSL Breached its Fiduciary Duty to the Department and Demonstrated a Lack of Administrative Capability by Substantially Misrepresenting the Nature of its Educational Program

Through its PPA, CSL agreed to comply with all conditions specified therein, including compliance with all Title IV, HEA program requirements. *See also* 20 U.S.C. § 1094(a)(1); 34 C.F.R. § 668.14. By entering into the PPA, CSL and its officers also accepted fiduciary responsibility in the administration of the Title IV programs. 34 C.F.R. § 668.82(a). As fiduciaries, an institution and its officers must act with the highest standard of care and diligence in administering the Title IV programs and in accounting to the Secretary for the funds received. 34 C.F.R. §§ 668.82(a), (b). This standard of care and diligence includes prohibitions against substantial representations by an institution's officers or employees. *See e.g., In re Warnborough College*, Dkt Nos. 95-164-ST, 96-60-SF (Aug. 9, 1996) (finding an institution in violation of the required fiduciary standard due to its failure to properly oversee an employee who made substantial misrepresentations to students, and holding the institution responsible that employee's misrepresentations). Additionally, in order to "continue participating" in any Title IV program, a school must be "capable of adequately administering that program." 34 C.F.R. § 668.16. A school is not considered to have such administrative capability if it fails to "administer[] the Title IV, HEA programs in accordance with all statutory provisions of or applicable to Title IV of the HEA" and "all applicable regulatory provisions prescribed under that authority." 34 C.F.R. § 668.16(a).

Under the Department's regulations, "[s]ubstantial misrepresentations are prohibited in all forms," 34 C.F.R. § 668.71(b), and the Department may deny institutional participation applications, including recertification applications, when it determines that an institution has engaged in a substantial misrepresentation. 34 C.F.R. § 668.71(a)(3). A "misrepresentation" is:

> [a]ny false, erroneous or misleading statement an eligible institution, one of its representatives, or any ineligible institution, organization, or person with whom the eligible institution has an agreement to provide educational programs, or to provide marketing, advertising, recruiting or admissions services makes directly or indirectly to a student, prospective student or any member of the public, or to an accrediting agency, to a State agency, or to the Secretary. A misleading statement includes any statement that has the likelihood or tendency to deceive. A statement is any communication made in writing, visually, orally, or through other means.

34 C.F.R. § 668.71(c).

A "substantial misrepresentation" is "any misrepresentation on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment." *Id.* Substantial misrepresentations include misrepresentations made by the institution itself, or one of its representatives, regarding the nature of the institution's academic programs or the employability of its graduates. 34 C.F.R. § 668.71(b). Substantial misrepresentations involving

Mr. Chidi Ogene
Charlotte School of Law
Page 10

the nature of an institution's education program include misrepresentations concerning the "nature and extent" of the institution's accreditation and the "availability, frequency, and appropriateness of its courses and programs to the employment objectives that it states its programs are designed to meet." 34 C.F.R. §§ 668.72(a), (g). Substantial misrepresentations regarding the employability of an institution's graduates include misrepresentations regarding "requirements that are generally needed to be employed in the fields for which training is provided." 34 C.F.R. § 668.74(f). Each substantial misrepresentation serves as an independent ground for the Department to deny an institution's recertification application.

The Department's review established that CSL substantially misrepresented to students and prospective students the "nature and extent" of CSL's accreditation and the "appropriateness of its courses and programs to the employment objectives that it states its programs are designed to meet." 34 C.F.R. §§ 668.72(a), (g). As set forth above, since February 2016, CSL has been found to be out of compliance with ABA Standards 301(a), 501(a), and 501(b), and Interpretation 501-1. These standards are foundational to the educational enterprise insofar as they speak to whether the school "maintain[s] a rigorous program of legal education that prepares its students, upon graduation, for admission to the bar and for effective, ethical, and responsible participation as members of the legal profession," (Standard 301(a)); whether the school "maintains sound admission policies" that are "consistent with the Standards, [the school's] mission, and the objectives of [the school's] program of legal education" (Standard 501(a)); and whether the school refrains from admitting applicants "who do not appear capable of satisfactorily completing its program of legal education and being admitted to the bar" (Standard 501(b)).

In February 2016, the ABA first concluded that CSL was out of compliance with the standards and interpretation discussed above. However, neither CSL nor the ABA publicly disclosed this fact until November 2016, when the ABA first announced that CSL was being placed on probation. Prior to the ABA's November 2016 announcement, the Department was unaware of *any* public statements that would have informed a student or prospective student that the ABA had found the school to be out of compliance with the Standards, or that the ABA had determined that CSL had "not demonstrated that it is maintaining a rigorous program of legal education that prepares its students, upon graduation, for admission to the bar and for effective, ethical, and responsible participation as members of the legal profession." Second Committee Decision at 6, Third Committee Decision at 12, Council Decision at 2. Nor is the Department aware of any statement or disclosure during that period by CSL that the ABA had determined that the school was "admitting applicants who do not appear capable of satisfactorily completing its program of legal education and being admitted to the bar." *Id.*

In contrast, beginning no later than February 2016 and continuing at least until December 2016, CSL made public statements to students and prospective students that constitute misrepresentations regarding the nature of the educational program that CSL offered.

