**INFILAW HOLDING, LLC and SUBSIDIARY**

**OPE ID NUMBERS:**
**04131400**
**03374300**
**04143500**

**Consolidated Financial Statements**

**For the Year Ended July 31, 2018**

**with**

**Independent Auditors' Report**

**INFILAW HOLDING, LLC and SUBSIDIARY**

**Table of Contents**

                                                                          Page

Independent Auditors' Report on the Consolidated
   Financial Statements and Other Information                                 1

Consolidated Balance Sheet as of July 31, 2018                               3

Consolidated Statement of Operations for the Year
   Ended July 31, 2018                                                       4

Consolidated Statement of Members' Equity for the
   Year Ended July 31, 2018                                                  5

Consolidated Statement of Cash Flows for the Year
   Ended July 31, 2018                                                       6

Notes to Consolidated Financial Statements                                  8

Supplementary Information (Information Required by
   the U.S. Department of Education)                                        23

Independent Auditors' Report on Compliance and on Internal
   Control over Financial Reporting Based on an Audit of
   Consolidated Financial Statements Performed in Accordance
   with *Government Auditing Standards*                                      27



# ALMICH & ASSOCIATES
### Certified Public Accounting and Business Services

## INDEPENDENT AUDITORS' REPORT ON THE CONSOLIDATED
## FINANCIAL STATEMENTS AND OTHER INFORMATION

To the Board of Directors and
  Members of InfiLaw Holding, LLC:

*Report on the Consolidated Financial Statements*

We have audited the accompanying consolidated financial statements of InfiLaw Holding, LLC (a Delaware limited liability company) and Subsidiary (collectively, the Company), which comprise the consolidated balance sheet as of July 31, 2018, and the related consolidated statements of operations, members' equity and cash flows for the year then ended, and the related notes to the consolidated financial statements.

*Management's Responsibility for the Consolidated Financial Statements*

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

*Auditors' Responsibility*

Our responsibility is to express an opinion on these consolidated financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America and the standards applicable to financial audits contained in *Government Auditing Standards*, issued by the Comptroller General of the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on the auditors' judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

*Opinion*

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of the Company as of July 31, 2018, and the consolidated results of its operations and its cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America.

*Substantial Doubt about the Company's Ability to Continue as a Going Concern*

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As shown in the consolidated financial statements, the Company incurred a net loss of over $64 million during the year ended July 31, 2018, and, as of that date, had a working capital deficiency of $35.6 million and members' deficit of $53.2 million.  As described more fully in Note 1 to the consolidated financial statements, the Company has faced substantial regulatory and operational difficulties that have resulted in the closure of two of its institutions of higher learning, resulting in management's assessment that substantial doubt exists about the Company's ability to continue as a going concern. Management's evaluation of the events and conditions and management's plans regarding those matters are also described in Note 1.  The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty. Our opinion is not modified with respect to that matter.

*Report on Required Supplementary Information and Other Regulatory Requirements*

Our audit was conducted for the purpose of forming an opinion on the consolidated financial statements taken as a whole. The accompanying supplementary information beginning on page 23 on the Company's calculation of their Title IV 90/10 revenue tests and on related party transactions is required by the U.S. Department of Education and is presented for purposes of additional analysis and is not a required part of the consolidated financial statements.  Such information is the responsibility of management and was derived from and relates directly to the underlying accounting and other records used to prepare the consolidated financial statements. Such information has been subjected to the auditing procedures applied in the audit of the consolidated financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the consolidated financial statements or to the consolidated financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America.  In our opinion, the accompanying supplementary information is fairly stated, in all material respects, in relation to the consolidated financial statements taken as a whole.

*Other Reporting Required by Government Auditing Standards*

In accordance with *Government Auditing Standards*, we have also issued our report dated January 31, 2019, on our consideration of the Company's internal control over financial reporting and on our tests of their compliance with certain provisions of laws, regulations, contracts, and grant agreements and other matters.  The purpose of that report is to describe the scope of our testing of internal control over financial reporting and compliance and the results of that testing, and not to provide an opinion on internal control over financial reporting or on compliance.  That report is an integral part of an audit performed in accordance with *Government Auditing Standards* in considering the Company's internal control over financial reporting and compliance.

*Almich & Associates*

Lake Forest, California
January 31, 2019

**InfiLaw Holding, LLC and Subsidiary**
**Consolidated Balance Sheet**
**July 31, 2018**

**Assets**

| | | |
|---|---|---:|
| Current assets: | | |
| Cash and cash equivalents | $ | 450,330 |
| Current portion of accounts and notes receivable from students, | | |
| net of allowance for doubtful accounts of $5,296,029 | | 1,118,430 |
| Other accounts receivable | | 3,195,309 |
| Prepaid expenses and other | | 316,005 |
| Total current assets | | 5,080,074 |
| Property and equipment, net of accumulated depreciation and | | |
| amortization of $28,655,240 | | 20,325,671 |
| Notes receivable from students, net of current portion and | | |
| allowance for doubtful accounts of $3,295,031 | | 700,781 |
| Deposits and other | | 5,298 |
| | $ | 26,111,824 |

**Liabilities and Members' Deficit**

| | | |
|---|---|---:|
| Current liabilities: | | |
| Accounts payable and accrued expenses | $ | 8,440,196 |
| Accrued legal settlement | | 24,550,000 |
| Accrued lease termination | | 6,042,699 |
| Current portion of capital lease obligations | | 807,708 |
| Unearned tuition | | 853,294 |
| Total current liabilities | | 40,693,897 |
| Capital lease obligations, net of current portion | | 24,300,444 |
| Long-term debt | | 14,349,777 |
| Total liabilities | | 79,344,118 |
| Members' deficit | | (53,232,294) |
| | $ | 26,111,824 |

See notes to consolidated financial statements

3

**InfiLaw Holding, LLC and Subsidiary**
**Consolidated Statement of Operations**
**For the Year Ended July 31, 2018**

| | |
|---|---:|
| Revenues: | |
| Tuition | $ 10,449,706 |
| Books and fees | 1,061,774 |
| Total revenues | 11,511,480 |
| Costs and expenses: | |
| Instructional | 3,845,238 |
| Academic support | 2,517,728 |
| Student services | 1,919,802 |
| Institutional support | 10,183,224 |
| Facilities | 3,563,874 |
| Goodwill impairment | 8,159,402 |
| Depreciation and amortization | 2,522,892 |
| Total costs and expenses | 32,712,160 |
| Operating loss | (21,200,680) |
| Other income (expense): | |
| Interest income | 41,833 |
| Interest expense | (2,210,191) |
| Loss on disposal | (476,061) |
| Loss on write-off of contingent consideration receivable | (5,295,000) |
| Gain on debt extinguishment | 2,831,200 |
| Total other income (expense) | (5,108,219) |
| Loss from continuing operations before income taxes | (26,308,899) |
| Provision for income taxes | (2,214,549) |
| Net loss from continuing operations | (28,523,448) |
| | |
| Loss from discontinued operations before income taxes | (35,931,994) |
| Provision for income taxes | - |
| Net loss from discontinued operations | (35,931,994) |
| | |
| Net loss | $ (64,455,442) |

**InfiLaw Holding, LLC and Subsidiary**
**Consolidated Statement of Members' Equity**
**For the Year Ended July 31, 2018**

| | Preferred Units | | | | General Members' Equity | Total Members' Equity |
| | Series A | Series B | Series A-1 | Series A-2 | | |
|---|---|---|---|---|---|---|
| Balances at July 31, 2017 | $ 132,070,431 | $ 138,678,400 | $ 3,253,648 | $ 9,195,097 | $ (262,779,331) | $ 20,418,245 |
| Surrender of Series A-2 units | - | - | - | (9,195,097) | - | (9,195,097) |
| Net loss | - | - | - | - | (64,455,442) | (64,455,442) |
| Balances at July 31, 2018 | $ 132,070,431 | $ 138,678,400 | $ 3,253,648 | $ - | $ (327,234,773) | $ (53,232,294) |

