**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| FLORIDA COASTAL SCHOOL OF LAW, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 3:21-cv-721-MMH-JBT |
| MIGUEL CARDONA, in his official capacity as Secretary of Education, *et al.*, | ) ) ) ) | |
| Defendants. | ) ) | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

**INTRODUCTION**

Plaintiff Florida Coastal School of Law is a private, for-profit law school.  Until 2017, Florida Coastal had two sister law schools with common ownership.  But those schools have closed, leaving behind approximately $5.5 million in unpaid obligations to the U.S. Department of Education (of which approximately $1.9 million is under appeal or subject to appeal).

The Department has an obligation to be a good steward of federal funds and not to make loans at institutions lacking in financial responsibility.  Those obligations led the Department to conclude that the law school could not participate in the Title IV loan program.   The Department's administrative conclusions are supported by considerable evidence that Florida Coastal failed to comply with applicable regulations and cannot comply moving forward.  Moreover, the school has posted on its website that "[t]he Law School will not offer any credit-bearing courses beyond the summer 2021 term," and the law school's president has stated publicly that the school "will not be offering classes following the end of the summer term."  *See infra* at 16.

Against this backdrop, Florida Coastal seeks a mandatory preliminary injunction, requiring the Secretary of Education to reinstate its lapsed participation in federal student financial aid programs for the pendency of

1

this case (and causing the Department to make millions of dollars of loan disbursements that are not likely ever to be repaid). The school presents a single claim under the Administrative Procedure Act (APA), which allows for mandatory injunctions (at final judgment) to "compel agency action unlawfully withheld." 5 U.S.C. § 706(1). But the requirements for such a claim are demanding, because "the only agency action that can be compelled under the APA is action legally *required*." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 63 (2004) (emphasis in original). Florida Coastal does not even allege that the Secretary of Education was legally required to approve its application, only that his denial was arbitrary and capricious. Such claims under 5 U.S.C. § 706(2) simply cannot support a mandatory injunction—and all the less so on a motion for preliminary relief, where such injunctions are strongly disfavored. On the merits, Florida Coastal has no likelihood of winning a mandatory injunction, because it has not pled any claim that could lead to mandatory injunctive relief. And so it clearly is not entitled to such relief at the preliminary stage.

Moreover, the school is not likely to succeed on the merits of its claim for vacatur of the challenged decisions. Florida Coastal tries to convince the Court that it has made sufficient promises to the Department to justify its participation in the Title IV loan program. To be sure, the Department holds

approximately $5.7 million in letters of credit from the parent corporation—but that is security against *both* future losses attributable to Florida Coastal *and* the $5.5 million in outstanding obligations from the two closed law schools.  In a sleight of hand, Florida Coastal treats the letters of credit as if they pertained only to Florida Coastal; in truth, these letters of credit would be almost entirely consumed by the unpaid obligations of Florida Coastal's failed corporate siblings.  The Department of Education had good reason to determine that Florida Coastal was not financially responsible, and the school has not persuasively identified any errors in the challenged decisions.

Finally, Florida Coastal cannot show that the extraordinary remedy of mandatory preliminary injunctive relief would spare it from any irreparable harm.  For purposes of this motion, Florida Coastal has imagined that a court order, entered at an August 4 hearing, could save a fall term that was supposed to begin on August 23.  That is simply fanciful.  If Florida Coastal is about to close, nothing that this Court can do here could prevent that.

**BACKGROUND**

**A.    Statutory and Regulatory Background**

Under Title IV of the Higher Education Act (HEA), Congress provides billions of dollars through loan and grant programs to help students pay tuition for their postsecondary education.  The Direct Loan program is most relevant here.  *See* 20 U.S.C. § 1087a *et seq*.  When schools are poor stewards of these federal funds, or engage in risky or unlawful behavior, students and taxpayers suffer.  If students default on their loans, or are discharged from their obligation to repay them, the taxpayer bears the loss.

Loans can be discharged "if the borrower . . . did not complete the program of study for which the loan was made because the school at which the borrower . . . was enrolled closed," or "if a school falsely certifies the eligibility of the borrower . . . to receive the proceeds of a Direct Loan," among other reasons.  34 C.F.R. §§ 685.214(a), 685.215(a).  The first category is known as a "closed school" discharge, while the second is known as a "borrower defense to repayment" discharge when it is based on certain school misconduct.  In both cases, the Department may seek repayment from the school that the borrower attended.   34 C.F.R. §§ 685.214(d)–(e), 685.215(e)(6)(ii).  If the school is insolvent, the Department may not be able to recoup the loss.

4

To participate in Title IV programs—*i.e.*, to be able to accept federal funds—a postsecondary institution must satisfy several statutory requirements.   Among other things, a school must demonstrate its "administrative capability and financial responsibility."   20 U.S.C. § 1099c(a).