    *First*, CSL promoted, and continues to promote, on its website that it "has been awarded full accreditation" by the ABA in 2011, which required the school to "ha[ve] established *full compliance with each of the ABA's standards*, including standards *relating to bar passage*, job

Mr. Chidi Ogene
Charlotte School of Law
Page 11

placement and diversity."[9]  In the same section, CSL promoted, and continues to promote, that, although it had received only provisional approval by the ABA in 2008, the Council had determined in June 2011 that CSL was "in full compliance with the ABA Standards for Approval of Law Schools." A student or prospective student could reasonably read these statements and conclude that the 2011 finding of "full compliance" by the ABA was the final word as to the institution's compliance with the ABA's accreditation standards. This is particularly true because the school disclosed prior accreditation events, such as its initial "provisional" approval. Accordingly, beginning in February 2016, when the Committee determined that CSL was "not in compliance" with Standards 301(a), 501(a), and 501(b) and Interpretation 501-1, the above-mentioned statements were misleading insofar as they had the likelihood or tendency to deceive reasonable students and prospective students about the current status, nature, and extent of CSL's accreditation. The misrepresentation became even more pronounced in July 2016 when the Committee again notified CSL of its noncompliance and also found that the noncompliance was "substantial" and "persistent." Although the school appealed the July 2016 determination as to the findings of the "substantial" and "persistent" nature of the noncompliance, the school did not appeal the finding of noncompliance itself. Nonetheless, the school did not amend, update, or otherwise correct its continuing and misleading representation on its website.

　　　　*Second*, CSL promoted, and continues to promote, on its website to students and prospective students (under the heading "Practical Preparation is Critical") that it "created" a "rigorous curriculum … to ensure that [CSL] students are equipped with practical skills that will allow them to thrive in a professional setting." *See* Enclosure 1. This statement appears directly beneath the section of the webpage in which CSL promotes its "full compliance" with ABA standards, which includes Standard 301(a), which provides that law schools should maintain a "rigorous program of legal education that prepares its students, upon graduation, for admission to the bar and for effective, ethical, and responsible participation as members of the legal profession." In this context, CSL's promotion of its "rigorous curriculum" is misleading insofar as: (1) as described above, the ABA has specifically and repeatedly concluded that CSL has not maintained a "rigorous" program of legal education, that its failures in this regard are "substantial" and "persistent," and that CSL's plans to come into compliance with that standard have not proven effective or reliable; and (2) the positioning of CSL's description of its curriculum as "rigorous" directly beneath the discussion of compliance with the ABA standards (which use the word "rigorous" to describe what is expected of a compliant program) has the likelihood or tendency to leave students and prospective students with the false impression that CSL was compliant with that very requirement by the ABA.

Each of these misleading statements constitutes a substantial misrepresentation because students and prospective students could reasonably be expected to rely on each of these statements to their detriment. 34 C.F.R. § 668.71(b). Indeed, CSL argued to the ABA that if students and prospective students were aware of the ABA's findings of noncompliance, that would have a "profound impact on admissions" because: (1) knowledge of the ABA's findings would make

---

[9]　　　*See* http://www.charlottelaw.edu/our-mission.html (last visited Dec. 16, 2016) (attached hereto as Enclosure 1) (emphasis added).

Mr. Chidi Ogene
Charlotte School of Law
Page 12

applicants "much less likely to enroll;"[10] and (2) such a disclosure would "effectively tell applicants to beware of attending the Charlotte School of Law."[11]   In addition, CSL argued to the ABA that public disclosure of its noncompliance would "have an adverse impact on [CSL's] ability to retain high-performing students," because it would "inevitably create anxiety on the part of high-performing students and make their transfer more likely." *Id.* Thus, under CSL's own arguments, the truth about its noncompliance would have impacted the decisions made by prospective students and current students to either enroll or continue their studies at CSL.