See notes to consolidated financial statements

5

**InfiLaw Holding, LLC and Subsidiary**
**Consolidated Statement of Cash Flows**
**For the Year Ended July 31, 2018**

| | |
|---|---:|
| Cash flows from operating activities: | |
| Net loss | $ (64,455,442) |
| Adjustments to reconcile net loss to net cash used by operating activities - | |
| Net loss from discontinued operations | 35,931,994 |
| Loss on disposal | 476,061 |
| Loss on write-off of contingent consideration receivable | 5,295,000 |
| Gain on debt extinguishment | (2,831,200) |
| Goodwill impairment | 8,159,402 |
| Depreciation and amortization | 2,522,892 |
| Deferred income taxes | 3,761,392 |
| Change in assets and liabilities: | |
| Accounts and notes receivable from students, net | (226,214) |
| Income taxes receivable | 4,034,963 |
| Other accounts receivable | 2,869,901 |
| Prepaid expenses and other | 452,477 |
| Deposits | 1,214,156 |
| Accounts payable and accrued expenses | 1,988,279 |
| Accrued lease termination | 1,620,340 |
| Unearned tuition | 220,064 |
| Deferred rent | (573,437) |
| Other long-term liabilities | (55,000) |
| Net cash provided by operating activities - continuing operations | 405,628 |
| Net cash used by operating activities - discontinued operations | (5,099,713) |
| Net cash used by operating activities | (4,694,085) |
| Cash flows from investing activities: | |
| Purchases of property and equipment | (156,328) |
| Net cash used by investing activities - continuing operations | (156,328) |
| Net cash used by investing activities - discontinued operations | (16,008) |
| Net cash used by investing activities | (172,336) |

**InfiLaw Holding, LLC and Subsidiary**
**Consolidated Statement of Cash Flows (Continued)**
**For the Year Ended July 31, 2018**

| | | |
|---|---|---:|
| Cash flows from financing activities: | | |
| Borrowings on long-term debt | $ | 3,350,000 |
| Payments on capital lease obligations | | (541,912) |
| Net cash provided by financing activities - continuing operations | | 2,808,088 |
| Net decrease in cash and cash equivalents | | (2,058,333) |
| Cash and cash equivalents, beginning of year | | 2,508,663 |
| Cash and cash equivalents, end of year | $ | 450,330 |
| | | |
| Supplemental cash flows information: | | |
| Cash paid for interest | $ | 2,210,191 |
| Cash paid for income taxes | $ | - |
| | | |
| Supplemental schedule of non-cash investing and financing activities: | | |
| Surrender of Series A-2 units in exchange for term loans | $ | 9,195,097 |
| Acquisition of equipment under capital lease obligation | $ | 157,271 |

**InfiLaw Holding, LLC and Subsidiary**
**Notes to Consolidated Financial Statements**
**July 31, 2018**

NOTE 1 – SIGNIFICANT ACCOUNTING POLICIES

*Organization and Discontinued Operations*

InfiLaw Holding, LLC (Holding) is a Delaware limited liability company organized in July 2006 and is the sole member of InfiLaw Corporation (InfiLaw, a Delaware corporation).  InfiLaw was organized in June 2003 for the purpose of acquiring, owning and operating independent law schools and other entities providing educational services.

During the year ended July 31, 2018, InfiLaw's consortium of independent law schools included Arizona Summit Law School (ASLS, a Delaware limited liability company), Florida Costal School of Law, Inc. (FCSL, a Delaware corporation) and Charlotte School of Law, LLC (CSL, a Delaware limited liability company).  During all or part of the year ended July 31, 2018, ASLS, FCSL and CSL (collectively, the Schools) operated in the states of Arizona, Florida and North Carolina, respectively, under accreditation by the American Bar Association (ABA).

InfiLaw also owns and operates Inspiras Management Services, LLC (IMS, a Delaware limited liability company) which provides management services to its subsidiary, Inspiras California, LLC (Inspiras), a Delaware limited liability company providing educational services.

In August 2017, management decided to cease operations of CSL due to continuing operational difficulties including the loss of accreditation from the ABA and the loss of approval for participation in the Title IV programs administered by the U.S Department of Education (ED) for the funding of student tuition.  In August 2018, management also decided to cease continuing operations of ASLS due to operational difficulties similar to those experienced by CSL.  ASLS is no longer accepting new students and is in the process of completing a teach-out, which has been approved by the ABA.  As such, the results from operations of CSL and ASLS have been included within discontinued operations on the accompanying consolidated financial statements. See Note 8 for additional information pertaining to the discontinued operations of the Company as of and for the year ended July 31, 2018.

*Basis of Presentation*

The accompanying consolidated financial statements include the accounts of Holding, InfiLaw, the Schools, IMS and Inspiras (collectively, the Company), and have been prepared as of and for the year ended July 31, 2018.  All intercompany accounts and transactions have been eliminated in consolidation.

The Company's consolidated financial statements as of and for the year ended July 31, 2018 have been prepared on a going concern basis which contemplates the continued operations of the Company through a period extending one year from the date of the accompanying auditors' report, and the realization of assets and the settlement of liabilities and commitments in the normal course of business. The Company incurred a net loss from continuing operations of approximately $28.5 million during the year ended July 31, 2018, which included a goodwill impairment charge of $8.2 million and a write-off of a $5.3 million receivable for contingent consideration.  The Company had a working capital deficiency of $35.6 million, largely attributable to a $25.6 million legal settlement and $6 million of liability for lease terminations, most of which were attributable to discontinued operations of the Company. The Company's members' deficit of $53.2 million has largely resulted from these matters. The Company has also faced substantial regulatory issues that have resulted in decreases in student population, significant legal fees, and ultimately the closures of CSL in August 2017 and ASLS in August 2018. The Company is also subject to various legal claims that have resulted in substantial fees and costs and represent a considerable contingency for the Company.

Management is continuing to implement strategies to improve the operational effectiveness of its continuing School, FCSL. Management has also taken cost reduction measures to align operating expenses with revenue, with a primary emphasis on non-academic areas such as real estate and back office functions.  Management is committed to aggressively pursuing additional strategies for the fiscal year ending July 31, 2019 and believes that its plans, along with the reduced impact of discontinued operations, will provide an improved financial position in future reporting periods.  However, there can be no assurance on the effects on the Company as a result of the outcome of these planned courses of action or the Company's return to profitability and full accreditation. The Company's long-term success is dependent upon management's ability to successfully execute its plans and ultimately, to achieve sustained profitable operations. The accompanying consolidated financial statements do not include any adjustments that might result from the above uncertainties.

See Note 6 for additional information regarding the various legal claims facing the Company and Note 13 for information regarding FCSL's compliance with ED's gainful employment rule and accreditation status with the ABA.

*Letters of Credit*

As of July 31, 2018, the Company had posted letters of credit in favor of ASLS's landlord and the Arizona State Board for Private Postsecondary Education in the amounts of $3,000,000 and $1,168,800, respectively.  The cash collateralizing the letters of credit had been deposited with the issuing financial institution by a member of Holding and serves to reduce the available borrowings under the line of credit discussed in Note 4.  The $3,000,000 letter for credit was drawn by the landlord in August 2018 due to ASLS's closure and surrender of its campus location.

As of July 31, 2017, the Company also maintained a letter of credit in the amount of $2.5 million posted in favor of an insurance company which has executed a surety bond on behalf of CSL, as required by the state of North Carolina for institutions conducting post-secondary degree activity within the state.  Due to CSL's closure in August 2017, the state of North Carolina notified CSL that the $2.5 million letter of credit described above was no longer required effective December 2017. The letter of credit was cancelled by the issuing financial institution in January 2018.

*Cash and Cash Equivalents*

The Company considers all highly liquid investments with an original maturity of three months or less to be cash equivalents.