***Financial responsibility.***   The Secretary determines "whether an institution has the financial responsibility required by [Title IV] on the basis of whether the institution is able," as relevant here, "to provide the services described in its official publications and statements," and "to meet all of its financial obligations, including (but not limited to) . . . repayments to the Secretary for liabilities and debts incurred in programs administered by the Secretary." *Id.* § 1099c(c)(1)(A), (C); *see* 34 C.F.R. §§ 668.15(b), 668.171(a). To meet the "General standards of financial responsibility," an "institution's Equity, Primary Reserve, and Net Income ratios" must "yield a composite score of at least 1.5," on a scale of -1 to 3, "as provided under [34 C.F.R.] § 668.172 and appendices A and B to this subpart." 34 C.F.R. § 668.171(b)(1).

When "an institution fails to meet criteria prescribed by the Secretary regarding [the] ratios that demonstrate financial responsibility, then the institution" must "provide the Secretary with satisfactory evidence of its financial responsibility," 20 U.S.C. § 1099c(c)(2), by (as relevant here)

submitting "to the Secretary third-party financial guarantees that the Secretary determines are reasonable" or establishing "to the satisfaction of the Secretary . . . that the institution has sufficient resources to ensure against the precipitous closure of the institution," *id.* § 1099c(c)(3)(A), (C). "The Secretary . . . take[s] into account an institution's total financial circumstances in making a determination of its ability to meet the standards" of financial responsibility. *Id.* § 1099c(c)(2).

***Administrative capability and fiduciary obligation.*** As for administrative capability, the Secretary has "establish[ed] procedures and requirements relating to the administrative capacities of institutions of higher education, including . . . consideration of past performance of institutions or persons in control of such institutions with respect to student aid programs." *Id.* § 1099c(d)(1)(A). And the Secretary has imposed a requirement that "[t]o participate in any Title IV, HEA program, the institution . . . must at all times act with the competency and integrity necessary to qualify as a fiduciary." 34 C.F.R. § 668.82(a). This "fiduciary standard always applies and is not to be construed narrowly." 59 Fed. Reg. 8051. It "is not simply an additional requirement but, rather, it is a condition of initial and continued participation in . . . the Title IV, HEA programs." *Id.*

*Program participation agreements.*   Finally, an otherwise eligible school "may participate in . . . Title IV, HEA program[s] . . . only if the institution enters into a written program participation agreement with the Secretary," or is only participating in programs not relevant here.   34 C.F.R. § 668.14(a)(1).  "A program participation agreement conditions the initial and continued participation of an eligible institution in any Title IV, HEA program upon compliance with the provisions of this part, the individual program regulations, and any additional conditions specified in the program participation agreement that the Secretary requires the institution to meet." *Id.*

## B.   Factual Background

### i.   The InfiLaw Schools

Until 2017, Florida Coastal School of Law had two sister schools—Arizona Summit Law School, and Charlotte School of Law.  All three were proprietary institutions of higher education under Section 102(b) of the Higher Education Act, 20 U.S.C. § 1002(b).  Each school was owned by a separate for-profit corporation (for example, Florida Coastal School of Law, Inc.).  Those companies were owned by InfiLaw Corporation, which was owned by InfiLaw Holdings, LLC, which was almost entirely owned by a private equity firm called Sterling Capital Partners, L.P.  Decl. of Michael J.

Frola, U.S. Dep't of Educ. ("Frola Decl.") ¶ 5.  Because of the schools' ownership structure, the Department reviewed the financial statements of their common holding company and assigned a single financial responsibility score under 34 C.F.R. § 668.171(b)(1), which applied to all three schools.  For the fiscal years 2015 and 2016, the InfiLaw schools received a passing score of 1.5.  For the fiscal year 2017, the InfiLaw schools received a score of 1.1.  Frola Decl. ¶ 6.  This was not a passing score, but the schools were allowed to participate in Title IV under alternative standards of participation for scores ranging from 1.0 to 1.4.  Frola Decl. ¶¶ 6–7; *see* 34 C.F.R. § 668.175(d).

Charlotte School of Law closed in 2017.  In December 2016, the Department denied its application for continued participation in Title IV programs, because Charlotte School of Law had failed to meet the American Bar Association's requirements related to admissions, rigor of education, and admissibility to the legal profession (both graduation and bar passage rates). The Department determined that the school had also breached its fiduciary duty and shown an absence of administrative capability by substantially misrepresenting the nature of its educational programs.  Frola Decl. ¶ 8 & Exh. A.  Charlotte School of Law continued to operate until its state license expired in August 2017. *See generally Herrera v. Charlotte School of Law,*

*LLC*, 818 Fed. App'x 165, 168–69 (4th Cir. 2020) (describing circumstances of closure while upholding $2.65 million settlement of class action alleging fraudulent misrepresentations by the school).