CSL's assertion that knowledge of noncompliance would be material to student admissions and retention decisions was not conjecture. Indeed, in the Third Committee Decision, the Committee ordered CSL to disclose to its admitted students and the public, via its webpage, a statement disclosing the ABA's noncompliance findings and required remedial actions. As part of its appeal of this requirement, CSL commissioned (and provided to the ABA) a market study that tested the impact of disclosure on CSL applicants. The study analyzed the views of individuals with LSAT scores above 142 who had applied to one or more of the InfiLaw schools. These individuals were asked to assess the impact on the likelihood of their respective enrollment at a particular law school if acceptance materials from that school included a statement that the school failed to meet accreditation standards dealing with admissions, educational programs, and bar passage. The study concluded that approximately 3 in 4 applicants (or 74%) stated that they would be "much less likely to enroll" after reading such a statement – establishing that reasonable students were highly likely to rely on the disclosure of information regarding the accreditation failures that CSL sought to keep from public view.

*Finally*, the Department finds that CSL substantially misrepresented the bar passage rates of CSL graduates in an interview you had with the Charlotte Business Journal published on November 30, 2016.[12] In that interview, you stated that "[i]f you look at bar pass rates between 2009 and 2013, we were consistently *at or above* the state bar average pass rate. That is an incredible feat for a new school." (emphasis added). However, bar passage data published on CSL's website shows that, out of the nine sittings of the North Carolina bar exam (between July 2009 and July 2013), CSL's first-time bar passage rate was actually *below* the state average *five times* (with a maximum differential of -13.33%) and above the state average only four times (with a maximum differential of 7.4%).[13] Thus, your statement was false and/or misleading, particularly when you were making representations as a law school president responding to questions about an accreditor's finding of the school's substantial and persistent failures to prepare students for admission to the bar. Substantial misrepresentations about the success that CSL graduates have on bar examinations constitute substantial misrepresentations about both the "appropriateness of [CSL's] courses and programs to the employment objects that [CSL] states

---

[10]     Letter from J. Conison & C. Ogene to G. Murphy, Chair, Council of the ABA Section of Legal Education & Admissions to the Bar (Oct. 4, 2016).

[11]     Letter from J. Conison to G. Murphy (Aug. 22, 2016) (enclosing Appeal) & Appeal at 11.

[12] Jennifer Thomas, *Charlotte School of Law president talks probation, considers nonprofit status*, CHARLOTTE BUS. J., Nov. 30, 2016 *available at* 2016 WLNR 36711693 (Nov. 30, 2016).

[13] Bar passage data published at: http://www.charlottelaw.edu/gainful-employment-aba-required-disclosures.html.

Mr. Chidi Ogene
Charlotte School of Law
Page 13

its programs are designed to meet," 34 C.F.R. § 668.72(g), and the schools' success in training its students to meet "requirements that are generally needed to be employed in the fields for which the training is provided," 34 C.F.R. § 668.74(f).  You either knew or reasonably should have known that this interview was to be made public and could be viewed by current or prospective students.[14]  Because a reasonable student or prospective student would have understood your comments to be misleading in its representation of CSL graduates' prior success on the bar examination, these statements constituted substantial misrepresentations in violation of 34 C.F.R. § 668.71.

*     *     *     *

The denial of recertification will be effective on December 31, 2016.  Should CSL have factual evidence to dispute the Department's findings and demonstrate their inaccuracy, CSL may submit that evidence via overnight mail to me at the following address:

> Administrative Actions and Appeals Service Group
> U.S. Department of Education
> Federal Student Aid/Enforcement
> 830 First Street, NE (UCP-3, Room 84F2)
> Washington, DC 20002-8019

If any such material is received by *January 3, 2017*, the Department will review it and notify CSL whether the recertification denial will be modified, rescinded, or left in place. If the recertification denial remains in effect following the Department's review of such submission, or if CSL opts not to make such a submission, the Multi-Regional School Participation Division will contact CSL concerning the proper procedures for closing out CSL's Title IV program accounts.

In the event that CSL submits an application to participate in the Title IV, HEA programs in the future, that application must address the deficiencies noted in this letter. If you have any questions about this letter, you may contact Mitch Cary of my staff at (303) 844-3145.

Sincerely,

Susan D. Crim
Director
Administrative Actions and Appeals Service Group

Enclosure

cc:     Rick Inatome (InfiLaw), via rinatome@infilaw.com
        Jonathon Glass (Cooley LLP), via jglass@cooley.com

---

[14] Notably, the question immediately preceding the question that elicited your statement about bar passage rates was: "What's the message to current students?"