*Student Accounts and Notes Receivable*

Accounts and notes receivable are recorded at the net realizable value expected to be received from students or third-party payors and are not collateralized.  Accounts and notes receivable include amounts billed to students less payments received and an allowance for doubtful accounts. The allowance for doubtful accounts is management's best estimate based upon historical experience. Management continually monitors and adjusts its allowance associated with the Schools' receivables to address any credit risks associated with the Schools' accounts and notes receivable.  When uncertainty exists as to the collection of receivables, the Schools record an allowance for doubtful accounts and a corresponding charge to bad debt expense.  As of July 31, 2018, all accounts and notes receivable were fully earned.

*Revenue Recognition*

Revenues are derived primarily from courses taught at the Schools.  Tuition revenues are recognized on a straight-line basis over the term of instruction taking into consideration expected externship periods and refunds.  Unearned tuition is the portion of tuition payments received but not earned as of the consolidated balance sheet date and is reflected as a current liability on the accompanying consolidated balance sheet.  Revenue for book sales and fees are recognized upon the related sale or charge.

*Property and Equipment*

Property and equipment are recorded at cost or estimated fair market value as of the date of acquisition and are being depreciated over their estimated useful lives ranging from 3 to 10 years utilizing the straight-line method.  Leasehold improvements are recorded at cost or estimated fair market value as of the date of acquisition and are being amortized over their estimated useful lives or lease term, whichever is shorter, utilizing the straight-line method.  Maintenance, repairs, and minor renewals and betterments are expensed as incurred.

Long-lived assets are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable.  When such factors indicate that assets should be evaluated for possible impairment, management would prepare an analysis comparing the carrying value of the assets to future undiscounted cash flows of the underlying assets.  The net book value of the underlying assets would be adjusted to fair value if the sum of the expected undiscounted future cash flows is less than book value.  Management has not identified any such factors pertaining to the Company's long-lived assets as of July 31, 2018.

*FCSL Goodwill and Impairment Charge*

Goodwill represents the excess of the purchase price over the fair market value of the identifiable net assets acquired in a business acquisition.  Goodwill is not amortized, but evaluated for impairment annually, in the fourth quarter of each fiscal year, or whenever events or circumstances indicate that the carrying amount may not be recoverable.  Impairment exists when the carrying amount of goodwill exceeds its implied fair value.  The implied fair value of goodwill is determined by deducting the estimated fair value of all tangible and identifiable intangible net assets of the reporting unit from the estimated fair value of the reporting unit.  If the recorded value of goodwill exceeds its implied value, an impairment charge is recorded for the excess.  The Company tests for goodwill impairment at the reporting unit level.

Determining the fair value of a reporting unit and other intangible assets acquired is judgmental in nature and involves the use of significant estimates and assumptions.  These estimates and assumptions include, among others, future economic and market conditions and determination of appropriate market comparables.  Such estimates are unpredictable and inherently uncertain; actual future results may differ from the estimates.  The Company may also assess qualitative factors to determine if it is more likely than not that the fair value of the reporting unit is less than its carrying amount.

Due to the decrease in the FCSL's student population and the resulting net loss during the year ended July 31, 2018, the Company's annual impairment testing for its goodwill brought management to the conclusion that it was no longer more-likely-than not that the fair value of the School exceeded its carrying value.  As a result, management revised its projections and performed goodwill impairment tests which yielded a goodwill impairment charge of $8,159,402.  None of this charge is deductible for income tax purposes.

10

*Income Taxes and Related Accounting Pronouncement*

Holding is treated as a partnership for federal and state income tax purposes as are the other limited liability companies of the Company.  Consequently, federal income and state taxes are not provided for nor are they payable by these entities.  The respective members of Holding are taxed individually based on their pro rata ownership share of the consolidated earnings of the Company.

The entities of the Company operating as corporations use the asset and liability method of accounting for income taxes.  Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases.  Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled.  The effect of a change in tax rates on deferred tax assets and liabilities will be recognized in income in the period that includes the enactment date.

In November 2015, the Financial Accounting Standards Board (FASB) issued *Accounting Standards Update (ASU) 2015-17, Income Taxes (Topic 740), Balance Sheet Classification of Deferred Taxes.* ASU 2015-17 removes the requirement of a reporting entity to separate deferred income tax assets and liabilities into current and noncurrent amounts in a classified balance sheet, providing for all such net income tax assets or liabilities to be reflected as noncurrent.  The new guidance is effective for nonpublic entities in fiscal years beginning after December 15, 2017, and interim periods within fiscal years beginning after December 15, 2018, with early adoption permitted for financial statements that have not been previously issued.  The Company does not intend to early-implement this new guidance.

*Other Recent Accounting Pronouncements*

In May 2014, FASB issued *ASU 2014-09, Revenue from Contracts with Customers*, which establishes a comprehensive revenue recognition standard for virtually all industries in U.S. GAAP, including those that previously followed industry-specific guidance. This ASU will be effective for the Company for the year ending July 31, 2020.  The Company is currently evaluating the effect the provisions of ASU 2014-09 will have on the consolidated financial statements, if any.

In February 2016, FASB issued *ASU No. 2016-02, Leases*.  The guidance in this ASU supersedes the leasing guidance in *Topic 840, Leases*.  Under the new guidance, lessees are required to recognize lease assets and lease liabilities on the consolidated statement of financial position for all leases with terms longer than twelve months.  Leases will be classified as either finance or operating, with classification affecting the pattern of expense recognition in the consolidated statement of operations.  This ASU will be effective for the Company for the year ending July 31, 2021.  The Company is currently evaluating the effect that the provisions of ASU 2016-02 will have on the consolidated financial statements.

*Fair Value Measurements*

The carrying value of the Company's financial instruments approximates fair value due to the relative short-term nature of these instruments.

The Company uses a three-tier fair value hierarchy which prioritizes the inputs used in measuring fair value.  These tiers include: Level 1, defined as observable inputs such as quoted market prices in active markets; Level 2, defined as inputs other than quoted prices in active markets that are either observable directly or indirectly through market corroboration, for substantially the full term of the financial instruments; and Level 3, defined as unobservable inputs in which little or no market data exists, therefore requiring an entity to develop its own assumptions.  The Company has no financial instruments utilizing Level 2 or Level 3 inputs.

*Course Service and Advertising Costs*

Course service and advertising costs are expensed as incurred.

*Estimates*

The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect amounts reported in the consolidated financial statements and accompanying notes.  Accordingly, actual results could differ from those estimates.

*Subsequent Events*

The Company has evaluated subsequent events through the date of the auditors' report, January 31, 2019, which is the date the accompanying consolidated financial statements were available to be issued.

 NOTE 2 – PROPERTY AND EQUIPMENT

Property and equipment consisted of the following as of July 31, 2018:

| | |
|---|---:|
| Building and improvements | $  29,758,270 |
| Library and online courses | 8,706,120 |
| Furniture and equipment | 3,076,103 |
| Computer equipment and software | 7,440,418 |
| | 48,980,911 |
| Less: accumulated depreciation and amortization | (28,655,240) |
| | $   20,325,671 |

Depreciation and amortization expense related to property and equipment from continuing operations for the year ended July 31, 2018 was $2,522,892.

NOTE 3 – CAPITAL LEASE OBLIGATIONS

FCSL leases its operating facility from an unrelated third-party under the terms of a non-cancellable lease agreement which has been classified as a capital lease.  As of July 31, 2018, the fair market value of the leased property included within property and equipment on the accompanying consolidated balance sheet amounted to approximately $26,870,000; the accumulated depreciation was approximately $9,960,000. Depreciation expense associated with the property under capital lease is included within depreciation and amortization expense on the accompanying consolidated statement of operations.

The FCSL facility lease provides for annual increases based on changes in the Consumer Price Index and is scheduled to expire in March 2031.  The capital lease obligation recorded by the Company utilizes an imputed interest rate of 9.0%.

In addition, the Company also leases certain computer equipment under the terms of a capital lease agreement bearing interest at 9.8% and requiring annual payments through maturity in February 2022.