Closed school discharges were issued to some former students who received federal loans to attend Charlotte School of Law.  *See* 34 C.F.R. § 685.214(c)(1).  InfiLaw is challenging $1,585,802 of those discharges in administrative appeals on behalf of the defunct school, *see id.* § 668.113, and is not contesting (but has not paid) another $3,475,261.  Recently, $330,743 in additional loan discharges were issued in accordance with 34 C.F.R. § 685.214(c)(3)(ii), for a total of $1,916,545 in Charlotte School of Law discharges under (or subject to) appeal.  Frola Decl. ¶ 9.

Arizona Summit Law School closed in 2018, after it was informed that the American Bar Association intended to withdraw accreditation.  Frola Decl. ¶ 10.  InfiLaw is liable for, but has not paid, $130,427 of closed school loan discharges for Arizona Summit Law School.  Frola Decl. ¶ 12.

In sum, InfiLaw is responsible for $3,605,688 in unchallenged discharges, and another $1,916,545 in discharges currently under (or still subject to) appeal.  In addition, approximately 1,100 former students of InfiLaw schools have applied for "borrower defense to repayment" discharges to date, alleging that they were defrauded by the schools.

InfiLaw's potential liability from those pending applications totals approximately $167 million.  Frola Decl. ¶ 13.

### ii.    Florida Coastal School of Law

In 2016, Florida Coastal School of Law applied to renew its program participation agreement, which was set to expire in June of that year.  *See* Frola Decl., Exh. B.  Because the renewal application was timely filed, the participation agreement was automatically extended on a month-to-month basis until the Department reached a decision regarding renewal.  In the meantime, the financial responsibility of the InfiLaw consortium of law schools was assessed each year.  Frola Decl. ¶ 14.

For fiscal year 2018—which included the closing of Charlotte School of Law and ended weeks before Arizona Summit Law School also closed—the InfiLaw schools received a failing financial responsibility score under 34 C.F.R. § 668.171(b)(1).  The schools received a score of -1.0, the lowest possible score, which they also received for fiscal years 2019 and 2020.  Frola Decl. ¶ 15 & Exh. C.

As a result of the first failing score, the Department required InfiLaw to post an irrevocable letter of credit to continue its participation in Title IV programs.  The Department offered InfiLaw the choice between a letter of credit for $11,362,511—seventy percent (70%) of the Title IV, HEA program

funds received by InfiLaw during the previous fiscal year—or half that amount, $5,681,255.  Under the latter option, InfiLaw would "acknowledge[] that it has not met the Department's standards of financial responsibility," and subject itself to additional regulatory burdens and reporting requirements.  Compl., Exh. 1 at 2.  The Department noted that "InfiLaw has faced substantial regulatory and operational difficulties that have resulted in the closure of two of its institutions."  *Id*. at 1.  *See* Frola Decl. ¶ 16.

InfiLaw chose to post the smaller amount, split between three letters of credit submitted from September 13 to November 6, 2019.  Each of the three letters identifies all three InfiLaw schools and provides security against the obligations of all three schools, including the $3,605,688 in unchallenged discharges, $1,916,545 in discharges under appeal (or subject to appeal), and any potential discharges to come.  Frola Decl. ¶ 17 & Exhs. D–G.  Absent successful appeals, InfiLaw's letters of credit will exceed its debts to the Department by less than $160,000.  Frola Decl. ¶ 17.

Throughout this time, while Florida Coastal's application to renew its participation agreement was pending, InfiLaw discussed with the Department the possible impact of several potential corporate transactions it was considering.  None of those proposals came to fruition.  In 2018, Infilaw considered the possibility of a corporate restructuring that would free

11

the still-operational InfiLaw school (or schools) from the liabilities of the closed school (or schools).  The following year, InfiLaw asked the Department to conduct an abbreviated pre-acquisition review[1] of a transaction in which Florida Coastal would be acquired by PhoenixLaw Foundation, a new Arizona nonprofit corporation with no financial statements to submit for review.  Because of the lack of any financial statements, the Department determined that this transaction would require PhoenixLaw Foundation to post an irrevocable letter of credit for 25% of Florida Coastal's Title IV funding from the previous year.  Frola Decl. ¶ 18.

Later that year, in September 2019, the parties began to discuss the possibility that InfiLaw would sell Florida Coastal to Campbellsville University, a nonprofit institution in Kentucky.  Frola Decl. ¶¶ 19–22.  At various times, the parties also discussed the possible settlement of InfiLaw's obligations to reimburse the Department for discharged loans made to students of Arizona Summit Law School and Charlotte School of Law.  Frola

---

[1] A covered change in ownership triggers the automatic termination of a school's Title IV program participation agreement, unless the school submits a material complete application for participation under the changed ownership within ten days of the change, which in turn allows the school short-term, temporary participation while the Department reviews the transaction.  *See* 34 C.F.R. § 668.14(g).  Schools often request that the Department review potential change-in-ownership transactions before they are completed, to offer a preliminary assessment of the significant terms of the sale.

Decl. ¶ 23.  InfiLaw's obligations for those schools were never settled (nor paid), and Florida Coastal was never sold.