Mr. Chidi Ogene
Charlotte School of Law
Page 14

> Barry A. Currier, Managing Director, Accreditation and Legal Education, ABA Section of Legal Education and Admissions to the Bar, via barry.currier@americanbar.org
>
> Dr. Tim Gallimore, Associate VP for Academic Planning and State Authorization, The University of North Carolina – General Administration, via tagallimore@northcarolina.edu
>
> Department of Defense, via osd.pentagon.ousd-p-r.mbx.vol-edu-compliance@mail.mil
>
> Department of Veteran Affairs, via INCOMING.VBAVACO@va.gov
>
> Consumer Financial Protection Bureau, via CFPB_ENF_Students@cfpb.gov

ENCLOSURE 1

ABA Required Disclosures and Gainful Employment



REQUEST INFO        APPLY ONLINE        CONTACT US

## CHARLOTTE SCHOOL *of* LAW

Search Website          | GO

🏛 **CORPORATE COMPLIANCE CENTER**

| Home | About | Academics | Programs | Admissions | Campus | Career Services | Alumni |

# Our Mission



## Our History

Charlotte School of Law has been awarded full accreditation by the American Bar Association. The action was approved by the Council of the ABA's Section of Legal Education and Admissions to the Bar during the Council's quarterly meeting in Salt Lake City, Utah, on June 10, 2011. The Council determined through its accreditation process that Charlotte School of Law is in full compliance with the ABA Standards for Approval of Law Schools.

The ABA Accreditation Committee gave Charlotte School of Law a positive recommendation to the Council in May 2011. The ABA granted provisional approval to the School in 2008, concluding it was in compliance with ABA standards and had a plan to bring itself into full compliance. A law school must be provisionally approved for at least two years before it is eligible to apply for full approval. In order to be granted full approval, a School must demonstrate that it has established full compliance with each of the ABA's standards, including standards relating to bar passage, job placement and diversity. The ABA's Chicago Headquarters is located at 321 North Clark Street, Chicago, IL, 60654.

## Practical Preparation is Critical

A rigorous curriculum has been created to ensure that our students are equipped with practical skills that will allow them to thrive in a professional setting. Students are taught not only the traditions and theory of law, but also how to apply this learning through critical thinking and analytical skill sets. We address what using a law degree in "real life" can mean to an individual both personally and professionally.

**Request Information**        **Apply For Admission**

**Make An Appointment**        **Financial Assistance**

## Admissions Office

**Hours:**
Mon-Fri: 8:30 a.m. - 5:30 p.m.

**Address:**
201 S. College St, Ste 400,
Charlotte, NC 28244

**Email:**
admissions@charlottelaw.edu

**Phone:** (704) 971-8500
**Fax:** (818) 386-5699

## Law Library

**Library User Experience (LUX) Desk Hours:**

**Mon-Thurs:** 8:00 a.m. - 8:00 p.m.
**Fri:** 8:00 a.m. - 6:00 p.m.
**Sat:** Noon - 5:00 p.m.
**Sun:** 2:00 p.m. - 8:00 p.m.
*Library Hours are subject to change.*

**Address:** 201 S. College St, Ste 400,
Charlotte, NC 28244

**Email:** libreference@charlottelaw.edu

**Library User Experience (LUX) Desk:**
704-971-8573

View Programs

## We are student outcome focused

Our faculty is driven by a desire to motivate and energize the student community in every aspect of the Charlotte School of Law experience. Professors are accessible mentors who take an active role in the development of students and help them to embrace their legal education and capitalize on the opportunities within the school and community network of resources. Student success is of the utmost importance to everyone at the institution, on every level.

View Our Faculty

## It is essential to serve our community

The Charlotte School of Law believes strongly that tomorrow's leaders must reflect and interact effectively with an eclectic collective of people and cultures. Consequently, the school places strong emphasis on serving the underserved through community service and pro bono work in an inclusive environment that fosters a demanding yet supportive educational setting for a diverse community.

View Community Service

## Share This Page

### Learn More

We've provided access to tools & resources that help you meet your educational goals.

**TRANSFER TO CSL**

**SCHEDULE A TOUR**

**REQUEST MORE INFORMATION**

**COURSE DESCRIPTIONS**

**FAST FACTS**

### Student Testimonials ▾

**Sally S.**
*"The biggest advantage CSL gave me was making me practice-ready. I made use of the school's resources and landed four different internship opportunities, one of which has lead to a full-time associate position post graduation."*



 More

### Charlotte School of Law Blog ▾

**Learn More About Our Corporate Compliance Certificate**

**Regular LUX Desk Hours Will Resume January 8, 2017**

**Fall Fashion from .gov: A New Look for the Library of Congress and a New View of Government Open Source Projects**

**The Charlotte School of Law Trial Team Does It Again!**

**Practice Ready Resources in the Library: North Carolina Lawyers Weekly**

### Upcoming Events ▾

**View Full Event Calendar**

## EXPLORE CHARLOTTE LAW

- **About**
- **Programs**
- **Campus**

- **Academics**
- **Admissions**
- **Career Services**

 **CHARLOTTE SCHOOL of LAW**

· **Alumni**         · **CSL Pro Bono Blog**

· **Contact Us**     · **CSL Civil Rights Blog**



 **CORPORATE COMPLIANCE CENTER**

© 2016 Charlotte School of Law | **Terms of Use** | **Privacy Policy** | **Disclosures**     ◈ avweb designs