Future minimum lease payments under the terms of the capital lease agreements were as follows as of July 31, 2018:

| Year Ending July 31, | |
| --- | --- |
| 2019 | $ 3,019,992 |
| 2020 | 3,040,370 |
| 2021 | 3,116,969 |
| 2022 | 3,195,523 |
| 2023 | 3,239,579 |
| Thereafter | 27,640,098 |
| Total future minimum lease payments | 43,252,531 |
| Less: amount representing interest | (18,144,379) |
| Present value of future minimum lease payments | 25,108,152 |
| Less: current portion | (807,708) |
| | $ 24,300,444 |

## NOTE 4 – LONG-TERM DEBT

*Revolving Line of Credit*

The Company maintains a revolving line of credit with one of the former members of Holding. The agreement currently provides for borrowings of up to $17.5 million through maturity in September 2022; In addition to repayment of the outstanding principal balance in September 2022, a fee equal to 15% of the outstanding principal amount and face amount of any posted letters of credit as of September 30, 2021 will be assessed.

An amendment to the line of credit agreement in July 2017 served to forgive and forfeit any claims to, and cancel all interest that was accrued but unpaid on the revolving line of credit as of the date thereof and also as would otherwise accrue thereafter.

The principal balance outstanding on the revolving line of credit as of July 31, 2018 was $4,711,800, which includes the $3.0 million subsequently drawn on the letter of credit maintained for ASLS's landlord in August 2018. The $1,168,800 million letter of credit discussed in Note 1 has been issued under the line of credit and serves to further reduce the availability of funds available for draw by the Company.

In December 2017, the Company repurchased 100% of the equity interest held by the member of Holding providing for the line of credit. In addition, under the terms of a side letter accompanying the unit repurchase agreement, the member has agreed to reduce, on a dollar-for dollar-amount basis, the aggregate principal amount outstanding under the line of credit by the amount equal to any expired, cancelled, surrendered, replaced or substituted letter(s) of credit. As discussed in Note 1, CSL's $2.5 million letter of credit was cancelled in January 2018. Also, during the year ended July 31, 2018 there was a reduction to the Company's letter of credit posted for the Arizona State Board for Private Postsecondary Education in the amount of $331,200. These amounts have been reflected as gain on extinguishment of debt on the accompanying consolidated statement of operations.

*Loans from Members of Management*

During the year ended July 31, 2017, the Company received advances from certain members of senior management under the terms of two Credit Facility Agreements.  The first agreement provides for borrowings up to $4.5 million bearing interest at 14.0%. Though the agreement does not currently provide provisions for repayment, this debt is subordinated to the revolving line of credit described above.  The Company received total advances of $4.5 million during the year ended July 31, 2017 under the terms of the agreement.  An amendment to the agreement in July 2017 served to forgive and forfeit any claims to, and cancel all interest that was accrued but unpaid on the loan as of the date thereof and also as would otherwise accrue thereafter. Also in July 2017, total outstanding borrowings of $4.5 million were converted to Series A-2 Preferred Units of Holding and as of July 31, 2017, there was no amount outstanding under the first agreement.

The second agreement entered by the Company with members of senior management provides for borrowings up to $6,370,977 bearing interest at 1.0%.  Though the agreement does not currently provide provisions for repayment, this debt is subordinated to the revolving line of credit described above. The Company received total advances of $4.48 million during the year ended July 31, 2017 under the terms of the agreement. Similar to the first agreement described above, an amendment to the agreement in July 2017 served to forgive and forfeit any claims to, and cancel all interest that was accrued but unpaid on the loan as of the date thereof and also as would otherwise accrue thereafter.  Also in July 2017, total outstanding borrowings of $4,387,120 were converted to Series A-2 Preferred Units of Holding; outstanding principal borrowings as of July 31, 2017 amounted to $92,880.

During the year ended July 31, 2018, the members of senior management served Notice to the Company that they were surrendering the Series A-2 Preferred Units obtained though the conversion of the $4,500,000 and $4,387,120, pursuant to the terms of the July 2017 amendment.  Under the terms of the Notice, the Series A-2 Preferred Units were first exchanged for common stock of InfiLaw, followed by the conversion of the common stock back to the Credit Facility Agreements described above. In addition, $307,977 of previously converted unit options held by the members of senior management were also converted.  Subsequent to the execution of the Notice, the outstanding balances under the Credit Facility Agreements described above were $9,637,977.

Future minimum payments of long-term debt under the terms of the revolving line of credit and loans from senior management described above were as follows as of July 31, 2018:

| Year Ending July 31, | | |
|---|---|---:|
| 2019 | $ | - |
| 2020 | | - |
| 2021 | | - |
| 2022 | | - |
| 2023 | | 14,349,777 |
| | $ | 14,349,777 |

NOTE 5 – LEASE ABANDONMENTS AND RELATED LEGAL SETTLEMENT

*Accrued Lease Termination*

During the year ended July 31, 2018, the Company vacated its ASLS campus as well as certain of its corporate office space.  As such, the future commitments for rent expense through the remaining terms of the leases have been accrued on the accompanying consolidated balance sheet.  Any reduction to these future commitments that may be negotiated with the landlords will be accounted for in the period in which the concession is received.

*Accrued Legal Settlement*

Upon closure of the institution, CSL vacated its campus location. On January 12, 2018, CSL and InfiLaw were sued in Superior Court in Mecklenburg County in a case captioned *South College Street LLC v. InfiLaw Corporation and Charlotte School of Law LLC*. The lawsuit alleged that the defendants breached their obligations under a lease and associated guaranty agreement with the plaintiff (as successor-in-interest to the original lessor). The plaintiff sought certain remedies, including damages resulting from the alleged breach and the recovery of attorneys' fees.

On October 31, 2018, the parties held a Mediated Settlement Conference in which a full and final agreement was reached and Memorandum of Agreement was executed. The terms of the agreement stipulate that the defendants are liable to the plaintiff for the sum of $24,550,000, inclusive of past due rent of $6,089,078 and an acceleration of rent payments due through July 31, 2026 of $18,460,922.  The agreement further stipulates this amount to be immediately due and payable by the defendants.

NOTE 6 – ADDITIONAL LEGAL PROCEEDINGS

The Company is subject to various claims and lawsuits in the ordinary course of business.  Currently, these claims and lawsuits relate primarily to the closure of CSL and have been brought against the Company by certain displaced students of CSL.  The Company denies the allegations of the claimants, believes it has meritorious defenses and intends to vigorously defend itself.  The status of these claims and lawsuits is as follows:

On March 9, 2015, the Department of Justice (DOJ) served a Civil Investigative Demand (CID) on the Company seeking to determine whether the Company violated the Department of Education's Program Participation Agreement regulations, 34 C.F.R. § 668.14, by submitting false statements or making false claims.  Through the CID and subsequent requests, DOJ has focused on whether the Company's schools (a) complied with regulations that limit the proportion of revenues for-profit schools may earn under Title IV of the Higher Education Act (Title IV) to 90 percent of the school's total revenues; (b) advertised job placement rates in a misleading way; or (c) offered recruiters or admissions staff improper incentive payments tied to enrolling students or securing financial aid for students.  The Company is cooperating in the investigation and there have been no communications regarding this investigation since August 26, 2016.  The Company denies any wrongdoing.

On May 6, 2016, Assistant U.S. Attorneys from the DOJ Criminal Division notified the Company that they were investigating possible fraudulent activity relating to the Schools claiming revenues generated by their post-graduation bar preparation classes as funds derived from non-Title IV funds.  DOJ has made several informal requests for documents and information, but no subpoena or CID has been issued.  The Company is cooperating in the investigation, and there have been no communications regarding this investigation since November 18, 2016.  The Company denies any wrongdoing.