On November 27, 2020, the Department offered to approve Florida Coastal's application to renew its program participation agreement, which had been pending since 2016, so long as InfiLaw Corporation, InfiLaw Holding, LLC, and Sterling Capital Partners, L.P. each agreed "to be jointly and severally liable for the performance by the institution of its obligations under this agreement."  Compl., Exh. 6 at 17; *see* Frola Decl. ¶ 24 & Exh. H.  Sterling Capital Partners, L.P. owned almost all of InfiLaw Holding, and its signature on the participation agreement would have provided further recourse for the Department for Title IV liabilities owed by Florida Coastal.  Florida Coastal's existing participation agreement was renewed on a month-to-month basis while the parties discussed whether the school's owners would agree to assume this liability.  The two InfiLaw entities agreed; Sterling Capital asserted that it was prohibited from doing so and therefore refused.  In a letter dated March 26, 2021, the Department disputed this prohibition, reiterated the requirement for Sterling Capital to assume liability, and informed Florida Coastal that if its new participation agreement was not signed and returned to the Department by March 30, its existing agreement would expire the following day—which it did.  Frola Decl. ¶ 24 &

Exh. J.  Florida Coastal's participation in Title IV programs ended when its participation agreement expired on March 31.

On March 30, instead of returning a signed participation agreement, InfiLaw provided the Department with a draft agreement of sale under which Florida Coastal would be sold to Campbellsville University for one dollar.  A schedule appended to that draft agreement summarized various concerns raised by the American Bar Association regarding Florida Coastal's compliance with ABA standards for accreditation.  Despite the parties' regular communications regarding Florida Coastal, including the approval that the school was seeking from the ABA, the Department had been unaware of the ABA's concerns.  Frola Decl. ¶ 25.

On April 5, Sterling Capital relinquished its ownership of InfiLaw Holding, LLC.  The Department does not know who or what entity presently owns InfiLaw Holding, LLC.  Florida Coastal applied for reinstatement to Title IV participation shortly thereafter.   The Department denied the application on May 13.  Frola Decl. ¶ 26 & Exh. K.

In its denial letter, the Department explained that Florida Coastal did not meet the standards of financial responsibility or administrative capability, and had fallen short of the fiduciary standard of conduct. Frola Decl. ¶ 27 & Exh. K.  As to financial responsibility, the Department noted that

14

Florida Coastal (as an InfiLaw school) had received a failing score of -1.0 under 34 C.F.R. § 668.171(b)(1), and explained that the ABA's concerns indicated that Florida Coastal was "not providing the instructional, library, and career services that it advertises."[2] Frola Decl., Exh. K at 4. *See* 20 U.S.C. § 1099c(c)(1)(A) (explaining that "whether an institution has the financial responsibility required by [Title IV]" depends in part on "whether the institution is able . . . to provide the services described in its official publications and statements"). As to the fiduciary standard of conduct, the Department cited several failures of candor in Florida Coastal's dealings with the Department. And the Department concluded that Florida Coastal had also failed to meet the standards of administrative capability, in light of its failure to keep the Department apprised of those developments. *See* 34 C.F.R. § 668.16. Frola Decl. ¶ 28 & Exh. K at 4–6.

Florida Coastal sought reconsideration by letter dated May 24, and the Department affirmed its denial on July 16. *See* Frola Decl., Exhs. L & M. This suit and motion followed.

---

[2] The Department also erroneously suggested that Florida Coastal's auditor had raised a substantial doubt about the school's ability to continue as a going concern which would have violated an additional regulatory provision in the financial responsibility standards. 34 C.F.R. §668.171(h).

Florida Coastal's home page currently links to a notice of a decision by the Executive Committee of the ABA Council of the Section of Legal Education and Admissions to the Bar, which is available at https://fcsl.edu/wp-content/uploads/2021/06/June-2021-Teach-Out-ABA.pdf.  The notice includes the following paragraph:

> The Law School's accreditation will continue until July 1, 2023, for the limited purpose of allowing the Law School to receive credits from currently enrolled students earned as transient students at other ABA-approved law schools and to issue the Law School's J.D. degree to such students who meet the Law School's graduation requirements. The Law School shall not admit any students. The Law School will not offer any credit-bearing courses beyond the summer 2021 term.

On June 9, the ABA Journal reported the following statement by Peter Gopelrud, President and Dean of Florida Coastal:

> We will not be offering classes following the end of the summer term. Many students will transfer to other schools. Those who do not transfer will participate in the teach-out as visiting students at other schools.

Stephanie Francis Ward, *Teach-out plan for Florida Coastal approved; classes will end after summer term*, ABA Journal (June 9, 2021), *available at* https://www.abajournal.com/news/article/teach-out-plan-for-florida-coastal-approved-classes-end-after-summer-term.

## ARGUMENT

**A.  Florida Coastal seeks a mandatory preliminary injunction, but has not pled any claim that would support mandatory injunctive relief.**

To obtain a mandatory injunction compelling agency action—effectively, mandamus relief—Florida Coastal must show that the Secretary had a non-discretionary duty to approve the school for participation in Title IV.  The Secretary has no such duty, and Florida Coastal has not argued that he does.