The Company has been sued in three class action lawsuits and a single plaintiff lawsuit in federal court. The complaints were filed in December 2016 and January 2017. The plaintiffs contend that the defendants made false or misleading statements about CSL's ABA accreditation status and compliance with regulatory and accreditation standards.  The plaintiffs allege violation of the North Carolina Unfair Competition statute, unjust enrichment, breach of fiduciary duty, and fraud. The defendants contest these allegations. The three class action lawsuits and the single plaintiff lawsuit have been consolidated for purposes of discovery in District Court in the Western District of North Carolina. The Company denies any wrongdoing and is vigorously defending itself. The parties participated in a mediation on April 19-20, 2018. On September 11, 2018, the defendants and certain of the plaintiffs jointly moved for preliminary approval of a settlement class and preliminary approval of a class settlement. The Court granted the motion for preliminary approval on September 12, 2018.  The Court held a fairness hearing on the settlement on January 9, 2019 and approved it on January 10, 2019.  The settlement requires the payment of a total of $2.65 million to the plaintiffs, $2.5 million of which will be funded by the remaining limits of the Company's excess insurance policy.

The Company was sued in state court in Mecklenburg County (MC) in a case captioned *Herrera v. Charlotte School of Law, LLC*.  The plaintiffs allege violations of the North Carolina Unfair Competition statute, breach of contract, breach of the covenant of good faith and fair dealing, fraud, constructive fraud, intentional misrepresentation, negligent misrepresentation, and unjust enrichment. Plaintiffs seek monetary damages and attorneys' fees.  On June 16, 2017, the Company filed a motion to dismiss for failure to state a claim.  On June 21, 2017, the Court associated this case with four closely-related state actions also filed in MC District Court against the Company.  These cases, and subsequently filed cases on similar facts, are pending in the Business Court and are subject to a June 21, 2017 court order that the defendant is not required to respond to any related complaints in state court until 60 days after the court's resolution of any motions to dismiss.  On September 12, 2017, the Court held a hearing on all motions to dismiss.  More than sixty related actions have been filed between August 11, 2017 and December 18, 2017, involving more than 125 additional plaintiffs.  All cases include similar allegations and seek monetary damages and attorneys' fees. The Company is vigorously defending itself against the allegations in all of the complaints. This case is subject to the settlement approved by the Court on January 10, 2019, following the fairness hearing.

On March 10, 2017, the Attorney General of North Carolina (AG) served a CID on CSL, seeking information regarding CSL's response to the Denial Letter from ED.  The company is cooperating in this investigation and there have been no communications regarding this investigation since July 2017.  On November 8, 2017, the AG served a second CID, seeking information and documents relating to the closure of CSL and other issues.  The Company denies any wrongdoing.

On June 6, 2016, the Company was sued in a qui tam lawsuit filed under seal in the Middle District of Florida, captioned *United States ex rel. Bernier v. InfiLaw Corporation*.  On August 14, 2017, the United States declined to intervene.  On August 15, 2017, the case was unsealed.  On August 22, 2017, Relator served the lawsuit on the defendants.  Relator brings three claims for alleged violations of the federal False Claims Act, contending that the defendants entered into a Program Participation Agreement (PPA) with deliberate indifference to or knowing disregard for its obligations to comply with applicable federal regulations or ABA accreditation standards.  Relator alleges a variety of improper conduct and regulatory violations, and she seeks monetary damages and attorneys' fees.  On October 26, 2017, the Company filed a motion to dismiss for failure to state a claim.  On November 9, 2017, Relator filed an amended complaint.  On December 4, 2017, the Company filed a motion to dismiss the amended complaint for failure to state a claim. On April 23, 2018, the Court granted defendants' motion to dismiss for failure to state a claim. On May 7, 2018, Relator filed a second amended complaint, which added new claims filed on the Relators' behalf as an individual, a new co-plaintiff, and an additional defendant. The Company

moved to dismiss the second amended complaint on June 4, 2018. On November 14, 2018, the Court dismissed the case with prejudice. The time to appeal has expired without a notice of appeal being filed, and the case is terminated.

On August 5, 2015, the Company and certain of its subsidiaries were sued in a qui tam lawsuit filed under seal in the Middle District of Florida, captioned *United States ex rel. Lorona v. InfiLaw Corporation*. The Relators filed an amended complaint on August 31, 2015, and a Second Amended Complaint on March 10, 2016. On February 16, 2018, the government declined to intervene. On April 14, 2018, the case was unsealed. On April 16, 2018, the Court struck the Second Amended Complaint as a shotgun pleading. On May 18, 2018, the Relators filed a Third Amended Complaint. Relators allege violations of the False Claims Act. On October 22, 2018, the Company filed a motion to dismiss for failure to state a claim, which remains pending. The Company denies any wrongdoing and is vigorously defending itself against the allegations in the complaint.

NOTE 7 – SALE OF OPERATING SEGMENT

In July 2017, the Company entered into a Unit Purchase Agreement (UPA) to sell all of its interest in iLaw Ventures, LLC (Ventures, an educational services provider) to an unrelated third-party; the Company held approximately 93 percent ownership in Ventures at the time of the sale.  The preliminary purchase price of Ventures was $13.6 million, inclusive of $5.6 million attributable to the provisions of an earnout period ending July 31, 2019 for which management believed to be fully-realizable as of July 31, 2017.  The Company's portion of the earnout amounted to $5,295,000 per the terms of the UPA and had been included within noncurrent assets on the Company's July 31, 2017 consolidated balance sheet. During the year ended July 31, 2018, management concluded that the realization of the earnout amount was no longer likely to occur and has included the write-off of such in the accompanying consolidated statement of operations.

NOTE 8 – DISCONTINUED OPERATIONS

Summary results from discontinued operations were as follows for the year ended July 31, 2018:

| Revenues: | |
|---|---:|
| Tuition | $    4,979,732 |
| Books and fees | 566,086 |
| Total revenues | $    5,545,818 |
| | |
| Loss from discontinued operations before income taxes | $ (35,931,994) |
| Provision for income taxes | - |
| Net loss from discontinued operations | $ (35,931,994) |

Assets and liabilities of discontinued operations were as follows as of July 31, 2018:

| | | |
|---|---|---:|
| Current assets: | | |
| Cash | $ | 56,259 |
| Current portion of accounts and notes receivable | | |
| from students, net | | 118,628 |
| Prepaid expenses and other | | 21,657 |
| Total current assets | | 196,544 |
| Notes receivable from students, net | | 442,671 |
| Total assets | $ | 639,215 |
| Current liabilitites: | | |
| Accounts payable and accrued expenses | $ | 1,896,603 |
| Accrued legal settlement | | 24,550,000 |
| Accrued lease termination | | 4,422,359 |
| Unearned tuition | | 1,408 |
| Total liabilities | $ | 30,870,370 |

## NOTE 9 – OTHER ACCOUNTS RECEIVABLE

Other accounts receivable included on the accompanying consolidated balance sheet include amounts due from two unrelated institutions, one which the Company had previously intended to acquire, and the other a California non-profit educational institution for whom Inspiras provided management services.

In October 2016, an agreement between InfiLaw and the first institution providing for InfiLaw's acquisition of the institution was formally terminated. Prior to the agreement's termination, certain funds had been advanced by InfiLaw for working capital needs of the target institution. The purchase agreement had provided for repayment provisions if the transaction were not to close and upon termination of the agreement, the institution sold its obligation for repayment of the funds to a third-party. The outstanding balance for repayment as of July 31, 2018 amounted to approximately $1.8 million and was received in-full by the Company in September 2018.

On April 1, 2018, Inspiras executed a promissory note with a California non-profit educational institution for the repayment of certain fees billed by Inspiras for management services and related expenses. The promissory note provided for 48 equal monthly payments of principal and interest (at 12%) through maturity in May 2022. In January 2019, the California non-profit repaid the outstanding balance of approximately $1.5 million in-full.

## NOTE 10 – MEMBERS' EQUITY

Holding has authorized for issuance of five classes of membership units: Series A Preferred Units, Series A-1 Preferred Units, Series A-2 Preferred Units, Series B Preferred Units and Class A (general) Units. Class A Units are the only class of membership units to hold voting rights.