To participate in Title IV programs, each school must have a "written . . . agreement with the Secretary," which "conditions the [school's] initial and continued participation" on its compliance with all applicable regulations and "any additional conditions . . . that the Secretary requires the institution to meet."  34 C.F.R. § 668.14(a)(1).  When Florida Coastal's program participation agreement (PPA) expired on March 31, its participation in Title IV programs ended.  To resume participation, Florida Coastal would need to sign a new agreement with the Secretary.

Florida Coastal now seeks a preliminary injunction—and ultimately, a permanent injunction—that would require the Secretary to enter such an agreement, on terms chosen by the Court rather than the Secretary.  This would be a mandatory injunction, "[a]n injunction ordering a party to 'take

action.'"  *United States v. Gilbert*, 244 F.3d 888, 908 n.49 (11th Cir. 2001), *superseded by rule on other grounds as recognized in United States v. Marion*, 562 F.3d 1330 (11th Cir. 2009); *accord Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) ("A mandatory injunction, . . . is said to alter the status quo by commanding some positive act.").  The Supreme Court has distinguished "a mandatory injunction, *i.e.*, one that orders a responsible party to 'take action'" from "a prohibitory injunction, *i.e.*, one that 'restrains' a responsible party."  *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 484 (1996); *see Gilbert*, 244 F.3d at 908 n.49 ("The most common type of injunctions 'restrain' a party from doing something and such injunctions are properly labeled prohibitory injunction[s].").  Florida Coastal asks the Court to compel the Secretary, not to restrain him.

As an initial matter, the Higher Education Act provides that "with respect to, the functions, powers, and duties, vested in him by this part, the Secretary may . . . sue and be sued . . . but no . . . injunction . . . shall be issued against the Secretary."  20 U.S.C. § 1082(a)(2).  *See Bartels v. Ala. Comm. Coll.*, 54 F.2d 702 (11th Cir. 1995) (discussing § 1082).  The HEA therefore bars the injunction that Florida Coastal seeks.  Frola Decl., Exhs. B at 2 & I at 2; Compl., Exh. 6 at 2; *see Mashiri v. U.S. Dep't of Educ.*, 724 F.3d 1028,

1031 (9th Cir. 2013); *Thomas v. Bennett*, 856 F.2d 1165, 1168 (8th Cir. 1988); *Calise Beauty Sch., Inc. v. Riley*, 941 F. Supp. 425, 428 (S.D.N.Y. 1996) (explaining that § 1082's bar on injunctive relief "is unambiguous").

And Florida Coastal's request also fails under the APA, the basis for its only claim.  Compl. ¶¶ 337–45.  *See* 5 U.S.C. § 703 (allowing APA "actions for . . . writs of prohibitory or mandatory injunction").  This Court's "jurisdiction to issue the requested mandatory injunction" would be "based in federal question jurisdiction, 28 U.S.C. § 1331."  *Carpet, Linoleum & Resilient Tile Layers, Local Union No. 419 v. Brown*, 656 F.2d 564, 566 (10th Cir. 1981). "The injunctive remedy itself would be provided by the Administrative Procedure Act, 5 U.S.C. § 706(1), which authorizes a court reviewing agency action to 'compel agency action unlawfully withheld.'"  *Id.* at 566–67; *accord Thompson v. U.S. Dep't of Labor*, 813 F.2d 48, 52 (3d Cir. 1987) ("[T]he APA authorizes actions for a mandatory injunction to enforce compliance with [legal] requirements, 5 U.S.C. § 703 (1982), and requires reviewing courts to 'compel agency action unlawfully withheld or unreasonably delayed.' 5 U.S.C. § 706(1) (1982)."); *Estate of Smith v. Heckler*, 747 F.2d 583, 591 (10th Cir. 1984) (discussing *Carpet, Linoleum & Resilient Tile Layers*); *Pease v. Udall*, 332 F.2d 62, 62 n.1 (9th Cir. 1964) (making the same point and citing an earlier codification of the APA).

A "mandatory injunction is essentially in the nature of mandamus relief." *Mt. Emmons Min. Co. v. Babbit*, 117 F.3d 1167, 1170 (10th Cir. 1997) (citing *Estate of Smith*, 747 F.2d at 591); *see Preferred Sites, LLC v. Troup County*, 296 F.3d 1210, 1221 (11th Cir. 2002) (explaining that "a 'writ of mandamus' frequently grants the same relief to a party as a mandatory injunction, which orders a party to 'take action'"). As the Supreme Court has explained, "the APA carried forward the traditional practice prior to its passage, when judicial review was achieved through use of the so-called prerogative writs—principally writs of mandamus." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 63 (2004). "The mandamus remedy was normally limited to enforcement of a specific, unequivocal command, the ordering of a precise, definite act about which an official had no discretion whatever." *Id.* (cleaned up). And so, "the only agency action that can be compelled under the APA is action legally *required*." *Id.* (emphasis in original). "This limitation appears in § 706(1)'s authorization for courts to 'compel agency action *unlawfully* withheld.'" *Id.* (emphasis added in original). "Thus, a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required* to take." *Id.* at 64 (emphasis in original).