As of July 31, 2018, the issued membership units of Holding were as follows:

| | Units Issued | Amount |
|---|---|---|
| Series A Preferred Units | 1.320704 | $ 132,070,431 |
| Series A-1 Preferred Units | 0.032536 | 3,253,648 |
| Series B Preferred Units | 5.872000 | 138,678,400 |
| Class A Units | 88.080000 | - |

*Series A and A-1 Preferred Units*

In connection with the execution of the Credit Agreement described in Note 4, Holding issued Series A Preferred Units which were entitled to a preferred return of various rates since their issuance. The initial preferred rate of the Series A preferred return was 9.5% through January 2016, at which time the rate increased to 11.5%. The additional 2.0% was payable in kind at the election of the Company and was done so at the time of a July 2016 amendment to the Holding operating agreement, resulting in an increase to the Series A Preferred Unit balance of $1,070,431. The July 2016 amendment also provided for an increase to the Series A preferred return to 15.0%, with the option for the Company to pay the increase in kind.

In July 2016, Holding issued one of its members Series A-1 Preferred Units in exchange for the cancellation of certain outstanding term loans made by the member totaling $2,671,123. In addition, Series A-1 Preferred Units were issued to a member of the Company's management team in exchange for $1,000,000. Series A-1 Preferred Units were entitled to a preferred return in the same manner as the Series A Preferred Units.

By letter dated June 16, 2017, the holders of Series A and A-1 Preferred Units agreed to forgive and forfeit any claims to, and authorized Holding to cancel all Series A and Series A-1 preferred returns that were accrued but unpaid to the date thereof, or that would otherwise accrue thereafter.

*Series B Preferred Units*

Series B Preferred Units were issued by Holding in October 2012 to fund certain accrued returns for existing members. The holders of Series B Preferred Units would earn a preferred rate of return between 2 and 2.5 times the original investment upon certain defined liquidity events. Series B Preferred Units hold no right to a preferred return other than in the event of liquidity.

NOTE 11 – INCOME TAXES

On December 22, 2017, the President of the United States signed the Tax Cuts and Jobs Act (the Tax Act). Among other things, the Tax Act lowered the U.S. corporate income tax rate from 35% to 21% effective January 1, 2018. Consequently, the Company wrote-down certain of its deferred tax assets as of July 31, 2018 by approximately $733,000 to reflect the estimated impact of the Tax Act and recorded a corresponding net one-time expense, all of which was non-cash, primarily related to enactment of the Tax Act and the re-measurement of certain net deferred tax assets using the lower U.S. corporate income tax rate, on a blended basis, for the year ending July 31, 2018.

While the Company has substantially completed its provisional analysis of the income tax effects of the Tax Act and recorded a reasonable estimate of such effects, the net one-time benefit related to the Tax Act may differ, possibly materially, due to, among other things, further refinement of its calculations, changes in interpretations and assumptions that were initially made, additional guidance that may be issued by the U.S. Government, and actions and related accounting policy decisions that may be taken as a result of the Tax Act. Any further adjustments will be included in the results from operations in future consolidated statements of operations of the Company.

Components of the income tax provision on the accompanying consolidated statement of operations are attributable to continuing operations only. The benefit (provision) for income taxes from continuing operations consisted of the following for the year ended July 31, 2018:

|  |  |  |
|---|---|---:|
| Current: |  |  |
| Federal | $ | 1,546,843 |
| State |  | - |
|  |  | 1,546,843 |
| Deferred: |  |  |
| Federal |  | (6,415,560) |
| State |  | 2,654,168 |
|  |  | (3,761,392) |
|  | $ | (2,214,549) |

The amount of income tax benefit that would result from applying federal statutory rates to the pretax loss differs from the income tax provision recorded due primarily to the effect of the Tax Act discussed above and the recording of a full valuation allowance against the net deferred tax assets of the Company, as discussed further below.

As of July 31, 2018, total deferred tax assets and liabilities recognized for deductible temporary differences were approximately $19.8 million and $1.3 million, respectively. No deferred tax assets or liabilities are presented on the accompanying consolidated balance sheet due to the establishment of a $18.5 million valuation allowance as of July 31, 2018, all of which was non-cash and recorded in the current year. A valuation allowance is provided when it is more likely than not that all or some portion of the net deferred tax asset will not be realized.  Deferred tax assets and liabilities relate to differences in the timing of recognizing various expenses for income tax purposes and financial reporting purposes and result primarily from the allowance for doubtful accounts, the capital lease obligation, net operating losses and the accrued expenses of the Company.

As of July 31, 2018, federal and state net operating loss carryforwards were approximately $20.5 million and $44 million, respectively. Pursuant to the Tax Act and the provisions under current Florida Administrative Code Rule 12C-1.013(14)(a), the Florida state net operating loss carryforward of approximately $24.3 million would be carried forward indefinitely without expiration. The remaining state net operating loss carryforwards of approximately $19.7 million expire in various years through 2038.

NOTE 12 – EMPLOYEE BENEFIT PLAN

Holding maintains a defined contribution 401(k) savings plan for which eligible employees of the Company may elect to participate. For the period from August 1, 2016 to January 31, 2017, the Company's matching contributions to a participant's account were equal to 100% of the first 3% of the participant's contribution and 50% of the next 2% of a participant's contribution. As of January 31, 2017, employer matching contributions were suspended indefinitely.

NOTE 13 – REGULATORY MATTERS

The Company is subject to extensive regulation by federal and state governmental agencies and accrediting bodies. In particular, the Higher Education Act (the Act) and the regulations promulgated thereunder by ED subject the Company to significant regulatory scrutiny on the basis of numerous standards that schools must satisfy in order to participate in the various federal student financial assistance programs under Title IV of the Act. These standards include, among others, financial responsibility, student default rates, and the "90/10" rule. Ineligibility to participate in the Title IV programs would have a material adverse effect on the Company's enrollments, revenue and results of operations.

Institutions participating in Title IV programs are required by ED to demonstrate financial responsibility. ED determines an institution's financial responsibility through the calculation of a composite score based upon certain financial ratios as defined in regulations. Institutions receiving a composite score of 1.5 or greater are considered fully financially responsible. Institutions receiving a composite score between 1.0 and 1.4 are subject to additional monitoring. Institutions receiving a composite score below 1.0 are required to submit financial guarantees in order to continue participation in the Title IV programs. As of and for the year ended July 31, 2018, the Company's composite score was less than 1.0.

For each federal fiscal year, ED calculates a rate of student defaults for each educational institution known as a "cohort default rate". Under certain defined circumstances, an institution may lose its eligibility to participate in some or all Title IV programs. As of July 31, 2018, management believes that the Company was in compliance with ED's requirements concerning cohort default rates.

Substantial portions of the Company's revenue and collection of accounts receivable are dependent upon its continued participation in the Title IV programs of the Act. To continue to participate in the Title IV programs, the Company must comply with certain regulations of ED. ED regulations restrict the proportion of cash receipts for tuition and fees from eligible programs to not more than 90 percent from the Title IV programs. The failure of an institution to meet the 90 percent limitation could result in the loss of an institution's ability to participate in Title IV programs. For the year ended July 31, 2018, the Company was in compliance with the 90/10 rule. ED requires an institution to provide additional disclosures with respect to the 90/10 rule, which are included in the accompanying supplementary information beginning on page 23.

As a result of operating in a highly regulated industry, the Company may be subject from time to time to audits, investigations, claims of noncompliance or lawsuits by governmental agencies, regulatory bodies, or other third parties. While there can be no assurance that such matters will not occur and if they do occur will not have a material adverse effect on the Company's business, results of operations or financial condition, management believes that the Company has complied with all regulatory requirements.