Florida Coastal cannot state that claim.  The principal Title IV program for law schools is the Direct Loan program, the authorizing statute for which explicitly disclaims any right of participation.  20 U.S.C. § 1087b(b) ("No institution of higher education shall have a right to participate in the programs authorized by this part . . . .").  Moreover, in administering the Direct Loan program, the Secretary "may require" "such information and assurances" from applicants as he sees fit, *id.* § 1087c(b)(1); and he selects participants who "meet such . . . eligibility requirements as the Secretary shall prescribe," *id.* § 1087c(b)(2).  Turning to the broader criteria for participation in Title IV, schools such as Florida Coastal, which cannot satisfy the general standards of financial responsibility, *see* 34 C.F.R. § 668.171(b), may instead qualify through "third-party financial guarantees *that the Secretary determines are reasonable*," or by "establish[ing] *to the satisfaction of the Secretary* . . . that the institution has sufficient resources to ensure against the precipitous closure of the institution."  20 U.S.C. § 1099c(c)(3)(A), (C) (emphasis added); *see* 34 C.F.R. § 668.175(c).  "To begin and to continue to participate in any Title IV, HEA program, an institution shall *demonstrate to the Secretary* that the institution is capable of adequately administering that program under each of the standards established" by the Secretary, 34 C.F.R. § 668.16 (emphasis added), and must

21

show that it "[d]oes not otherwise appear to lack the ability to administer the Title IV, HEA programs competently," *id.* § 668.16(n).  And finally, the Secretary may include "any additional conditions . . . in the program participation agreement that the Secretary requires the institution to meet." *Id.* § 668.14(a)(1).

Title IV "is a federal program, federal dollars are at stake, and . . . the Secretary has discretion to [administer it] in order to protect federal interests." *Sistema Universitario Ana G. Mendez v. Riley*, 234 F.3d 772, 778 (1st Cir. 2000) (rejecting an argument "that the Secretary has no discretion to determine [the meaning of a statutory phrase] for Title IV eligibility purposes").  The breadth of the discretion conferred upon the Secretary in the statutory provisions discussed above and exercised in his regulations, and the lack of any right for a school to participate in Direct Loan program, *see* 20 U.S.C. § 1087b(b), make a mandatory injunction entirely unavailable here.

Florida Coastal has not  stated a claim under the APA for a mandatory injunction, by which this Court can "compel agency action unlawfully withheld."  5 U.S.C. § 706(1).  Florida Coastal has not pled—and could not show—that the Secretary is "*required*" to approve its application for Title IV participation.  *S. Utah Wilderness Alliance*, 542 U.S. at 64.  Instead, Florida

Coastal has invoked this Court's power to "hold unlawful and set aside agency action" under § 706(2). *See* Compl. ¶¶ 337–45. Even if Florida Coastal prevails on its claim under one of the standards set out in § 706(2), however, that could only empower the Court to "hold unlawful and set aside" the challenged decisions and remand them to the Secretary for further proceedings—but not to compel a particular result on remand. *See Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001) (When a plaintiff "prevails on its APA claim, it is entitled to relief under that statute, which normally will be a vacatur of the agency's order."). Florida Coastal's failure to allege—and inability to prove—a non-discretionary duty to approve its application likewise dooms any efforts to obtain a mandatory injunction at final judgment.

## B.  Florida Coastal is not entitled to a mandatory preliminary injunction.

On this motion for preliminary injunction, Florida Coastal's burden is even heavier. A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (cleaned up). It is "never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted), and a plaintiff "must establish that he is likely to succeed on the

merits, that he is likely to suffer irreparable harm in" its absence, "that the balance of equities tips in his favor, and that an injunction is in the public interest," *id.* at 20, 24.

When a plaintiff seeks a *mandatory* preliminary injunction, his burden is heightened further. *Haddad v. Arnold*, 784 F. Supp. 2d 1284, 1296 (M.D. Fla. 2010) (Morales Howard, J.). "The typical preliminary injunction is prohibitory and generally seeks only to maintain the status quo pending a trial on the merits." *Tom Doherty Assocs.*, 60 F.3d at 34; *see Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.*"); Ne. Florida Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1284 (11th Cir. 1990) ("The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated."). "Mandatory preliminary relief, which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored . . . ." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976). "A mandatory injunction . . . , especially at the preliminary stage of proceedings, should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party." *Miami Beach Federal Sav.*

& *Loan Ass'n v. Callander*, 256 F.2d 410, 415 (5th Cir. 1958); *accord Harris v. Wilters*, 596 F.2d 678, 680 (5th Cir. 1979) ("Only in rare instances is the issuance of a mandatory preliminary injunction proper."). This is not the rare instance in which such a disfavored injunction is warranted.