On October 30, 2014, ED released its final rule concerning gainful employment which was formally published in the Federal Register October 31, 2014 and became effective July 1, 2015. The final rule applies to all gainful employment programs, which include all non-degree programs at public and private non-profit institutions, and all programs offered at for-profit institutions. The final rule will assess continued eligibility of gainful employment programs by their performance against specific defined debt-to-earnings measures. Gainful employment programs that fail in two out of any three consecutive years or are in the zone for four consecutive years will be ineligible. In addition, institutions will be required to certify that each of their gainful employment programs meet state and federal licensure, certification, and accreditation requirements, as well as make public disclosures regarding performance and outcomes of their gainful employment programs, such as costs, earnings, debt and completion rates. In January 2017, ED released its final debt-to-earnings rates and underlying data applicable for the first measurement year and ASLS's law program was determined to be in the zone and FCSL's law program was determined to fail. In response, FCSL completed a Recent Graduates Employment and Earnings Survey and the Gainful Employment alternative earnings survey for the Gainful Employment debt measure year 2015 debt-to-earnings rate appeal for the law program.  These surveys resulted in a revised debt-to-earnings rate that would place the law program in the zone. Those surveys have been made available to institutions under *The Standards for Conducting the Recent Graduates Employment and Earnings Survey* issued by ED, and are utilized for contesting the published debt-to-earnings rates. As required by ED, FCSL's compliance with the standards for conducting these surveys was attested to by an independent accountant.  On July 9, 2018, ED confirmed that it had accepted FCSL's data and granted its appeal, as a result of which FCSL was determined to be in the zone.

FCSL is accredited by the ABA.  It currently is fully accredited and remains in good standing.  In March 2018, the Accreditation Committee of the Council of the Section of Legal Education and Admissions to the Bar found the school to be out of compliance with Standards 301(a), 309(b), and 501(b) and Interpretation 501-1 (relating to the rigor of the school's legal education, program, adequate academic support, and admitting students capable of being admitted to the bar, respectively).  The Council affirmed the findings of the Committee in August 2018, and required FCSL to undertake certain remedial measures, including providing certain disclosures to current and admitted students as to FCSL's bar passage rates by quartile, the class quartile for the applicable student, and attrition rates. The Council also required FCSL to submit a "reliable plan" for coming back into compliance with these Standards. A fact-finder is scheduled to visit the school in February 2019 to assess FCSL's compliance. Based on conversations with representatives of the Council, FCSL expects the Council to determine in or around May 2019 whether FCSL's improved bar passage rates and incoming student credentials suffice to warrant a finding of full compliance with the Standards.

NOTE 14 – CONCENTRATION OF CREDIT RISK

At certain times during the year ended July 31, 2018, the Company maintained deposits with banks in excess of the federally-insured amount.

**InfiLaw Holding, LLC and Subsidiary**
**Supplementary Information**
**(Information Required by the U.S. Department of Education)**
**July 31, 2018**

Institution's Calculation of 90/10 Revenue Test

InfiLaw Holding, LLC and Subsidiary (collectively, the Institution) derives a substantial portion of its revenues from Student Financial Aid (SFA) received by its students under the Title IV programs administered by the U.S. Department of Education pursuant to the Higher Education Act of 1965, as amended (HEA). To continue to participate in the SFA programs the Institution must comply with the regulations promulgated under HEA. The regulations restrict the proportion of cash receipts for tuition and fees from eligible programs to not more than 90 percent from the Title IV programs. In July 2008, modifications to the regulations were made with respect to amounts to be included in the 90 percent calculations including the allowance for the inclusion of funds received for certain qualifying non-Title IV programs. In addition, the modifications included provisions for institutions that do not comply with the 90 percent rule for a single fiscal year, whereby such institutions would be placed on provisional certification status for a period of two years. Institutions that do not comply with the 90 percent rule for two consecutive fiscal years are subject to the loss of their ability to participate in the SFA programs. For the year ended July 31, 2017, all reporting entities of the Institution were in compliance with the 90 percent rule.

For the year ended July 31, 2018, the Institution's 90/10 test percentages were computed as follows:

| Revenue by Fund Source | Florida Coastal School of Law, Inc. OPE ID No. 03374300 | | Arizona Summit Law School, LLC OPE ID No. 04131400 | |
|---|---|---|---|---|
| | Amount Disbursed | Adjusted Amount | Amount Disbursed | Adjusted Amount |
| **Adjusted Student Title IV Revenue** | | | | |
| Subsidized Loan | $ - | $ - | $ - | $ - |
| Unsubsidized Loan | 6,813,847 | 6,813,847 | 3,622,232 | 3,622,232 |
| Federal Pell Grant | - | - | - | - |
| FSEOG (subject to matching reduction) | - | - | - | - |
| Federal Work Study applied to tuition and fees (subject to matching reduction) | - | - | - | - |
| Federal Direct PLUS Loan | 9,520,642 | 9,520,642 | 4,935,393 | 4,935,393 |
| All Other Title IV Loans and Grants | - | - | - | - |
| **Student Title IV Revenue** | $ 16,334,489 | $ 16,334,489 | $ 8,557,625 | $ 8,557,625 |
| Revenue Adjustment - If the amount of funds applied first plus Student Title IV revenue is more than tuition and fees, then reduce Title IV revenue by the amount over tuition and fees | | (6,183,774) | | (2,989,135) |
| Title IV funds returned for a student under 34 C.F.R § 668.22 (withdrawal), reduce Student Title IV Revenue | | (546,845) | | (828,148) |
| **Adjusted Student Title IV Revenue** | | $ 9,603,870 | | $ 4,740,342 |

| Revenue by Fund Source | Florida Coastal School of Law, Inc. OPE ID No. 03374300 | | Arizona Summit Law School, LLC OPE ID No. 04131400 | |
|---|---|---|---|---|
| | Amount Disbursed | Adjusted Amount | Amount Disbursed | Adjusted Amount |
| **Student Non-Title IV Revenue** | | | | |
| Grant funds for the student from non-Federal public agencies or private sources independent of the institution | $      17,360 | | $      62,798 | |
| Funds provided for the student under a contractual arrangement with a Federal, State, or local government agency for the purpose of providing job training to low income individuals | - | | - | |
| Funds used by a student from savings plans for educational expenses established on or behalf of the student that qualify for special tax treatment under the Internal Revenue Code | - | | - | |
| Institutional scholarships disbursed to the student | - | | - | |
| Student payments on current charges | 2,067,049 | | 605,387 | |
| **Student Non-Title IV Revenue** | $     2,084,409 | | $     668,185 | |
| **Revenue from Other Sources (Totals for the Fiscal Year)** | | | | |
| Activities conducted by the institution that are necessary for education and training | $           - | | $           - | |
| Funds paid by a student, or on behalf of a student, by a party other than the school for an education or training program that is not eligible | - | | - | |
| Allowable student payments plus allowable amounts from account receivable or institutional loan sales minus any required payments under a recourse agreement | - | | - | |
| **Revenue from Other Sources** | $           - | | $           - | |
| Adjusted Title IV Revenue | | $     9,603,870 | | $     4,740,342 |
| Student Non-Title IV Revenue + Total Revenue from other sources | | $   11,688,279 | | $     5,408,527 |
| | | **82.17%** | | **87.65%** |

This information is required by the U.S. Department of Education and is presented for purposes of additional analysis and is not a required part of the consolidated financial statements.

Related Party Transactions

The Institution participates in Student Financial Aid under the Title IV programs administered by the U.S. Department of Education (ED) pursuant to the Higher Education Act of 1965, as amended (HEA). The Institution must comply with the regulations promulgated under HEA.  Those regulations require that all related party transactions be disclosed, regardless of their materiality to the consolidated financial statements.

*Organization and Discontinued Operations*

InfiLaw Holding, LLC (Holding) is a Delaware limited liability company organized in July 2006 and is the sole member of InfiLaw Corporation (InfiLaw, a Delaware corporation).  InfiLaw was organized in June 2003 for the purpose of acquiring, owning and operating independent law schools and other entities providing educational services.