### i. Florida Coastal has not made a heightened showing that it is likely to succeed on the merits.

As discussed above, Florida Coastal has no likelihood of winning a mandatory injunction on the merits, and so it cannot be entitled to such an order at the preliminary stage. That is more than enough to resolve this motion.

Florida Coastal has only invoked this Court's power to "hold unlawful and set aside agency action" under 5 U.S.C. § 706(2). *See* Compl. ¶¶ 337–45. It has not alleged a claim to "compel agency action unlawfully withheld" under 5 U.S.C. § 706(1)—and with good reason, because "the only agency action that can be compelled under the APA is action legally *required*." *S. Utah Wilderness Alliance*, 542 U.S. at 63 (emphasis in original). Florida Coastal cannot—and has not tried to—show that the approval of its Title IV application was legally required, much less that "the facts and law are clearly in [its] favor" on that point. *Miami Beach Federal Sav. & Loan*, 256 F.2d at 415. The school cannot be entitled to a mandatory injunction at the

preliminary stage when the most that it could win on the merits is "a vacatur of the agency's order." *Am. Bioscience*, 269 F.3d at 1084.

Nor has Florida Coastal made a heightened showing that it is likely to succeed on the merits of its claim for vacatur. The school repeatedly suggests that the approximately $5.7 million in letters of credit posted by InfiLaw— which indicate *on their face* that they are security for the obligations of not only Florida Coastal but also Arizona Summit Law School and Charlotte School of Law (Frola Decl., Exhs. D, E, & F)—were security provided by Florida Coastal alone. *See, e.g.*, Mot. at 12 (asserting that "FCSL's $5.6 million [$5,681,255] letter of credit represents 78 percent of the Title IV funds it received in the fiscal year ended ('FYE') July 31, 2020."). Florida Coastal argues that "considering the 78 percent letter of credit currently held, FCSL had eliminated the need for additional security" under 34 C.F.R. § 668.175(c). *Id.* at 16. But the InfiLaw schools currently owe the Department $3,605,688 in unchallenged discharges, and $1,916,545 in discharges under appeal (or subject to appeal). If the appeals are unsuccessful, InfiLaw's letters of credit will exceed its debts to the Department by less than $160,000, far short of the additional security the Department may require pursuant to 34 C.F.R. § 668.175(c). Indeed, Florida Coastal concedes towards the end of its brief that "CSL and ASLS's

26

liabilities, . . . are . . . covered by the $5.6 million letter of credit held by the Department." Mot. at 47.  In light of those liabilities, Florida Coastal has not shown that it is financially responsible.  *Cf.* Mot. at 43–44.

Nor can Florida Coastal show a heightened likelihood of winning its challenge to the Secretary's determination that the school was not providing "the services described in its official publications and statements," 20 U.S.C. § 1099c(c)(1)(A), given the deficiencies identified by the American Bar Association.  Those deficiencies are cataloged in detail in the Department's letters of May 13 (Frola Decl., Exh. K at 3–4) and July 16 (Frola Decl., Exh. M at 2–6), and plainly "show the effect of [Florida Coastal's] dire financial condition on its educational programs and administration," Frola Decl., Exh. M at 6.  In reaching that conclusion, the Department was not "interfering in accreditation matters," Mot. at 29, but rather noting objective indications of Florida Coastal's impaired administrative and financial condition in findings made by its accrediting agency.  An earlier report, *see* Mot. at 32–33, is no answer to the Department's findings in May and July of this year.

Nor has Florida Coastal made a heightened showing that it is likely to succeed on the merits of its claim that the Secretary violated the APA by requiring Sterling Capital to sign the school's program participation agreement.  *See* Mot. at 20–25.  In doing so, the Secretary was exercising his

27

discretion to "specif[y]" "additional conditions . . . in the program participation agreement that the Secretary requires the institution to meet" in order to participate in Title IV programs.  34 C.F.R. § 668.14(a)(1).  The Secretary reasonably determined that it was *prudent* to seek this additional security from the corporate owners of a school in weak financial condition.  No regulation precluded him from doing so, and he had no obligation to show that it was *necessary*.

Finally, Florida Coastal has not shown that it is likely to succeed in its challenge to the Secretary's determination that the school failed to "act with the competency and integrity necessary to qualify as a fiduciary" in its dealings with the Department and the public.  34 C.F.R. § 668.82(a).  The Department's letters of May 13 (Frola Decl., Exh. K at 4–6) and July 16 (Exh. M at 6–14) recite a long series of omissions and misleading statements that fell far short of Florida Coastal's duty of candor.  The school's objections that one or another omission may have been permissible in isolation are beside the point, because the "fiduciary standard . . . is not to be construed narrowly."  59 Fed. Reg. 8051.  Among other failings, Florida Coastal's statements were "misleading and created a false impression that there were no significant issues of concern to the ABA," Frola Decl., Exh. M at 14, a clear violation of their fiduciary duty.