During the year ended July 31, 2018, InfiLaw's consortium of independent law schools included Arizona Summit Law School (ASLS, a Delaware limited liability company), Florida Costal School of Law, Inc. (FCSL, a Delaware corporation) and Charlotte School of Law, LLC (CSL, a Delaware limited liability company).  During all or part of the year ended July 31, 2018, ASLS, FCSL and CSL operated in the states of Arizona, Florida and North Carolina, respectively, under accreditation by the American Bar Association (ABA).

InfiLaw also owns and operates Inspiras Management Services, LLC (a Delaware limited liability company) which provides management services to its subsidiary, Inspiras California, LLC, a Delaware limited liability company providing educational services.

In August 2017, management decided to cease operations of CSL due to continuing operational difficulties including the loss of accreditation from the ABA and the loss of approval for participation in the Title IV programs administered by ED for the funding of student tuition.  In August 2018, management also decided to cease continuing operations of ASLS due to operational difficulties similar to those experienced by CSL.  ASLS is no longer accepting new students and is in the process of completing a teach-out, which has been approved by the ABA.  As such, the results from operations of CSL and ASLS have been included within discontinued operations in the Institution's July 31, 2018 consolidated financial statements.

*Revolving Line of Credit*

The Institution maintains a revolving line of credit with one of the former members of Holding. The agreement currently provides for borrowings of up to $17.5 million through maturity in September 2022; In addition to repayment of the outstanding principal balance in September 2022, a fee equal to 15% of the outstanding principal amount and face amount of any posted letters of credit as of September 30, 2021 will be assessed.

An amendment to the line of credit agreement in July 2017 served to forgive and forfeit any claims to, and cancel all interest that was accrued but unpaid on the revolving line of credit as of the date thereof and also as would otherwise accrue thereafter.  The principal balance outstanding on the revolving line of credit as of July 31, 2018 was $4,711,800, which includes $3.0 million drawn on a letter of credit maintained for ASLS's landlord in August 2018.

In December 2017, the Institution repurchased 100% of the equity interest held by the member of Holding providing for the line of credit.  In addition, under the terms of a side letter accompanying the unit repurchase agreement, the member has agreed to reduce, on a dollar-for dollar-amount basis, the aggregate principal amount outstanding under the line of credit by the amount equal to any expired, cancelled, surrendered, replaced or substituted letter(s) of credit

*Loans from Members of Management*

During the year ended July 31, 2017, the Institution received advances from certain senior members of management under the terms of two Credit Facility Agreements.  The first agreement provides for borrowings up to $4.5 million bearing interest at 14.0%. Though the agreement does not currently provide provisions for repayment, this debt is subordinated to the Institution's revolving line of credit. The Institution received total advances of $4.5 million during the year ended July 31, 2017 under the terms of the agreement.  An amendment to the agreement in July 2017 served to forgive and forfeit any claims to, and cancel all interest that was accrued but unpaid on the loan as of the date thereof and also as would otherwise accrue thereafter.  Also in July 2017, total outstanding borrowings of $4.5 million were converted to Series A-2 Preferred Units of Holding and as of July 31, 2017, there was no amount outstanding under the first agreement.

The second agreement entered by the Institution with members of senior management provides for borrowings up to $6,370,977 bearing interest at 1.0%.  Though the agreement does not currently provide provisions for repayment, this debt is subordinated to the Institution's revolving line of credit. The Institution received total advances of $4.48 million during the year ended July 31, 2017 under the terms of the agreement.  Similar to the first agreement described above, an amendment to the agreement in July 2017 served to forgive and forfeit any claims to, and cancel all interest that was accrued but unpaid on the loan as of the date thereof and also as would otherwise accrue thereafter.  Also in July 2017, total outstanding borrowings of $4,387,120 were converted to Series A-2 Preferred Units of Holding; outstanding principal borrowings as of July 31, 2017 amounted to $92,880.

During the year ended July 31, 2018, the members of senior management served Notice to the Institution that they were surrendering the Series A-2 Preferred Units obtained though the conversion of the $4,500,000 and $4,387,120, pursuant to the terms of the July 2017 amendment.  Under the terms of the Notice, the Series A-2 Preferred Units were first exchanged for common stock of InfiLaw, followed by the conversion of the common stock back to the Credit Facility Agreements described above. In addition, $307,977 of previously converted unit options held by the members of senior management were also converted.  Subsequent to the execution of the Notice, the outstanding balances under the Credit Facility Agreements described above were $9,637,977.

This information is required by the U.S. Department of Education and is presented for purposes of additional analysis and is not a required part of the consolidated financial statements.

# ALMICH & ASSOCIATES
## Certified Public Accounting and Business Services

**INDEPENDENT AUDITORS' REPORT ON COMPLIANCE AND
ON INTERNAL CONTROL OVER FINANCIAL REPORTING BASED ON
AN AUDIT OF CONSOLIDATED FINANCIAL STATEMENTS PERFORMED IN
ACCORDANCE WITH *GOVERNMENT AUDITING STANDARDS***

To the Board of Directors and
 Members of InfiLaw Holding, LLC:

We have audited, in accordance with auditing standards generally accepted in the United States of America and the standards applicable to financial audits contained in *Government Auditing Standards* issued by the Comptroller General of the United States, the consolidated financial statements of InfiLaw Holding, LLC (a Delaware limited liability company) and Subsidiary (collectively, the Company), which comprise the consolidated balance sheet as of July 31, 2018, and the related consolidated statements of operations, members' equity and cash flows for the year then ended, and the related notes to the consolidated financial statements, and have issued our report thereon dated January 31, 2019, which included an emphasis-of-matter paragraph because of the uncertainty of the Company's ability to continue as a going concern.

*Internal Control Over Financial Reporting*

In planning and performing our audit, we considered the Company's internal control over financial reporting (internal control) as a basis for designing audit procedures that are appropriate in the circumstances for the purpose of expressing our opinion on the consolidated financial statements, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control. Accordingly, we do not express an opinion on the effectiveness of the Company's internal control.

A deficiency in internal control exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent, or detect and correct misstatements on a timely basis.  A material weakness is a deficiency, or combination of deficiencies, in internal control, such that there is a reasonable possibility that a material misstatement of the entity's consolidated financial statements will not be prevented, or detected and corrected on a timely basis.  A significant deficiency is a deficiency, or a combination of deficiencies, in internal control that is less severe than a material weakness, yet important enough to merit attention by those charged with governance.

Our consideration of internal control was for the limited purpose described in the first paragraph of this section and was not designed to identify all deficiencies in internal control that might be material weaknesses or significant deficiencies.  Given these limitations, during our audit we did not identify any deficiencies in internal control that we consider to be material weaknesses.  However, material weaknesses may exist that have not been identified.

*Compliance and Other Matters*

As part of obtaining reasonable assurance about whether InfiLaw Holding, LLC and Subsidiary's consolidated financial statements are free from material misstatement, we performed tests of their compliance with certain provisions of laws, regulations, contracts, and grant agreements, non-compliance with which could have a direct and material effect on the determination of financial statement amounts. Such tests included compliance tests as set forth in the *Guide for Audits of Proprietary Schools and for Compliance Attestation Engagements of Third-Party Servicers Administering Title IV Programs, used by the U.S. Department of Education, Office of Inspector General* (the Guide) including those relating to related parties and percentage of revenue derived from Title IV programs. However, providing an opinion on compliance with those provisions was not an objective of our audit, and accordingly, we do not express such an opinion. The results of our tests disclosed no instances of non-compliance that are required to be reported under Government Auditing Standards or the Guide.

*Purpose of this Report*

The purpose of this report is solely to describe the scope of our testing of internal control and compliance and the results of that testing, and not to provide an opinion on the effectiveness of the entity's internal control or on compliance.   This report is an integral part of an audit performed in accordance with *Government Auditing Standards* in considering the entity's internal control and compliance. Accordingly, this communication is not suitable for any other purpose

*Almich & Associates*

Lake Forest, California
January 31, 2019