Florida Coastal has not shown a heightened likelihood of success on the merits of its claim, and its motion for a mandatory preliminary injunction must therefore be denied.

### ii.     Florida Coastal has not made a heightened showing that a mandatory preliminary injunction would prevent an irreparable injury.

"[T]he central purpose of a preliminary injunction, . . . is to prevent irreparable harm." *Parks v. Dunlop*, 517 F.2d 785, 787 (5th Cir. 1975); *accord Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir. 1971) (per curiam) ("The purpose of a preliminary injunction is to preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits."). If the requested injunction will not prevent the asserted harm, then the motion must be denied. *See, e.g.*, *Tulsa Fire Fighters Ass'n v. City of Tulsa*, 834 F. Supp. 2d 1277, 1293 (N.D. Okla. 2011) (denying preliminary injunction where "the issuance of an injunction . . . would not protect the Plaintiffs from the alleged harms"); *Seto v. Thielen*, 2010 WL 2612603 at *2 (D. Haw. June 28, 2010) (denying preliminary injunction where "the requested injunction would not necessarily prevent irreparable harm to Plaintiffs, as the [harmful activity] would continue" notwithstanding an injunction against the defendant).

Florida Coastal suggests that it will close if this Court does not enter a preliminary injunction in its favor.  But Florida Coastal must  demonstrate that this harm would be *prevented* by the entry of an injunction.  If the school is going to be closing with or without an injunction, then the injunction should not enter.

Florida Coastal does not make any showing—much less a heightened one—that a mandatory preliminary injunction against the Secretary would actually save the school from the fate of its corporate siblings.  Such a showing would need to account for the recent statement of Florida Coastal's dean that "We will not be offering classes following the end of the summer term."  And it would need to explain why the ABA's notice that Florida Coastal "shall not admit any students" and "will not offer any credit-bearing courses beyond the summer 2021 term" did not make the school's closure inevitable.  *See supra* at 16.  Florida Coastal has not even attempted that showing, preferring to ignore these statements and pretend that a preliminary injunction is all that is needed for the school to open smoothly on August 23.[3]

---

[3] Florida Coastal's academic calendar for the 2021-22 school year is still available at https://fcsl.edu/wp-content/uploads/2021/04/2021-2022-Academic-Calendar-4-8-21.pdf.

Nor has Florida Coastal attempted to justify its long delay in seeking injunctive relief. The school's participation in Title IV programs, which it argues is necessary for its continued operation, ended on March 31. Florida Coastal could have, but did not, seek judicial review then. Instead, it applied to the Department for reinstatement, which was denied on May 13. Again, Florida Coastal did not seek judicial review, preferring to petition the Department for reconsideration. Only after the Department affirmed its denial did Florida Coastal finally come to court and seek injunctive relief, less than two weeks before it said that it would have to close its doors.

"A delay in seeking a preliminary injunction of even only a few months . . . militates against" the entry of the injunction. *Wreal, LLC v. Amazon.com LLC*, 840 F.3d 1244, 1248 (11th Cir. 2016). "Indeed, the very idea of a *preliminary* injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits." *Id.* (emphasis in original). "For this reason," many courts "have found that a party's failure to act with speed or urgency in moving for a preliminary injunction necessarily undermines" its argument for the injunction. *Id.*

If the March 31 expiration of its Title IV participation agreement was going to cause Florida Coastal an irreparable injury on July 31, or shortly thereafter, then the school had no excuse for waiting until July 20 to file suit.

Florida Coastal has not shown that injunctive relief from this Court would actually prevent an irreparable injury to the school, and has not behaved in a way to suggest that it would. The preliminary injunction should therefore be denied.

### iii. Florida Coastal has not made a heightened showing that the balance of the equities favor a mandatory preliminary injunction.

Florida Coastal is the last remaining member of a three-school consortium; its corporate siblings closed under financial stress and scrutiny from their accreditor. Their precipitous closings led to the discharge of Title IV loans, for which Florida Coastal's parent InfiLaw still has not compensated the Department. The Department holds security from InfiLaw that exceeds its established and pending liabilities to the government by less than $160,00.

As noted in the Department's denial letters, Florida Coastal faces many challenges that imperil its operations, and restoring its Title IV participation would not remedy those concerns. If Florida Coastal were to close despite receiving additional Title IV funding—as seems likely on the facts before the Court—then those new loans would also be charged to the taxpayer. The balance of the equities do not favor a mandatory preliminary injunction here.

## CONCLUSION

For the reasons set forth above, Florida Coastal's motion for a preliminary injunction should be denied.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

MARCIA BERMAN
Assistant Director
Federal Programs Branch

*/s/ James Bickford*
JAMES BICKFORD
Trial Attorney (N.Y. Bar No. 5163498)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
James.Bickford@usdoj.gov
Telephone: (202) 305-7632
Facsimile: (202) 616-8470

*Counsel for Defendants*

Date: July 28, 2021