# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

FLORIDA COASTAL SCHOOL
OF LAW, INC.,

          Plaintiff,

                                  Case No. 3:21-cv-721-MMH-JBT

vs.

MIGUEL CARDONA, in his official
capacity as Secretary of the U.S.
Department of Education, and the
UNITED STATES DEPARTMENT
OF EDUCATION,

          Defendants.

_____/

## O R D E R

**THIS CAUSE** is before the Court on Plaintiff's Emergency Motion for

Temporary Restraining Order and/or Preliminary Injunction and Memorandum

of Law (Doc. 5; Motion) filed on July 20, 2021.[1]   On July 28, 2021, Defendants

Miguel Cardona in his official capacity as Secretary of the U.S. Department of

Education and the United States Department of Education (collectively, the

Department) filed Defendants' Memorandum in Opposition to Plaintiff's Motion

---

[1] The Court held a status conference on July 21, 2021, at which Plaintiff agreed to forego its
request for a temporary restraining order and proceed only on its request for preliminary
injunctive relief.   <u>See</u> Minute Entry (Doc. 15).

for a Preliminary Injunction (Doc. 20; Response).   Plaintiff Florida Coastal School of Law, Inc. (FCSL) filed its reply to the Response on July 30, 2021.   <u>See</u> Reply to Defendant's Opposition to Plaintiff's Motion for a Preliminary Injunction (Doc. 25; Reply).   On August 4, 2021, the Court held a hearing on the Motion at which the parties argued their respective positions.   <u>See</u> Minute Entry (Doc. 27).   Accordingly, the Motion is ripe for review.

## I.    Background

Through Title IV of the Higher Education Act of 1965 (HEA), 20 U.S.C. § 1070 <u>et</u> <u>seq.</u>, Congress created various student financial assistance programs (Title IV, HEA programs) "to assist in making available the benefits of postsecondary education to eligible students . . . ."   <u>See</u> 20 U.S.C. § 1070.   The Department administers these programs, <u>id.</u>, and is charged with determining whether institutions of higher education such as FCSL qualify to participate in a Title IV, HEA program in accordance with various statutory requirements. 20 U.S.C. § 1099c(a).   As relevant here, to qualify to participate in a Title IV, HEA program an institution must demonstrate to the Department that it is financially responsible under the standards set forth in 34 C.F.R. part 668, subpart L, and that it is "capable of adequately administering" the Title IV, HEA program under the standards set forth in 34 C.F.R. § 668.16.   <u>See</u> 34 C.F.R.  §  668.13(a)(1)(i);  <u>see</u>  <u>also</u>  20  U.S.C.  §  1099c(a).   Significantly, institutions that participate in a Title IV, HEA program act "in the nature of a

fiduciary" in the administration of the program and "must at all times act with the competency and integrity necessary to qualify as a fiduciary." See 34 C.F.R. § 668.82(a).   To participate in a Title IV, HEA program an institution must enter into a program participation agreement (PPA) with the Department. The PPA conditions "the initial and continued participation" of the institution on its compliance with all applicable statutory and regulatory standards, as well as "any additional conditions specified in the program participation agreement that the Secretary requires the institution to meet." See 34 C.F.R. § 668.14(a)(1); 20 U.S.C. § 1094(a).

FCSL is a law school located in Jacksonville, Florida. See Verified Complaint for Declaratory and Injunctive Relief (Doc. 1; Complaint) ¶ 21.   It is owned by InfiLaw Corporation, whose sole shareholder is InfiLaw Holding, LLC (collectively, InfiLaw). Id. ¶ 31.   Significantly, until 2017, FCSL had two sister schools, Arizona Summit Law School (ASLS) and Charlotte School of Law (CSL). See Declaration of Michael J. Frola (Doc. 19; Frola Decl.) ¶ 5.   CSL closed on August 10, 2017, following the loss of its eligibility to receive Title IV funds on December 31, 2016. See id. ¶ 8.   In 2018, ASLS also closed its doors after the American Bar Association (ABA) informed the institution that it intended to withdraw its accreditation. Id. ¶ 10.   These three law schools were owned by respective for-profit corporations, all of which were owned by InfiLaw. Id. ¶ 5; Complaint ¶ 34.   Prior to the events of this lawsuit, InfiLaw

was almost entirely owned by a private equity firm called Sterling Capital Partners, L.P. (Sterling).   See Frola Decl. ¶ 5; see also Complaint ¶ 32.

In 2016, FCSL applied to renew its PPA with the Department which was set to expire on June 20, 2016.   See Frola Decl. ¶ 14; Complaint ¶ 86.   Because FCSL submitted a timely request for recertification, the previous PPA continued on a month-to-month basis until the Department issued a decision on FCSL's recertification application.   See 34 C.F.R. § 668.13(b)(2); see also Frola Decl. ¶ 14.   However, "the financial responsibility of the InfiLaw consortium of law schools was assessed each year."   See Frola Decl. ¶ 14.   Indeed, institutions participating in Title IV are required to "annually submit audited financial statements to the Department to demonstrate they are maintaining the standards of financial responsibility necessary to participate in Title IV programs."[2]

On June 18, 2019, the Multi-Regional and Foreign School Participation Division (MRFSPD) of the Department of Education wrote a letter to FCSL informing it that the MRFSPD had completed "its review of the fiscal year ended 7/31/2018 audited financial statements of InfiLaw Holdings, LLC and Subsidiary (InfiLaw)."   See Complaint, Ex. 1 (Doc. 1-1; June 18, 2019 Letter).   The MRFSPD found that InfiLaw failed to meet the financial responsibility

---

[2] Financial Responsibility Composite Scores, U.S. Dep't of Educ. Office of Federal Student Aid, https://studentaid.gov/data-center/school/composite-scores.

standards.   See id.   As a result of this failure, the Department informed

InfiLaw that it could continue participation in Title IV, HEA programs only if

it agreed to one of the following alternatives:

> 1. Letter of Credit (LOC) Alternative (34 C.F.R. § 668.175(c)):
>
> Under this alternative, InfiLaw is required to submit an irrevocable LOC in the amount of $11,362,511. This amount represents 70% of the Title IV, HEA program funds received by InfiLaw during its most recently completed fiscal year. By choosing this option, InfiLaw qualifies as a financially responsible institution.
>
> 2. Provisional Certification Alternative (34 C.F.R. § 668.175(f)):
>
> Under this alternative, InfiLaw must post an irrevocable LOC in the amount of $5,681,255 and be provisionally certified for a period of up to three complete award years. This amount represents 35% of the Title IV, HEA program funds received by the Institution during its most recently completed fiscal year.
>
> InfiLaw must comply with all of the requirements specified for the Provisional Certification Alternative in 34 C.F.R. § 668.175(f), including the Zone Alternative in 34 C.F.R. § 668.175(d)(2) and (3), and Requesting Funds 34 C.F.R. § 668.162(d) including the disbursement of Title IV, HEA program funds under the Heightened Cash Monitoring 1 Method of Payment. By choosing this option, InfiLaw acknowledges that it has not met the Department's standards of financial responsibility.

Id.   InfiLaw selected the second alternative titled, "Provisional Certification

Alternative," and provided the Department with three letters of credit totaling

$5,681,255.   See Complaint ¶ 49; see also Frola Decl. ¶ 17, Exs. D-G.

Notably, each letter of credit identifies all three InfiLaw law schools and

provides security against the obligations of all three schools.   See Frola Decl. ¶

17, Exs. D-G.  This is significant because InfiLaw currently owes substantial liabilities to the Department stemming from the closure of CSL and ASLS. Specifically, InfiLaw owes the Department $5,061,063 for student loans that the Department discharged following the closure of CSL, $3,475,261 of which InfiLaw does not contest.   See Frola Decl. ¶ 9; see also 34 C.F.R. § 685.214(c)(1). The remaining discharges in the amount of $1,585,802 are the subject of an ongoing administrative appeal.   See Frola Decl. ¶ 9.  For CSL, the Department also assessed an additional $330,743 in automatic closed school discharges, see 34 C.F.R. § 685.214(c)(3)(ii), which are also currently subject to appeal.  Id.  With regard to ASLS, InfiLaw owes the Department $130,427 in closed school discharges.  Id. ¶ 12.  Thus, in total, "InfiLaw is responsible for $3,605,688 in unchallenged discharges, another $1,585,802 in discharges under appeal, and another $330,743 in automatic discharges subject to appeal."  Id. ¶ 13.  InfiLaw is also facing an additional $167 million in potential liability stemming from the pending discharge applications submitted by former students who contend they were defrauded by the schools.  Id. ¶ 13.

### A. Allowing Eligibility to Expire Based on Sterling's Refusal to Sign the PPA (the Sterling Decision)

On November 27, 2020, the Department contacted Peter Goplerud, President and Dean of FCSL by letter, to inform him that the Department had reached a determination on FCSL's application for recertification.   See

Complaint, Ex. 16 (Doc 1-16; Recertification Decision).   The Department decided to grant Provisional Certification to FCSL and attached an agreement titled Program Participation Agreement [Provisional Approval] (Doc. 1-6; PPPA).   <u>See</u> Recertification Decision.   It further advised FCSL that "[t]he reasons for and conditions of [FCSL's] Provisional Certification" were described in the PPPA and that to complete the recertification process, FCSL must sign and return the PPPA.   <u>See</u> Recertification Decision.   The Department set a deadline of December 30, 2020, for FCSL to do so.   <u>See</u> Motion, Ex. 10 (Doc. 1-10; March 26, 2021 Department Letter).   Upon full execution of the PPPA, FCSL would be certified to participate in Title IV, HEA programs for a term ending on September 30, 2023.[3]   <u>See</u> PPPA.

One of the conditions set forth in the PPPA was that "[t]he owners of the institution agree to be jointly and severally liable for the performance by the institution of its obligations under this agreement."   PPPA at 17.   At that time, Sterling owned 98.6% of InfiLaw Holding.   Thus, the Department included Sterling in the list of entities required to execute the guaranty of FCSL's obligations under the PPPA.   <u>Id.</u>   Goplerud questioned the Department "regarding the inclusion of InfiLaw Holding, LLC and Sterling

---

[3] The PPPA attached to the Complaint as Exhibit 6, is not signed by any of the listed parties.

Capital Partners, LP as signators . . ." of the PPPA.   <u>See</u> Complaint, Ex. 7, (Doc 1-7; December 4, 2020 Email).   On December 4, 2020, the Department replied,

> [t]his is an updated standard the Department is applying for institutions with multiple levels of ownership.   The Department is now requiring the signature of each entity at 100% ownership or with a significant majority ownership percentage.   This requirement is also not unique to FCSL.

<u>Id.</u>   On December 28, 2020, Mr. Goplerud again contacted the Department requesting that Sterling be removed as a signer of the PPPA.   <u>See</u> Motion, Ex. 9 (Doc. 1-9; December 28, 2020 Goplerud Letter).   In his letter, Goplerud explained that Sterling was "a dormant investment entity" and had "waived all voting rights in April, 2020."   <u>Id.</u>   Further, he advised that "the entity was defunct" and had been attempting to separate from FCSL, however the ABA had denied both applications for approval of transition to new ownership.   <u>Id.</u> Additionally, Goplerud stated

> Sterling has no affiliated persons who are officers of the school or any of its holding companies. And, it has no representatives on the InfiLaw board of directors or the Florida Coastal board of directors. In fact, the Sterling representative formerly on the board resigned at the time Sterling waived its voting rights in favor of a representative from Campbellsville University.

<u>Id.</u>   Finally, Goplerud wrote that Sterling has been advised by counsel "that signing on to the PPPA would exceed the authority its investors (state pension funds and other highly respected institutions) granted to it."   <u>Id.</u>

The following day, the Department sought additional information and documents regarding FCSL's request to remove Sterling from the PPPA.   See March 26, 2021 Department Letter.   In light of the December 30, 2020 deadline for signing and returning the PPPA, the Department advised that it would permit FCSL to "remain in a month-to-month temporary [Title IV program participation] status."  Id.   On January 6, 2021, FCSL submitted a letter from Sterling's Chief Operating Officer and General Counsel, M. Avi Epstein, providing additional information in support of rescinding the requirement that Sterling execute the PPPA.   See id.; Motion, Ex. 8 (Doc. 1-8; January 6, 2021 Sterling Letter).   The letter stated in relevant part:

- Sterling is not involved in the day-to-day activities or strategic decision making for FCSL, it is merely a passive investment vehicle with no board representation at FCSL or its parent companies.

- Sterling is an investment fund that started in 2002 to make financial investments in businesses to generate long-term capital appreciation for the benefit of its investors.

- Sterling's fund term was not extended past October 15, 2017 and is currently in dissolution to allow for an orderly sale, transfer, or disposition of the fund's investments and ultimately a termination of the fund.

- Counsel has advised Sterling against cosigning and guaranteeing FCSL's obligations under the PPPA for a number of reasons including its dissolution status and limitations in the partnership agreement.

- Specifically,

    Section 6.2(c) [of the partnership agreement] states, "The Partnership may guarantee only the obligations of Portfolio Companies (and any direct and indirect subsidiaries thereof), and for the purposes of Section 6.2(b), the guarantee of a Portfolio Company's obligations shall be treated as Partnership indebtedness."

    Section 6.2(b) states "The stated maturity of any indebtedness for borrowed money incurred by the Partnership <u>shall not extend beyond the initial ten year term of the Partnership</u>." (Ten years from October 15, 2002).

<u>Id.</u>   As support, Sterling provided a copy, actually a partial copy, of its partnership agreement.   <u>See id.</u>   Upon review of Sterling's letter and the supporting documentation, on January 15, 2021, the Department affirmed "the requirement that the authorized representatives of FCSL's owners at each level sign the PPPA and take joint fiduciary responsibility for administering the federal funds received by FCSL, in accordance with 34 C.F.R. § 668.14."[4]   <u>See</u> March 26, 2021 Department Letter.   The same day, FCSL replied that it would

---

[4] Section 668.14 provides:

> An institution may participate in any Title IV, HEA program, other than the LEAP and NEISP programs, only if the institution enters into a written program participation agreement with the Secretary, on a form approved by the Secretary. A program participation agreement conditions the initial and continued participation of an eligible institution in any Title IV, HEA program upon compliance with the provisions of this part, the individual program regulations, and any additional conditions specified in the program participation agreement that the Secretary requires the institution to meet.

34 C.F.R. § 668.14(a)(1).

reach out to Sterling again but "did not expect that Sterling would agree to sign the PPPA." Id.  In response, the Department requested a complete copy of Sterling's Limited Partnership Agreement (LPA) which FCSL provided on January 19, 2021.  Id.  After reviewing the full LPA, the Department still concluded that there was no legal prohibition preventing Sterling from signing the PPPA.  Id.  Thus, on March 26, 2021, the Department sent FCSL a letter confirming that:

> the approval of the institution's recertification is contingent upon FCSL and all owners listed to sign and return the enclosed PPPA to the Department by March 30, 2021. If the PPPA is not signed and returned to the Department by March 30, 2021, FCSL's PPA will expire on the last day of this month (March 31, 2021). See 34 C.F.R. § 668.13(b)(2).

Id.

On the afternoon of March 30, 2021, Goplerud emailed the Department informing it that FCSL "finalized an opportunity to transition to a not-for-profit university in a manner that will immediately remove all common and private equity interests."  See Complaint, Ex. 11 (Doc. 1-11; March 30, 2021 Goplerud Email).  Goplerud attached a signed asset purchase agreement transferring FCSL's assets to Campbellsville University for $1.  See id.  Goplerud stated that the parties had been negotiating for three years but agreed to "expeditiously close upon completion of all regulatory and accreditation process."  Id.  Notably, the attached asset purchase agreement included a

schedule which "summarized various concerns raised by the [ABA] regarding [FCSL's] compliance with ABA standards of accreditation," matters of which the Department had not previously been informed.   See Frola Decl. ¶ 25; Complaint, Ex. 18.

In the March 30, 2021 Goplerud Email, Goplerud reiterated that its "current financial sponsor" did not believe it could sign the PPPA under its LPA "without seeking explicit approval from its limited partners (a lengthy process that can take up to 90 days and they are not assured of getting the approval)." Id.   Instead, Goplerud informed the Department that its "financial sponsors" would provide an additional financial security of approximately $1 million to remain in place until the transaction with Campbellsville University was "consummated."   Id.   The record before the Court does not disclose whether the Department responded to this offer.   Sterling did not execute the PPPA, and as a result, on March 31, 2021, FCSL's existing PPA expired.   See Frola Decl. ¶ 24.

Five days after the expiration of the PPA, on April 5, 2021, Goplerud emailed Michael E. Powers, a case manager with MRFSPD, stating:

> Please find attached a document evidencing Sterling Partners action today in relinquishing their shares.  We request that the EAPP be opened.  We will re-sign this afternoon and request that our participation be reinstated upon your receipt of the signed PPPA.

See Complaint, Ex. 13 (Doc. 1-13; April 5, 2021 Emails).   The document that Goplerud attached was a letter, also dated April 5, 2021, signed by Sterling Capital Partners, L.P. and Sterling Capital Partners GMBH & Co. KG, "the sole Sterling Members" of InfiLaw.   See Complaint, Ex. 12 (Doc. 1-12; Forfeiture Letter).   In the Forfeiture Letter, the Sterling Members of InfiLaw declared that "effective immediately," they forfeited and surrendered all equity interests in InfiLaw Holding, LLC for no consideration.   Id.   The record does not reveal and the Department does not know who currently owns InfiLaw.   See Frola Decl. ¶ 26.   In response to Goplerud's email, the Department explained that:

> Florida Coastal School of Law's PPA expired in accordance with 34 CFR 668.13(b)(2).[5]   To re-establish eligibility, FCSL must submit an application for reinstatement into the Title IV HEA programs under its current ownership structure.

See April 5, 2021 Emails.

---

[5] Section 668.13(b)(2) states,

> Provided that an institution has submitted an application for a renewal of certification that is materially complete at least 90 days prior to the expiration of its current period of participation, the institution's existing certification will be extended on a month to month basis following the expiration of the institution's period of participation until the end of the month in which the Secretary issues a decision on the application for recertification.

**B. Denial of Application for Reinstatement (the Reinstatement Decision)**

### 1. May 13, 2021 Denial Letter

Promptly thereafter, on April 8, 2021, FCSL applied for reinstatement of its eligibility to participate in Title IV, HEA programs.   See Complaint ¶ 112. In a letter dated May 13, 2021, the Department denied FCSL's application for reinstatement.   See Complaint, Ex. 14 (Doc. 1-14; Denial Letter).   The Department determined that FCSL was not eligible to participate in the Title IV, HEA programs because it failed to satisfy: 1) "the standards of financial responsibility set forth in 34 C.F.R. Part 668, Subpart L," 2) "the standards of administrative capability set forth in 34 C.F.R. § 668.16," and 3) "the fiduciary standard of conduct set forth at 34 C.F.R. § 668.82."   Id. at 1.   In the Denial Letter, the Department explained the reasons supporting its findings as to each standard.   Id.

### a. Financial Responsibility

The general standards of financial responsibility are set forth in 34 C.F.R. § 668.171.   Under the general standards, an institution must possess a "composite score," meaning, the average of an institution's "Equity, Primary Reserve, and Net Income ratios" as defined in the regulations, of at least 1.5. See 34 C.F.R. § 668.171(b)(1).   In addition, an institution must be able to "(1) Provide the services described in its official publications and statements; (2)

Meet all of its financial obligations; and (3) Provide the administrative resources necessary to comply with title IV, HEA program requirements." See id. § 668.171(a).   Significantly, even if an institution meets the general standards of financial responsibility, it is not considered financially responsible if:

> In the institution's audited financial statements, the opinion expressed by the auditor was an adverse, qualified, or disclaimed opinion, or the financial statements contain a disclosure in the notes to the financial statements that there is substantial doubt about the institution's ability to continue as a going concern as required by accounting standards, unless the Secretary determines that a qualified or disclaimed opinion does not have a significant bearing on the institution's financial condition, or that the substantial doubt about the institution's ability to continue as going concern has been alleviated.

See 34 C.F.R. § 668.171(h).   If an institution fails to meet the general standards of financial responsibility, it "may begin or continue to participate in the title IV, HEA programs by qualifying under an alternate standard set forth" in § 668.175(a).   Generally, these alternatives involve the submission of an irrevocable letter of credit, or other form of financial protection, to the Department.   See generally 34 C.F.R. § 668.175.

In the Denial Letter, the Department first explained that FCSL did not meet the standards of financial responsibility based on its composite score.   See Denial Letter at 1.   For proprietary institutions seeking reinstatement, the Department makes the financial responsibility determination based off the

audited financial statements submitted for the two most recent fiscal years. Id. The Department stated that it reviewed InfiLaw's financial statements for the fiscal years ending July 31, 2020, and July 31, 2019, and found that InfiLaw scored a -1.0, "the worst possible score." Id. at 2. FCSL does not contend that this composite score was improperly calculated.[6]

The Department also determined that FCSL was not "financially responsible" because it did not have the "ability to provide the services described in its official publications and statements, and to provide the administrative resources necessary to comply with Title IV, HEA program requirements." Id. at 3. In support of this finding, the Department pointed to the schedule accompanying the asset purchase agreement provided to the Department on March 30, 2021, which identified numerous areas where FCSL was not in compliance with ABA accreditation standards. See id. Specifically, the schedule acknowledged that FCSL remained accredited with the ABA, but disclosed that during a meeting on August 13-14, 2020, the ABA reviewed its findings from a March 1-4, 2020 visit to FCSL and found that "FCSL was not in compliance with several standards of accreditation; that it did not have sufficient information to make a determination regarding compliance with

---

[6] In the Denial Letter, the Department also found that InfiLaw failed to meet the audit opinion and disclosures standard pursuant to 34 C.F.R. § 668.171(h). Id. However, in its decision affirming the Denial Letter, the Department subsequently acknowledged that this finding was in error. See Complaint, Ex. 15 at 1; see also Response at 15 n.2. As such, the Court need not address it here.

other certain standards; and that [the ABA] had requested a response from FCSL by January 15, 2021." Id.  At its February 18-19, 2021 meeting, the ABA reviewed FCSL's response and found that the school was not in compliance with the following standards:

> 310 - determining credit hours awarded for coursework
> 311 - prohibition on enrollment that exceeds 20% of the total credit hours required for graduation
> 402 - sufficient number of full time faculty
> 508 - provision of career counseling
> 510 - maintenance of student complaints for the appropriate time period
> 601 - maintenance of a law library consistent with the Standards
> 603 - employment of a full time director of the law library
> 604 - sufficiency of the library staffing

Id.  The ABA requested additional responses from FCSL regarding its compliance with these standards, among others, by July 1, 2021.  Id.

The Department explained that it had reviewed the FCSL website where FCSL advertises that

> it provides practical training provided by experienced full-time faculty, offers a law library that provides students access to an expansive collection of information and lawyer-librarians who provide students with access to materials necessary to prepare them for their legal careers, and maintains a Center for Professional Development that provides support for students in all stages of the career planning process.

Id. at 4.  Given the deficiencies identified by the ABA in faculty, library services, and career counseling, the Department determined, "FCSL [was] not providing the instructional, library, and career services that it advertises," and

also concluded, in light of other ABA findings, that FCSL was "not meeting its obligations to correctly determine student eligibility for Title IV, HEA program funds." <u>Id.</u> at 4.

Based on its review, the Department concluded that FCSL failed to meet the standards of financial responsibility set forth in 34 C.F.R. 668 Subpart L. <u>Id.</u>   The Department further concluded that because its finding regarding financial responsibility was based on "material deficiencies" other than just FCSL's failing composite scores, FCSL could not qualify for participation under the letter of credit alternatives, 34 C.F.R. § 668.175.   <u>Id.</u>   The Department also noted that Sterling's relinquishment of ownership in FCSL "represents a material change that has eliminated the financial protections that the Department previously determined would be obtained by requiring Sterling to sign the FCSL PPA."   <u>Id.</u>   The Department explained,

> Sterling's refusal to take unequivocable responsibility for FCSL's future Title IV compliance, and for any liabilities resulting from noncompliance and possible closure, is telling.   Sterling is choosing to walk away rather than use its resources to support FCSL's continued participation in the Title IV, HEA programs.   The fact that Sterling is no longer an owner of FCSL represents a material change that has eliminated the financial protections that the Department previously determined would be obtained by requiring Sterling to sign the FCSL PPA.

<u>Id.</u>

**b. Fiduciary Standard of Conduct**

Pursuant to 34 C.F.R. § 668.82(a), (b), an institution "acts in the nature of a fiduciary in the administration of the Title IV, HEA programs," such that to participate the institution "must at all times act with the competency and integrity required of a fiduciary as required by 34 C.F.R. § 668.82(a), (b)."   Id. In the Denial Letter, the Department found that FCSL did not meet the fiduciary standard of conduct.   Id.   The Department explained that FCSL had been in contact with the Department regarding a number of issues such as its potential acquisition by an existing non-profit institution, its failure to meet the standards of financial responsibility and subsequent letter of credit, a settlement agreement to limit exposure to liabilities connected to the closure of InfiLaw's other institutions, and its application for recertification.   Id.   The Department went on to provide examples of various instances in which it found FCSL failed to "act with the competency and integrity necessary to qualify as a fiduciary" such as:

- FCSL stating to the Department that it is fully accredited by the ABA and not under any sanctions despite the ABA's findings that it was not in compliance with several accreditation standards as disclosed to Campbellsville University in the Asset Purchase Agreement.
- FCSL's failure to timely provide documentation of its changes in control when Sterling waived certain rights under its operating agreement.   Specifically, Sterling waived its rights on April 22, 2020.   Two days later FCSL notified the Department of these changes but did not comply with the Department's May 12, 2020 request for documentation of the changes until June 1, 2020.

- The Asset Purchase Agreement that FCSL provided to the Department on March 30, 2021 referenced other agreements and contracts that FCSL failed to provide.   These missing attachments potentially contained material information the Department would have needed to review.   FCSL did not provide the "list of contracts to be assumed."   And the inclusion of an InfiLaw subsidiary that provided services to FCSL in a schedule of "Affiliate Transactions" raised the concern that the acquiring university would be required to continue to contract with InfiLaw, a material fact that should have been disclosed to the Department.

The Department concluded that

> FCSL's failure to adhere to the fiduciary standard with regard to its provision of information to the Department demonstrates that it cannot be relied upon to deal fairly and transparently with regard to any eligibility issues, changes, or applications, including applications for changes in ownership and control of the institution.

Id. at 6.   As a result, the Department found that it "must therefore deny FCSL's application for reinstatement."   Id.

### c. Administrative Capability

Last, the Department determined that FCSL did not meet the standard of administrative capability set forth in 34 C.F.R. § 668.16.   As relevant here, an institution meets the standards of administrative capability if the institution: (1) administers the Title IV, HEA programs in accordance with all statutory and regulatory provisions, § 668.16(a); (2) utilizes "adequate checks and balances in its system of internal controls," § 668.16(c)(1); and (3) "[d]oes not otherwise appear to lack the ability to administer the Title IV, HEA programs competently," § 668.16(n).   The Department reasoned that FCSL

failed to meet these standards because it failed to keep the Department informed of "reviews and actions taken by the ABA with regard to its accredited status," and changes to its ownership structure that were material to decisions under its consideration.  For this additional reason, the Department denied FCSL's request for reinstatement.

The Department concluded its correspondence by advising FCSL that if it had factual evidence that disputed the Department's findings and "demonstrate[d] their inaccuracy," FCSL should overnight mail such evidence.  Id.  If received within 10 days of the date of the letter, the Department would review it and notify FCSL of its decision.   Id.

### 2. Affirmation of Denial

In a letter dated May 24, 2021, counsel for FCSL submitted "evidence and arguments in support of FCSL's request for reconsideration of the [May 13, 2021] Decision and approval of FCSL's application for reinstatement."  See generally Complaint, Ex. 19 (Doc. 1-19; May 24, 2021 Request for Reconsideration).[7]  FCSL argued that the Department incorrectly determined that FCSL had failed the financial responsibility, fiduciary duty, and administrative capability standards.

---

[7] Although FCSL included the Request for Reconsideration letter as an exhibit to the Complaint, it did not provide any of the documents attached to the letter.

In support of its argument that FCSL was financially responsible, FCSL characterized the Department's denial as being based on two primary findings:

> 1) The Department's erroneous assessment of FCSL's ability to continue in operations; and 2) the unwillingness of a former owner to execute the FCSL's Provisional Program Participation Agreement ("PPPA").

Id. at 1.   FCSL argued that the Department erred in considering the losses from InfiLaw's other two institutions that were no longer in operation.   Id. at 2.   Specifically, FCSL complained that the Department did not properly adjust the losses referenced in the Denial Letter to exclude discontinued operations pursuant to 34 C.F.R. Part 668, Subpt. L. App. A.   Id.   FCSL also insisted that the Department should have viewed FCSL's financial situation in isolation.[8] Id.

FCSL further emphasized that FCSL's financial condition was improving and its "current financial condition is the one that matters for the purposes of determining the institution's financial capabilities and the associated risk." Id. at 5.   Moreover, FCSL argued that the Department was still the beneficiary of letters of credit totaling $5,681,255 which amounted to approximately 78% of FCSL's Title IV revenue in FYE 2020.   Id.   FCSL insisted this "far exceeds the 50% threshold required by letter of credit alternative in 34 C.F.R. § 668.175(c)."

---

[8]  In addition, FCSL maintained that the Department's reliance on 34 C.F.R. § 668.171(h) to find that FCSL failed to meet the audit and disclosure standards was improper. Id.   As noted above, the Department has acknowledged this error.

Id.  FCSL also maintained that the Department should not consider Sterling's "inability" to sign the PPPA as an indicator of its financial responsibility.  Id. Despite having acknowledged that it could have sought approval from its partners to sign the PPPA, FCSL still contended that the Department ignored counsel for Sterling's opinion that Sterling was precluded from signing under its partnership agreement.  It further asserted that the Department should consider the amount of personal resources management for FCSL had put on the line by assuming control when Sterling relinquished the entirety of its 98.6% ownership interest.  See id.

As to the fiduciary standard of conduct, FCSL argued that it was not under any obligation to disclose the ABA's findings that FCSL was not meeting certain accreditation standards.  See id. at 6.  FCSL maintained that under 34 C.F.R. § 668.171(f), an accreditation agency is only required to disclose orders "such as a show cause order or similar action, that, if not satisfied, could result in the withdrawal, revocation or suspension of institutional accreditation for failing to meet one or more of the agency's standards."  Id. (citing 34 C.F.R. § 668.171(f)).  Because, according to FCSL, the ABA findings cited by the Department in the Denial Letter were merely "routine," the Department could not use its failure to disclose them as a basis for finding that FCSL breached the fiduciary standard of conduct.  Id. at 6-7.  FCSL also rejected the Department's reliance on FCSL's failure to timely provide documentation of

Sterling's waiver of rights in April 2020 as a breach of fiduciary duty.   Id. at 7.
Pursuant to 34 C.F.R. § 600.21(a), the Department required notice within 10
days and FCSL provided such notice within two, even if it was slow to provide
requested documentation.   Id.   Last, FCSL disputed that its failure to provide
the list of contracts to be assumed as part of the asset purchase agreement
between Campbellsville and InfiLaw constituted withholding material
information.   Id. at 7-8.

Finally, as to the Department's finding that FCSL lacked administrative
capability, FCSL again questioned the Department's reliance on the ABA's
findings.   Id. at 8-9.   FCSL argued that it was in communication with the ABA
regarding any purported violations and responding to any requests accordingly.
Id. at 9.   After explaining the factual circumstances that surrounded the ABA's
findings, FCSL contended, "[f]or good reason, the findings do not approach the
level of severity the Department portrays in the [Denial Letter], nor do they
form a basis for the Department to conclude that FCSL lacks administrative
capability."   Id.

On July 16, 2021, the Department wrote a 15-page letter to FCSL
affirming the May 13, 2021 initial denial of FCLS's application for
reinstatement.   See Complaint, Ex. 15 (Doc. 1-15; July 16, 2021 Affirmation of
Denial).   As noted above, the Department conceded that in reviewing the
audited financial statements it "mistakenly interpreted the detailed discussion

of the financial weaknesses of [InfiLaw]" to amount to "a going concern" disclosure pursuant to 34 C.F.R. § 600.21(a).   Id. at 1.   However, because this error did not impact the Department's concerns regarding InfiLaw's ultimate financial condition or its course of dealing with the Department, the denial of the application for reinstatement was due to be upheld.   Id. at 1-2.   The Department devoted the remainder of the correspondence to a detailed discussion of the reasons it denied FCSL's application.   See id. at 2.

First, the Department re-explained that FCSL did not meet the general standards of financial responsibility because it had a failing composite score pursuant to 34 C.F.R. § 668.171(b)(1).   Id.   Further, while Sterling's refusal to sign the PPPA raised doubts about FCSL's financial stability, the reasons Sterling refused to sign did not change the fact that its "subsequent relinquishment of its ownership was a material change that further supported the decision to deny reinstatement under FCSL's current ownership."   Id. Sterling's refusal to sign was "not a basis upon which the Department determined that FCSL did not meet the general standards of financial responsibility at 34 C.F.R. § 668.171(b)."   Id.

Additionally, "[t]he Department rejected [FCSL's] effort to minimize the significance of the ABA findings by portraying them as part of a routine review process."   Id.   In support, the Department detailed the ABA's recent conclusions from a February 26, 2021 letter finding that FCSL was not in

compliance with numerous ABA standards.   See id. at 3-4.   The Department also cited to the ABA's August 20, 2020 findings of fact.   The Department concluded that the ABA's findings "show the effects of FCSL's dire financial condition on its educational programs and administration."   Id. at 6.

The Department also expanded on its finding that FCSL "failed to meet the fiduciary standard of conduct with regard to its provision of information to the Department."   Id.   The Department stated that in various dealings with FCSL over the last several years FCSL demonstrated that it could not be relied upon to deal fairly and transparently.   Id.   These dealings included FCSL's

> aspirations to convert from a proprietary institution to a private non-profit institution and/or be acquired by an existing private non-profit institution; its failure to meet the standards of financial responsibility and consequent requirement that it provide a letter of credit; its desire to enter into a settlement agreement with the Department to, among other things, limit FCSL's exposure to liabilities associated with InfiLaw's prior operations of the Charlotte School of Law (CSL) and Arizona Summit Law School (ASLS); and its application for recertification.

Id.   Over the course of the next eight pages, the Department provided a discussion of FCSL's actions during these dealings which led the Department to conclude that FCSL failed to disclose relevant material information or was otherwise misleading in violation of the fiduciary standard of conduct.   See generally id. at 6-14.   Specifically, the Department pointed to communications from FCSL in January and March of 2021 in which FCSL stated, "[w]e are in full compliance with the ABA standards . . ." and insisted FCSL was "a school

in compliance with ABA requirements . . . ."  Id. at 14.   According to the Department, "FCSL's assertion on March 26, 2021 that it was in compliance with the ABA's standards, when the ABA had noted multiple significant deficiencies, was a statement that had the likelihood or tendency to mislead the Department in its review of the pending recertification and proposed transactions."  Id. at 14.   Given that FCSL intended for the Department to rely on this statement in deciding whether to allow FCSL's PPA to continue, the Department found the statement constituted "a substantial misrepresentation as defined in 34 C.F.R. § 668.71."  Id. at 14.

With regard to its finding that FCSL lacked administrative capability, the Department explained that this finding was based on "FCSL's failure to inform the Department of the ABA's reviews and actions and of significant events regarding its ownership structure, even though they were material to decisions pending before the Department."  Id. at 15.   The Department stated that it

> did not rely on the descriptions in Schedule 2.22(a) of the March 30, 2021 APA to determine that FCSL lacked administrative capability, and FCSL's claim in its Response in this regard are specious and will not be addressed.

Id. at 15.   In sum, the Department advised that the information submitted and arguments made in the May 24, 2021 Request for Reconsideration did not

change its decision to deny reinstatement.   Id.   Accordingly, as of July 16, 2021, the denial constituted a final agency decision.   Id.

At present, FCSL represents that it remains "fully approved by the ABA," as it has been "continuously since 2002."   See Complaint ¶ 127.   In addition, FCSL states that it has "continued to offer tuition-free courses for its summer students to protect them while the school challenges the Department's actions." See id. ¶ 321.   Nevertheless, "[a]bsent relief, FCSL will be forced to close prior to commencing the fall term which would start August 23, 2021."   Id. ¶ 323. According to FCSL, its "currently enrolled students are in limbo and will soon be forced to withdraw, attend other schools as transient students or seek to transfer to other schools."   Id. ¶ 324.   FCSL believes that if the Court restores its Title IV eligibility, "it can retain 90 of its currently active students," and "could yield a fall class of 70 first year students."   Id. ¶¶ 326, 330.   FCSL also asserts that an injunction will permit it to stay in business long enough to consummate the sale of the school to "a 100-year-old nonprofit institution with more than $147 million in assets . . . ."   Id. ¶¶ 333-35.   In the Reply, FCSL references yet another "Financial Partner" who is willing to "provide for the continued operations of the school so long as it is restored to Title IV."   See Reply at 11, Ex. 3: Declaration of Peter Goplerud ¶ 5.   FCSL maintains that the capital infusion from this "Financial Partner" will allow it to 'comfortably meet all financial obligations . . . ."   Id. at 12; Goplerud Decl. ¶ 13.

Significantly, the Executive Committee of the ABA Counsel of the Section of Legal Education and Admissions to the Bar issued a notice in June 2021 stating that it had approved a revised "Teach-Out Plan" submitted by FCSL. See Response at 17 (citing https://fcsl.edu/wp-content/uploads/2021/06/June-2021-Teach-Out-ABA.pdf (the ABA Notice).   The ABA Notice states that:

> The Law School's accreditation will continue until July 1, 2023, for the <u>limited purpose</u> of allowing the Law School to receive credits from currently enrolled students <u>earned as transient students at other ABA-approved law schools</u> and to issue the Law School's J.D. degree to such students who meet the Law School's graduation requirements. <u>The Law School shall not admit any students</u>. The Law School <u>will not offer</u> any credit-bearing courses beyond the summer 2021 term.

See ABA Notice (emphasis added).   FCSL maintains that the ABA issued these restrictions "solely because of the Department's termination of FCSL's Title IV eligibility," such that if FCSL's Title IV funding is restored, "the ABA would have no basis to continue these restrictions" and "FCSL would immediately begin enrolling students."   See Reply at 12-13, Ex. 2.   Nevertheless, even if restored to Title IV eligibility, it remains unclear whether FCSL could simply disregard the terms of the Teach-Out Plan and begin enrolling students for the fall semester.

### C. Lawsuit

On July 20, 2021, FCSL initiated the instant proceedings by filing its Verified Complaint for Declaratory and Injunctive Relief.   In the Complaint,

FCSL asserts a claim under the Administrative Procedures Act (APA), 5 U.S.C. § 706, challenging the Sterling Decision—the Department's March 26, 2021 decision requiring Sterling to sign the PPPA, as well as the Reinstatement Decision—the Department's May 13, 2021 initial denial of reinstatement and subsequent affirmance on July 16, 2021.   <u>See</u> Complaint at 53-57.

With regard to the Sterling signature requirement, FCSL contends that the Sterling Decision is contrary to law, arbitrary and capricious, and in excess of the Department's statutory authority.   <u>See</u> Complaint ¶¶ 340-41.   In support, FCSL argues that (1) the Department failed to adequately explain why Sterling's signature should be required as a condition of the PPPA; (2) the Department was precluded by statute and regulation from requiring Sterling's signature; and (3) the Department's requirement of Sterling's signature was contrary to the evidence.   <u>See</u> Motion at 20-25.

As to the Reinstatement Decision, FCSL argues that it is also contrary to law, arbitrary and capricious, and in excess of the Department's statutory authority.   <u>Id.</u> ¶¶ 343-44.   In addition, FCSL contends that the Reinstatement Decision is contrary to its constitutional right to due process.   <u>Id.</u> ¶ 345. Specifically, FCSL asserts: (1) the Department incorrectly interpreted FCSL's audited financial statements; (2) the Department erroneously relied on the ABA's "routine accreditation findings" to conclude that FCSL could not provide the services described in its official publications and statements; (3) FCSL did

not breach its fiduciary duty to the Department; and (4) FCSL was in fact financially responsible under the letter of credit alternative.   See Motion at 25-44.

In the instant Motion, FCSL asserts that it is substantially likely to succeed on these claims.   In addition, FCSL maintains that it will face irreparable harm absent a preliminary injunction because it "cannot survive without Title IV funding."   See Motion at 45.   As such, FCSL asks the Court to vacate the Sterling Decision and "order the Department to restore FCSL's access to Title IV, pursuant to its original PPA."   See id. at 49.   Alternatively, FCSL requests an order vacating the Reinstatement Decision and "restor[ing] FCSL's Title IV eligibility pending a decision on the merits."   Id.

## II.   Legal Standard

A preliminary injunction is an extraordinary and drastic remedy. See McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998); see also Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right."); Davidoff & CIE, S.A. v. PLD Int'l Corp., 263 F.3d 1297, 1300 (11th Cir. 2001). Indeed, "[a] preliminary injunction is a powerful exercise of judicial authority in advance of trial." Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, 896 F.2d 1283, 1284 (11th Cir. 1990).

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." <u>Winter</u>, 555 U.S. at 20. The Eleventh Circuit recently described the heavy burden on a party seeking preliminary injunctive relief as follows:

> A district court may grant a preliminary injunction only if the moving party establishes that: (1) [he] has a substantial likelihood of success on the merits; (2) [he] will suffer an irreparable injury unless the injunction is granted; (3) the harm from the threatened injury outweighs the harm the injunction would cause the opposing party; and (4) the injunction would not be adverse to the public interest.

<u>Gonzalez v. Governor of Georgia</u>, 978 F.3d 1266, 1270-71 (11th Cir. 2020); <u>see also</u> <u>Siegel v. LePore</u>, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). However, the court also instructed that "the third and fourth factors merge when, as here, the Government is the opposing party." <u>Id.</u> at 1271 (internal quotations and citation omitted).

The movant, at all times, bears the burden of persuasion as to each of these requirements. <u>See</u> <u>Ne. Fla.</u>, 896 F.2d at 1285. In deciding whether a party has met its burden, "[a] district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objectives of the injunctive proceeding." <u>Levi Strauss & Co. v. Sunrise Int'l Trading Inc.</u>, 51 F.3d

982, 985 (11th Cir. 1995) (internal quotations and citation omitted); see also Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc., 304 F.3d 1167, 1171 (11th Cir. 2002) ("Preliminary injunctions are, by their nature, products of an expedited process often based upon an underdeveloped and incomplete evidentiary record."). Notably, a party's failure to establish any one of the essential elements will warrant denial of the request for preliminary injunctive relief and obviate the need to discuss the remaining elements. See Pittman v. Cole, 267 F.3d 1269, 1292 (11th Cir. 2001) (citing Church v. City of Huntsville, 30 F.3d 1332, 1342 (11th Cir. 1994)); Del Monte Fresh Produce Co. v. Dole Food Co., 148 F. Supp. 2d 1326, 1339 n.7 (S.D. Fla. 2001).

A typical preliminary injunction is prohibitive in nature and seeks simply to maintain the status quo pending a resolution of the merits of the case. See Mercedes–Benz U.S. Int'l, Inc. v. Cobasys, LLC, 605 F. Supp. 2d 1189, 1196 (N.D. Ala. 2009). When a preliminary injunction is sought to force another party to act, rather than simply to maintain the status quo, it becomes a "mandatory or affirmative injunction" and the burden on the moving party increases. Exhibitors Poster Exch. v. Nat'l Screen Serv. Corp., 441 F.2d 560, 561 (5th Cir. 1971). A mandatory injunction "'should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party.'" Id. (quoting Miami Beach Fed. Sav. & Loan Ass'n v. Callander, 256 F.2d 410, 415 (5th Cir. 1958)); see also Martinez v. Mathews, 544 F.2d 1233,

1243 (5th Cir. 1976)[9] ("Mandatory preliminary relief, which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party."). Accordingly, a plaintiff seeking such relief bears a heightened burden of demonstrating entitlement to preliminary injunctive relief. See Verizon Wireless Pers. Commc'n LP v. City of Jacksonville, Fla., 670 F. Supp. 2d 1330, 1346 (M.D. Fla. 2009) ("Where a mandatory injunction is sought, 'courts apply a heightened standard of review; plaintiff must make a clear showing of entitlement to the relief sought or demonstrate that extreme or serious damage would result absent the relief.'") (quoting New York SMSA Ltd. Partnership v. Town of Clarkstown, 99 F.Supp.2d 381, 389 (S.D. N.Y. 2000)); Mercedes–Benz, 605 F. Supp. 2d at 1196; OM Group, Inc. v. Mooney, No. 2:05–cv–546–FTM–33SPC, 2006 WL 68791, at *8–9 (M.D. Fla. Jan. 11, 2006).

---

[9] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

### III.   Applicable Law

FCSL contends that the record before the Court shows that it has a substantial likelihood of success on the merits of its claim that the Department's Sterling Decision and Reinstatement Decision violated the APA.   See Motion at 20-44.[10]   The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009). Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."   5 U.S.C. § 706(2)(A).   Likewise, a court "may set aside a final agency decision if it is . . . 'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.'"   See High Point, LLLP v. Nat'l Park Serv., 850 F.3d 1185, 1193 (11th Cir. 2017) (quoting 5 U.S.C. § 706(2)(C)).   The APA also provides that a court shall set aside an agency decision that is "contrary to constitutional right . . . ."   See 5 U.S.C. § 706(2)(B).

Notably, "[t]he arbitrary and capricious standard is exceedingly deferential." Defenders of Wildlife v. U.S. Dep't of Navy, 733 F.3d 1106, 1115 (11th Cir. 2013) (internal quotation marks omitted). A reviewing court's role is

---

[10] Section 706(1) of the APA permits a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed . . . ."   However, FCSL does not rely on this provision to support the relief it seeks in this action and as such, the Court will not consider whether FCSL can prevail on a claim to compel agency action under § 706(1).

to "ensure that the agency came to a rational conclusion, not to conduct its own investigation and substitute its own judgment for the administrative agency's decision." Id. (internal quotation marks omitted). "In determining whether the agency acted arbitrarily and capriciously, [a court asks] whether the agency examined the relevant data and articulated a satisfactory explanation for its action." Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs, 781 F.3d 1271, 1288 (11th Cir. 2015) (internal quotation marks omitted).  An agency's action may be arbitrary and capricious:

> where the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Defenders of Wildlife, 733 F.3d at 1115. A court "should 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" Black Warrior Riverkeeper, 781 F.3d at 1288. When reviewing the evidentiary basis for an agency's action, a court must uphold the agency's decision "unless the evidence not only supports a contrary conclusion, but compels it." Abdille v. Ashcroft, 242 F.3d 477, 483–84 (3d Cir. 2001); see also I.N.S. v. Elias-Zacarias, 502 U.S. 478, 481 & n.1 (1992) (explaining that an agency's determination can be reversed as unsupported by substantial evidence only if a reasonable factfinder would have to reach a contrary conclusion).

## IV.   Discussion

### A. The Sterling Decision

In the Motion, FCSL asks the Court to vacate the Department's Sterling Decision and restore its now expired PPA.   FCSL maintains that this merely requires a return to the status quo existing prior to the Department's allegedly improper Sterling Decision.   See Reply at 2-3.   As such, FCSL maintains that it seeks a prohibitive rather than a mandatory injunction.   See id.   This characterization of the requested relief may have had merit had FCSL brought its challenge to the Sterling Decision before the March 31, 2021 expiration of the PPA, or promptly after that occurred.   However, by waiting over three and a half months after the expiration of the prior PPA to raise this challenge, FCSL has hopelessly frustrated the Court's ability to restore the previously existing status quo or otherwise provide meaningful relief.

Significantly, FCSL knew of the Department's decision to require Sterling to sign the PPPA since November 27, 2020.   See Complaint, Exs. 6, 16. Indeed, the original deadline for submitting the signed PPPA was December 30, 2020.   In communications throughout December and January, FCSL attempted to convince the Department to eliminate this requirement, arguing that Sterling was unable to sign the PPPA based on the terms of its LPA. Nevertheless, as early as January 2021, the Department informed FCSL that, despite the terms of the LPA, it would require that Sterling assume joint

liability.   FCSL continued to push back against this requirement, but in a final decision dated March 26, 2021, the Department informed FCSL that it had "completed its review of the material submitted and has found no legal prohibition for Sterling to sign FCSL's PPPA."   Id., Ex. 10. As such, the Department affirmed the Sterling Decision requiring that Sterling sign the PPPA and take "joint fiduciary responsibility for administering the federal funds received by FCSL . . . ."   Id.   The Department explained that unless FCSL and its owners returned a fully executed PPPA on March 30, 2021, its current PPA would expire on March 31, 2021.   Id.   In receipt of a final agency decision regarding the Sterling signature requirement, and facing the imminent expiration of its PPA, FCSL nevertheless failed to promptly file suit and seek injunctive relief preventing the expiration of the PPA, or seeking its immediate temporary reinstatement, so as to maintain the status quo until the merits of its challenge to the Sterling Decision could be addressed in court.

Instead, FCSL elected to pursue only the Department's reinstatement process.[11]   Doing so, FCSL waited over three and a half months after the expiration of its prior PPA to bring this lawsuit challenging the Sterling Decision.   As a result of this delay, the "status quo" existing prior to the

---

[11] While FCSL contends it took this path in accordance with the Department's instruction, it fails to explain why, if the expiration of its PPA presented a risk of imminent irreparable harm, it could not and did not simultaneously pursue both a preliminary injunction to maintain the status quo and its request for reinstatement.

expiration of the PPA has changed in significant ways.   Notably, Sterling is no longer an owner of InfiLaw and the Department represents that it does not know who the current owner or owners are.[12]   In addition, as detailed in the Affirmation of Denial, the Department has learned new information regarding FCSL which, in the Department's view, renders FCSL ineligible to participate in the Title IV, HEA programs for reasons separate and apart from Sterling's refusal to sign the PPPA.   Moreover, because FCSL failed to raise a timely legal challenge seeking to enjoin or set aside the Sterling Decision, its Title IV, HEA certification lapsed when the deadline to sign passed.   As a direct result of that lapse, the ABA required FCSL to submit, and the ABA has approved, the Teach-Out Plan for the winding down and closure of the school, and the ABA has prohibited FCSL from enrolling new students or offering credit bearing classes after the summer 2021 term.[13]   This dire consequence of losing

---

[12] Sterling relinquished its ownership interest in InfiLaw immediately after the PPA expired. FCSL maintains that by doing so, Sterling "resolved" the only issue preventing FCSL's recertification such that the Department should have then accepted the PPPA.   However, this argument ignores the stated purpose of the Sterling Decision.   The Department required Sterling to sign the PPPA and assume joint liability to provide the Department with additional recourse against any future liabilities.   See Denial Letter at 4.   Thus, rather than resolve the issue as FCSL contends, Sterling's decision to relinquish its ownership only further deprived the Department of the financial protection it was seeking.

[13] FCSL asserts that "the ABA would have no basis to continue" the restrictions imposed pursuant to the Teach-Out Plan if Title IV funding is restored.   See Reply at 12-13. However, FCSL does not disclose the terms of the Teach-Out Plan or otherwise explain whether that plan allows FCSL to immediately resume operations if restored to Title IV eligibility.   Moreover, despite relying on certain ABA Rules of Procedure in its Request for Reconsideration, FCSL has not identified any ABA Rule that would require the ABA to immediately rescind its restrictions if FCSL's Title IV eligibility were restored.   FCSL also fails to point to any rule, affidavit, regulation, or other evidence suggesting that PPA

Title IV, HEA program eligibility was not unknown to FCSL or unexpected. See Affirmation of Denial at 14 (quoting FCSL's email noting that termination of Title IV, HEA program eligibility would effectively close the school, displacing students, faculty, and staff). Yet, FCSL neither acted to forestall it nor acted promptly to unwind it. Could the Court enjoin the Department from enforcing the Sterling Decision if FCSL showed it was entitled to such relief? Perhaps. But would such an injunction return the parties to the status quo ante? No. Whatever powers a federal court may have, they do not extend to time travel. No action by this Court can undo the events that have unfolded in the last several months to return the relationships between FCSL, the Department, the ABA, and the Students and Faculty of FCSL to the state in which they stood before the Sterling Decision. Thus, even if FCSL could show that the Sterling Decision was arbitrary and capricious, given the Department's May 13, 2021 and July 16, 2021 conclusions regarding FCSL's Title IV, HEA program eligibility and the significant changes in circumstances, injunctive relief at this

---

reinstatement would automatically relieve it of the Teach-Out Plan, permit it to enroll students and offer classes, or restore its prior accreditation status. Notably, FCSL's response to the ABA's February 2021 findings that it was not in compliance with several accreditation standards was due on July 1, 2021. See Complaint, Ex. 18. The record does not reflect whether FCSL provided the requested response or the status of the ABA's investigation into those matters.

time could not actually restore the parties to the status quo existing in March 2021.[14]

For these same reasons, even aside from the merits of FCSL's challenge to the Sterling Decision, the Court would not be inclined to exercise its discretion to grant the preliminary injunctive relief FCSL seeks.   See Gonzalez v. Kemp, 470 F. Supp. 3d 1343, 1346 (11th Cir. 2020) ("The decision whether to grant preliminary injunctive relief is within the broad discretion of the district court."); Rahal Letterman Racing, LLC v. Scott Sharp Sports, LLC, 2008 WL 11407196, at *4 (S.D. Fla. Feb. 12, 2008) ("Even if the moving party succeeds at meeting its burden as to the four prerequisites, however, it is at the discretion of the district court whether to grant or deny a preliminary injunction."). Regardless, FCSL's request for a preliminary injunction vacating the Sterling Decision is due to be denied because FCSL has failed to demonstrate a substantial likelihood of success on the merits.   See Am. C.L. Union of Fla., Inc., 557 F.3d at 1198.

---

[14] For the reasons set forth next, the Court finds that FCSL has not met its burden of demonstrating a substantial likelihood of success in its challenge to the Reinstatement Decision.  As such, even if the Court were to find the Sterling Decision to be unlawful, it is unclear how vacating the Sterling Decision alone and directing the Department to reconsider FCSL's recertification application would change the outcome for FCSL.   The Department has already reconsidered FCSL's request for eligibility through the Reinstatement Decision, and it denied the request and affirmed that denial.

### 1.      Statutory and Regulatory Authority

FCSL contends that under 20 U.S.C. § 1099c(e) and 34 C.F.R. § 668.175(f)(3)(ii)[15] the Department "can only require an institution's ownership to assume personal liability at the <u>end</u> of a provisional period and, even then, only when it articulates a reasonable basis that it is necessary to protect the financial interests of the United States."  <u>See</u> Motion at 5.  FCSL maintains that the Department improperly imposed the requirement that Sterling assume joint and several liability at the beginning of a provisional period.  <u>Id.</u> at 20-22. FCSL also contends that the Department failed to articulate why Sterling's assumption of liability was necessary to protect the United States' financial interest.  As such, FCSL argues that the Department's Sterling Decision was contrary to law or in excess of its statutory authority.   In Response, the Department identifies 34 C.F.R. § 668.14 as the basis for its authority to require Sterling to assume joint liability as a condition of the PPPA, such that it had no need to find that such a requirement was "necessary," merely that it was prudent.  <u>See</u> Response at 27-28; <u>see</u> <u>also</u> March 26, 2021 Department Letter.

Pursuant to section 668.14(a)(1):

An institution may participate in any Title IV, HEA program, other than the LEAP and NEISP programs, only if the institution enters into a written program participation agreement with the Secretary, on a form approved by the Secretary. A program participation

---

[15] FCSL cites to section 668.175(f)(3)(B), however, no such subsection exists, and the Court concludes that FCSL meant to cite section 668.175(f)(3)(ii).

agreement conditions the initial and continued participation of an eligible institution in any Title IV, HEA program upon compliance with the provisions of this part, the individual program regulations, and <u>any additional conditions specified in the program participation agreement that the Secretary requires the institution to meet.</u>

34 C.F.R. § 668.14(a)(1) (emphasis added).   This provision appears to grant the Department broad discretion to impose whatever additional terms it deems appropriate under the circumstances.   As such, absent a statutory or regulatory provision limiting the Department's ability to require Sterling to assume joint liability, the Department appears to have had the authority to impose such a requirement so long as its decision to do so was not arbitrary and capricious.   As stated above, FCSL asserts that 20 U.S.C. § 1099c(e) and 34 C.F.R. § 668.175 limit the Department's discretion to impose this requirement. However, upon careful review of both provisions, the Court is unconvinced.

Section 1099c(e) states in relevant part:

(e) Financial guarantees from owners

(1) Notwithstanding any other provision of law, the Secretary may, to the extent necessary to protect the financial interest of the United States, require--

(A)   financial   guarantees   from   an   institution participating, or seeking to participate, in a program under this subchapter, or from one or more individuals who the Secretary determines, in accordance with paragraph (2), exercise substantial control over such institution, or both, in an amount determined by the Secretary to be sufficient to satisfy the institution's potential liability to the Federal

Government, student assistance recipients, and other program participants for funds under this subchapter; and

(B) the assumption of <u>personal</u> liability, by one or more <u>individuals</u> who exercise substantial control over such institution, as determined by the Secretary in accordance with paragraph (2), for financial losses to the Federal Government, student assistance recipients, and other program participants for funds under this subchapter, and civil and criminal monetary penalties authorized under this subchapter.

<u>See</u> 20 U.S.C. § 1099c(e) (emphasis added).   FCSL interprets this provision to mean that the Department could not require Sterling, the entity that owned 98.6% of InfiLaw, to assume joint liability unless the Department made a finding that it was "necessary to protect the financial interest of the United States."   But, as the Department argues, by its plain language, this provision does not appear to apply to an <u>entity</u> such as Sterling.   Rather, the statute refers to "the assumption of <u>personal</u> liability, by one or more <u>individuals</u> who exercise substantial control over such institution . . . ."   <u>See</u> 20 U.S.C. § 1099c(e)(1)(B) (emphasis added).   The statute expressly distinguishes between <u>entities</u> that exercise substantial control, and <u>individuals</u> who have such control, when defining those terms.   <u>See</u> 20 U.S.C. § 1099c(e)(2)(A)-(B). Notably, the statutory provision governing program participation agreements, 20 U.S.C. § 1094, references these definitions, and again, refers to entities and individuals separately.   <u>See</u> 20 U.S.C. § 1094(c)(2). ("If an <u>individual</u> who, or <u>entity</u> that, exercises substantial control, as determined by the Secretary in

accordance with the definition of substantial control in subpart 3 of Part H . . . .” (emphasis added)).   Thus, a plain reading of the statute supports the Department's position that while the Department's discretion to require the assumption of <u>personal</u> liability from an <u>individual</u> is limited to those circumstances where it is necessary to protect the financial interest of the United States, no such limitation exists regarding a requirement for the assumption of liability by an <u>entity</u> such as Sterling.

Alternatively, FCSL relies on 34 C.F.R. § 668.175(f)(3)(ii) to argue that the Department lacked the legal authority to requiring Sterling's signature on the PPPA.   In pertinent part, this regulation provides:

> (f) Provisional certification alternative.
>
>> (3) If at the end of the period for which the Secretary provisionally certified the institution, the institution is still not financially responsible, the Secretary may again permit the institution to participate under a provisional certification but the Secretary . . .
>>
>>> (ii) [m]ay require one or more of the persons or entities that exercise substantial control over the institution, as determined under § 668.174(b)(1) and (c), to be jointly or severally liable for any liabilities that may arise from the institution's participation in the title IV, HEA programs.

Based on this provision, FCSL argues that "the Department may <u>only</u> require an owner to assume personal liability if 'at the end of the period [f]or which the [Department] provisionally certified the institution, the institution is still not

financially responsible.'"   See Motion at 21-22 (emphasis added) (quoting 34 C.F.R. § 668.175(f)(3)(ii)).   Because FCSL contends that it was not at the "end" of a provisional certification period, FCSL maintains that the Department could not impose the Sterling signature requirement.   This argument is similarly unavailing.

First, although FCSL asserts that it was not at the "end" of a provisional certification period, the record is not so clear. At the time the Department issued the Sterling Decision, because FCSL had a timely application for recertification pending, it continued to operate under the month to month extension of the PPA that expired in 2016, which was not provisional.[16] However, in the Department's June 18, 2019 Letter regarding FCSL's failure to meet the standards of financial responsibility, the Department conditioned FCSL's continued participation in Title IV, HEA programs on its satisfaction of one of two financial responsibility alternatives.   FCSL elected to continue pursuant to the "Provisional Certification Alternative" and posted three letters of credit.   As such, it appears that FCSL was operating under a provisional certification after posting the letters of credit.   FCSL maintains it was not at the "end" of any such provisional certification and relies on language in the June

---

[16] As noted in footnote 5 above, so long as an institution has submitted a timely and materially complete application for recertification, the institution's existing certification is extended on a month to month basis until the end of the month in which the Secretary issues a decision on the application for recertification.   See 34 C.F.R. § 668.13(b)(2).

18, 2019 Letter that under the Provisional Certification Alternative it would "be provisionally certified for a period of up to three complete award years." See June 18, 2019 Letter at 2. However, this language does not appear to grant FCSL provisional certification under those terms for a three year period. Instead, it appears to require that FCSL remain provisionally certified for up to three years.[17]   Nevertheless, at that time, FCSL continued to operate pursuant to the month to month extension of its expired PPA albeit with the additional financial responsibility condition. As such, it appears that any provisional certification period that began with the June 18, 2019 Letter would have "ended" when the Department reached a decision on FCSL's 2016 application for recertification, which occurred when it issued the PPPA. See 34 C.F.R. § 668.13(b)(2); see also Frola Decl. ¶ 14.

Regardless, while FCSL contends that the Department may "only" require an owner such as Sterling to assume joint liability at the end of a provisional certification period, the word only does not appear in the regulation. FCSL offers no authority or argument to support a conclusion that the permissive language of 34 C.F.R. § 668.175(f)(3)(ii) is intended to be exclusive. Given the Department's broad discretion under § 668.14(a)(1) to impose additional conditions in the terms of a PPA, the Court is not convinced that

---

[17] "Under this alternative, InfiLaw must post an irrevocable LOC in the amount of $5,681,255 and be provisionally certified for a period of up to three complete award years." Id. (emphasis added).

because § 668.175(f)(3)(ii) specifies one circumstance where the Department may require joint liability, the Department is thereby precluded from imposing such a requirement in any other circumstance.   Based on the foregoing, the Court finds that FCSL has not demonstrated a substantial likelihood of success in showing that either 20 U.S.C. § 1099c(e) or 34 C.F.R. § 668.175(f)(3)(ii) render the Department's Sterling Decision contrary to law or in excess of its statutory authority.

## 2. **Factual Basis**

Next, FCSL maintains that the Department's Sterling Decision was arbitrary and capricious because the Department "failed to offer any justification for why Sterling's signature was necessary to protect the financial interest of the United States . . . ." [18]   See Motion at 21.   In addition, FCSL maintains that "[t]here is significant evidence that the financial interests of the United States are amply protected without Sterling's assumption of joint liability."   See id. at 23.   Because, in FCSL's view, Sterling's signature was not necessary to protect the United States' financial interest, FCSL maintains that the Department's decision to require it was arbitrary and capricious and contrary to law.   However, as stated above, FCSL has not succeeded in showing

---

[18] Notably, although FCSL spent months attempting to convince the Department not to require Sterling's signature because the Sterling LPA precluded it from signing the PPPA, FCSL never asserted that the Department could not lawfully require Sterling's signature, or that it could do so only as necessary to protect the financial interest of the United States.

that the Department was required to make such a finding before imposing the Sterling signature requirement.  Rather, on the record before the Court, it appears that the Department was permitted to require Sterling's assumption of liability so long as the decision to do so was not arbitrary and capricious. Nevertheless, under either standard, the Court finds that FCSL has not shown that it is substantially likely to succeed on these arguments either.

As an initial matter, while the Department may not have set out its rationale for requiring the Sterling signature in its communications with FCSL, the Court is of the view that the basis for this requirement is apparent from the record.  See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974) ("While we may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." (internal citation omitted)).  The PPPA itself explains that: 1) "FCSL owes certain money to the Department," 2) recent investigations have revealed "serious, repeated or systemic deficiencies that directly relate" to FCSL's administrative capability, and 3) FCSL did not meet the financial responsibility standards for the 2018 fiscal year.  See PPPA at 2-3.  Indeed, due to the closure of FCSL's sister schools, InfiLaw owed the Department substantial sums of money which had not been paid at the time the Department issued the PPPA and which remain unpaid to date.  And while FCSL maintains that InfiLaw's financial

situation was improving following the low point resulting from ASLS and CSL's closures, the financial records for FCSL's 2019 and 2020 fiscal years still reflected that the school was in a precarious financial position.  See Denial Letter at 1-2; Affirmation of Denial at 1-2 (explaining that InfiLaw's composite score for the 2019 and 2020 fiscal years was -0.1, the lowest possible score).   To the extent FCSL contends that the $5.6 million letters of credit offered ample security for FCSL's future liabilities, this argument is specious.   Given the Department's evidence regarding Infilaw's liabilities, the letters of credit appear to provide almost no protection for the Department going forward because they secure not only the obligations of FCSL, but also those of ASLS and CSL.   Unless InfiLaw is successful in its pending administrative appeals, the "letters of credit will exceed [InfiLaw's] debts to the Department by less than $160,000."  See Frola Decl. ¶ 17.   Moreover, in the Affirmation of Denial, the Department explained that Sterling's absence was "a material change that has eliminated the financial protections the Department previously determined would be obtained by requiring Sterling to sign the FCSL PPA."   See Affirmation of Denial at 5.   This statement reflects that the Department believed that a guarantee from Sterling would provide additional security and sought to obtain that security as part of the PPPA.[19]

---

[19] As noted by the Department in argument at the hearing:

Based on these facts, the Court cannot say that it was arbitrary and capricious for the Department to seek further security by requiring Sterling, the hedge fund that owned 98.6% of InfiLaw, to assume joint responsibility for FCSL's obligations under the PPPA.   FCSL presents several reasons why, in its view, the Department did not need to impose such a requirement—FCSL's improved financial condition, Sterling's lack of assets, and FCSL's last-minute offer of a $1 million letter of credit.[20]   But none of these arguments demonstrate that FCSL is substantially likely to succeed in showing that the

_____

This is a school that was plainly in shaky financial circumstances.   It was a school as to which the Department had very little real security <u>over and above the debts owned</u> [sic] by the previous schools that had failed under InfiLaw's ownership.   And all the Department was asking is that the actual beneficial owner of the school, the real capital with the ability to satisfy some liability, be willing to take on the liabilities that would otherwise fall to the taxpayers if the law students couldn't repay their debts, or if the school closed precipitously.

[20] As to the letter of credit, the Court notes that this offer was emailed to the Department at 3:41 PM on the day the signed PPPA was due.   <u>See</u> Complaint, Ex. 11.   The email states that the letter of credit would act as security until the sale of FCSL to Campbellsville University could be completed.   <u>Id.</u>   Even if the Department had time to consider this last-minute offer before the PPA expired, FCSL has not persuasively shown that it was arbitrary and capricious for the Department not to accept it.   By that time, InfiLaw had discussed many potential transactions with the Department, none of which had come to fruition.   <u>See</u> Frola Decl. ¶ 18.   Thus, the Department had reason to be skeptical that the sale to Campbellsville University would be successful.   Moreover, the email asserts that the "approximately $ 1 million surety," in combination with the $5.6 million letters of credit already posted, would represent "almost 100% of the Title IV funds disbursed last year by Florida Coastal."   <u>Id.</u>   However, as discussed above, the $5.6 million letters of credit was barely sufficient to cover InfiLaw's outstanding ASLS and CSL liabilities, and thus provided little security for any new liabilities going forward.   The $1 million letter of credit on its own would represent no more than 13 to 15 percent of the Title IV funds disbursed to FCSL in the previous year.   FCSL does not argue, and nothing in the record suggests, that the Department ever considered such an amount to be sufficient security.   Moreover, in this same email FCSL included the schedule to the asset purchase agreement that for the first time disclosed the ABA's findings, regarding FCSL's failure to satisfy accreditation standards.   Findings, which according to the Department, raised significant new concerns.

Department's decision was arbitrary and capricious.   FCSL merely offers reasons why it believes the Department reasonably <u>could have</u> reached a different decision, but none that demonstrate the Department was <u>compelled</u> to do so.   Review under the APA is "exceedingly deferential." <u>Defenders of Wildlife</u>, 733 F.3d at 1115.   While FCSL has attempted to poke holes in the Department's rationale, it has failed to show, at this preliminary stage in the proceedings, that the Department's decision was not a rational determination based on relevant, factually supported factors.   As such, the Court finds that FCSL has not shown that it is substantially likely to succeed in its challenge to the Sterling Decision and will deny its request for a preliminary injunction vacating this Decision and reinstating the prior PPA.

### B. The Reinstatement Decision

Alternatively, FCSL challenges the Department's decision denying FCSL's application for reinstatement to the Title IV, HEA program and subsequent affirmance of that decision.   FCSL asks the Court to issue a preliminary injunction vacating the Reinstatement Decision and "restor[ing] FCSL's Title IV eligibility pending a decision on the merits." <u>See</u> Motion at 49. Notably, FCSL presents no argument or legal authority in its Motion to support the proposition that the appropriate relief for this APA claim would be an order compelling the Department to reinstate FCSL's Title IV eligibility.   Indeed, even if FCSL were to establish that the Reinstatement Decision was unlawful,

the Court questions whether FCSL would be entitled to any relief other than an order vacating the Decision and directing the Department to reconsider the reinstatement application without relying on improper factors.  See Stone & Webster Constr., Inc. v. U.S. Dep't of Lab., 684 F.3d 1127, 1137 (11th Cir. 2012) ("It is an established principle of administrative law that an appellate court should not 'intrude upon the domain which Congress has exclusively entrusted to an administrative agency.'  Thus, 'the proper course, except in rare circumstances, is to remand [a matter] to [an] agency for additional investigation or explanation.'" (citations omitted)); see also Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985) ("The reviewing court is not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.").  Regardless, an order requiring the Department to allow FCSL to participate in the Title IV, HEA programs pending further review of the Reinstatement Decision would almost certainly constitute a mandatory injunction and, for the reasons set forth below, FCSL fails to show that it has a substantial likelihood of success, much less that it meets the heightened burden of showing a clear entitlement to the relief it seeks.[21]

---

[21] In the Response, the Department also asserts that the HEA "bars the injunction that Florida Coastal seeks."  See Response at 18.  In support, the Department cites 20 U.S.C. § 1082(a)(2).  Id.  This provision provides: "In the performance of, and with respect to, the functions, power, and duties, vested in him by this part, the Secretary may-- . . . (2) sue and be sued . . . but no attachment, injunction, garnishment, or other similar process, mesne or

To establish that FCSL is entitled to an order vacating the Reinstatement Decision, FCSL must demonstrate that none of the reasons the Department provided lawfully support the Department's decision to deny FCSL's request for reinstatement.   See Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec., 769 F.3d 1127, 1149 (D.C. Cir. 2014) ("Where, as here, an agency has set out multiple independent grounds for a decision, 'we will affirm the agency so long as any one of those grounds is valid, unless it is demonstrated that the agency would not have acted on that basis if the alternative grounds were unavailable.'" (quoting BDPCS, Inc. v. FCC, 351 F.3d 1177, 1183 (D.C. Cir. 2003) (Roberts, J.))).[22]   Given the expedited nature of these proceedings and the limited record, the Court will not address FCSL's challenge to every reason the Department provided.   Rather, the Court sets forth below the evidence that

---

final, shall be issued against the Secretary or property under the Secretary's control . . . ."   See 20 U.S.C. § 1082(a)(2) (emphasis added).   Significantly, § 1082 is in Part B of the HEA, pertaining to the Federal Family Education Loan Program.   FCSL's challenge in this case stems from the Department's duty to qualify institutions of higher education for participation in Title IV, HEA programs, as set forth in Part H of the HEA.   Moreover, the Department states in its brief that the "Direct Loan program is most relevant here," which is contained in Part D of the HEA.   See Response at 4.   Because the statutory provision on which the Department relies appears to be limited to the Department's duties in the particular part where it is found, Part B, the Court questions whether the anti-injunction provision applies to the claims raised in this action.   See Penn. Higher Edu. Assistance Agency v. Perez, 416 F. Supp. 3d 75, 95-96 (D. Conn. 2019).   Nevertheless, because the Court finds that FCSL's Motion is otherwise due to be denied, it need not reach a determination on this issue here.

[22] FCSL has made no attempt to show that the Department would have granted its application for reinstatement had any one of the alternative reasons provided for denial been unavailable.

most compellingly supports the Department's decision and the areas where FCSL's arguments most glaringly fall short.[23]

### 1. Accreditation

In the May 13, 2021 Denial Letter, one of the reasons the Department cited for its determination that FCSL was not "financially responsible" was its finding that FCSL did not "have the ability to provide the services described in its official publications and statements, and to provide the administrative resources necessary to comply with Title IV, HEA program requirements."  See Denial Letter at 3; see 34 C.F.R. § 668.171(a)(1), (3).  Specifically, the Department found that FCSL advertises on its website and in its catalog that

> it provides practical training provided by experienced full-time faculty, offers a law library that provides students access to an expansive collection of information and lawyer-librarians who provide students with access to materials necessary to prepare them for their legal careers, and maintains a Center for Professional Development that provides support for students in all stages of the career planning process.

---

[23] In the Request for Reconsideration and the Motion, FCSL quarrels with the Department's reliance on InfiLaw's consolidated financial statements rather than those of FCSL because the InfiLaw financials included the losses from CSL and ASLS.  However, the record reflects that throughout InfiLaw's dealings with the Department, including in 2019 after the other two schools closed, the Department consistently made its financial responsibility determinations based on InfiLaw's audited financials.  See Frola Decl. at ¶ 6; June 18, 2019 Letter at 3.  InfiLaw never objected to that, and at the hearing, FCSL conceded that the Department was authorized to rely on those financials.  Notably, FCSL points to no basis for finding that the Department's decision to do so was arbitrary or capricious.  Indeed, given that FCSL had joint and several responsibility for portions of CSL and ASLS's liabilities, it would seem to have been prudent to do so.  Additionally, FCSL did not even suggest that a review of FCSL's audited financial statements rather than those of InfiLaw would have yielded a passing composite score, or that the exclusion of the CSL and ASLS losses from review of InfiLaw's consolidated financials would have yielded a passing composite score.  Thus, this argument warrants no further consideration.

See Denial Letter at 4.   The Department determined that FCSL was not providing these advertised services based upon the factual findings from the ABA's March of 2020 site visit.   Id. at 3-4.   For example, the Department determined that contrary to FCSL's representations regarding its law library and law librarians, the ABA's factual findings reflected that FCSL was failing to meet the standards for maintaining a law library, a full-time director of the law library, and library staffing.   Id. at 3.   Likewise, while FCSL advertised assistance with career planning, the ABA found that FCSL was failing to meet the standards for provision of career counseling services.   Id.   In the Department's letter affirming the denial, the Department set out additional details from the ABA's findings in support of its conclusions.   See Affirmation of Denial at 2-6.[24]   On the record before the Court, the ABA's factual findings

---

[24]  For example,

- "[S]ince shortly before the site visit in March 2020, the Center for Professional Development (CPD) has been staffed by a single person, the Director of Admissions."

- "[T]he law library continues to be overseen by an Interim Director who is a legal writing faculty member.   She previously reported that she devotes three hours per week to administration of the library. . . . At the time of the site visit, there was no full-time reference librarian and no active reference service hours . . . The Dean's Response does not address the concern that some reporters and codes have not been updated since 2017 or earlier, and that the library is not subscribing to some electronic services such as HeinOnline and Bloomberg . . . ."

- "[T]he Law School is operating with a full-time faculty of only seven members, in addition to the Dean.   Faculty salaries have been reduced, in-house clinics have been eliminated, the library budget has been severely cut, and the physical space available to the Law School, including its courtrooms, has been or is being reduced.   The Law School is operating without an Assistant Dean or permanent Library Director, and the

appear to support the Department's finding that FCSL was not providing advertised services and did not have the necessary administrative resources to comply with Title IV, HEA program requirements.   <u>See</u> 34 C.F.R. § 668.171(a)(1), (3).

Nevertheless, FCSL argues at length that the Department improperly relied on the ABA's factual findings.  According to FCSL, by relying on the ABA's findings, the Department improperly interfered with accreditation matters, imposing sanctions where the ABA had not.  However, these arguments mischaracterize the nature of the Department's findings.  The Department did not "sanction" FCSL for failing to meet accreditation standards.  Nor did the Department address in any way whether the ABA's findings warranted sanctions from the ABA, or whether FCSL should lose accreditation as a result of these findings.  FCSL's reliance on the regulations governing accreditation matters is entirely misplaced.

---

Admissions Director is also serving as the Career Services Director."

- "A faculty member without experience in clinical legal education is directing the externship program."

<u>See</u> Affirmation of Denial at 3-5 (internal quotations omitted).  In the Reply, FCSL provides some evidence that the Department did not receive these additional details regarding the ABA's findings until after it issued the initial Denial Letter.  <u>See</u> Reply at 8, Ex. 1.  FCSL appears to contend that this undermines the legitimacy of the Department's decision.  <u>Id.</u> However, it is unclear why FCSL believes it was improper for the Department to conduct further investigation after receiving FCSL's challenge to the Denial Letter.  The fact that the Department obtained <u>more</u> information supporting its findings does little to suggest that the Department's final decision denying FCSL's request for reinstatement was arbitrary.

The issue before the Department was whether FCSL was providing the services it advertised in its official publications and statements.   See 34 C.F.R. § 668.171(a)(1).   The ABA's factual findings regarding the services available at FCSL are evidence directly relevant to this determination.   While FCSL argues that the Department should have conducted its own factual investigation, and minimizes the ABA's findings as merely "routine," it does not cite to any legal provision precluding the Department from relying on this evidence in making its determination.   Indeed, 34 C.F.R. § 602.27(a)(6) specifically provides that the Department may request from an accrediting agency "information that may bear upon an accredited or preaccredited institution's compliance with its title IV, HEA program responsibilities, including the eligibility of the institution or program to participate in title IV, HEA programs."

Significantly, FCSL does not point to any evidence in the administrative record demonstrating that the Department's findings, based on the ABA's investigation, were factually incorrect.   Instead, FCSL cites to the Department's Final Program Review Determination dated September 10, 2020, in which the Department found that FCSL had taken "the corrective actions necessary to resolve" a previous finding that it lacked administrative capability. See Complaint, Ex. 20: Final Program Review at 4.   FCSL contends that "[t]he ABA's findings are not sufficient evidence for the Department to disregard its

own investigation into FCSL's administrative practices and independent determination that FCSL is administratively capable of complying with Title IV requirements." <u>See</u> Motion at 33.   This argument is at best lacking in merit and at worst misleading.   As FCSL is aware, the findings in the Final Program Review were based on the Department's review of student files from the 2017-2018 and 2018-2019 award years.   <u>See</u> Complaint, Ex. 20 at 2, Final Program Review at 4.[25]   The ABA findings were based on its March 2020 site visit.   As such, the Department's findings in its Final Program Review in no way undermine or conflict with the ABA's subsequent findings regarding the services actually being provided by FCSL as of the Spring of 2020.   In sum, on the record before the Court, the Department appears to have made a rational determination, within its discretion, based on consideration of relevant facts that FCSL was not providing "the services described in its official publications and statements," and was unable to provide the administrative resources necessary to comply with program requirements.   <u>See</u> 34 C.F.R. § 668.171.

---

[25] The Final Program Review also expressly notes that the review "cannot be assumed to be all-inclusive" such that "[t]he absence of statements in the report concerning FCSL's specific practices and procedures must not be construed as acceptance, approval, or endorsement of those specific practices and procedures."   Moreover, the Review "does not relieve FCSL of its obligation to comply with all the statutory or regulatory provisions governing the Title IV, HEA programs."   <u>See</u> Complaint, Ex. 20: Final Program Review at 4.

### 2. Fiduciary Duty

The Department also found that FCSL's request for reinstatement must be denied because FCSL had breached its fiduciary duty to the Department. <u>See</u> Denial Letter at 4-6.   Although the Department lists several examples of FCSL's breach of that duty, the Court will highlight three here.   Among other communications, the Department pointed to two emails.   In the first email dated January 15, 2021, FCSL stated that "'[w]e are in full compliance with the ABA standards, and are meeting the ABA's more stringent bar pass rates.'" <u>See</u> Affirmation of Denial at 14.   In the second email, dated March 26, 2021, FCSL represented to the Department that "'[t]erminating Title IV eligibility and effectively forcing the closure of the school—a school in compliance with ABA requirements including the new, stringent requirements regarding bar passage—over this new requirement would displace many students, faculty and staff." <u>Id.</u>   Given the ABA's August 2020 and February 2021 findings that the school was not in compliance with a number of standards, FCSL fails to suggest why the the Department could not rationally conclude that it was misleading for FCSL to represent that it was "in compliance," much less "full compliance," with ABA standards.

Notably, FCSL does not dispute the underlying facts supporting this determination.   Instead, FCSL argues at length that no specific regulation required it to report this information to the Department.   Once again, however,

FCSL misapprehends the Department's findings.   The Department did not determine that FCSL had failed to comply with its regulatory disclosure requirements.    The Department found that FCSL made affirmative statements to the Department which were misleading under the circumstances. Significantly, the regulations require FCSL to act in the nature of a fiduciary, "with the competency and integrity necessary to qualify as a fiduciary."   See 34 C.F.R. § 668.82(a).   A fiduciary has "an <u>affirmative duty</u> of utmost good faith, and <u>full and fair disclosure of all material facts</u>, as well as an <u>affirmative obligation</u> to employ reasonable care to <u>avoid misleading</u>" the beneficiary of the fiduciary duty.   <u>See</u> <u>Sec. & Exch. Comm'n v. Cap. Gains Res. Bureau, Inc.</u>, 375 U.S. 180, 194 (1963) (emphasis added).   Indeed, Black's Law Dictionary defines a "fiduciary duty" as one of "utmost good faith, trust, confidence, and <u>candor</u> owed by a fiduciary . . . to the beneficiary . . . ."   <u>See</u> "fiduciary duty," <u>Black's Law Dictionary</u> (11th ed. 2019) (emphasis added).

Thus, even if FCSL is correct that no specific regulation required it to disclose the ABA's findings, it nevertheless had an affirmative duty to avoid misleading the Department.   Thus, when FCSL chose to comment on its status with the ABA in its emails to the Department, FCSL, as a fiduciary, could not make statements that were misleading or half-truths.   On this record, FCSL has failed to show that it was arbitrary for the Department to conclude that FCSL breached its fiduciary duty by affirmatively stating that it was in "full

compliance" with ABA Standards, when the ABA had recently determined and communicated to FCSL that it was <u>not</u> in compliance with several of its standards.

To the extent FCSL argues that these representations were simply "obvious misstatements," the Court is unconvinced. FCSL points to no evidence suggesting to the Department that the statements were inadvertent misstatements, much less any evidence that would have compelled the Department to conclude that they were simple misstatements not misleading statements. Significantly, the Department noted that FCSL made these statements in communications where it was attempting to persuade the Department to grant FCSL's request for recertification and rescind the Sterling Decision. <u>See</u> Affirmation of Denial at 13-15. Moreover, in the Department's view, FCSL understood the materiality of the ABA's findings given its decision to disclose the information in the asset purchase agreement with Campbellsville University. <u>Id.</u> at 14. Likewise, FCSL knew of the significance of such findings to the Department because the Department had previously denied CSL's application for recertification, and affirmed that denial, based in part on the ABA's findings and the fact that CSL continued to represent on its website that it was in "full compliance" with ABA standards despite notice from the ABA that it was not. <u>See</u> Frola Decl., Ex. A. On this record, it appears the Department could rationally conclude that FCSL's

statements were material and misleading.   Moreover, given what appear to be affirmative misrepresentations to the Department, FCSL's attempt to recharacterize the Department's decision as one premised on an arbitrary reporting requirement is unavailing.   At this stage of the proceedings, the Court is not convinced that the Department's breach of fiduciary duty finding was arbitrary and capricious, contrary to law or otherwise unlawful under the APA.

The Department also found that on at least two separate occasions FCSL failed to meet its fiduciary obligations in communications regarding a proposed sale of the school and conversion to non-profit status.   In 2019, FCSL applied to the ABA to convert to non-profit status and change its ownership to the PhoenixLaw Foundation.   <u>See</u> Affirmation of Denial at 6.   In May and June of 2019, while the ABA was reviewing this proposal, FCSL was engaged in settlement discussions with the Department seeking to limit FCSL's exposure to the liabilities of CSL and ASLS, which FCSL maintained was necessary for its conversion and acquisition to proceed.   <u>Id.</u>   According to the Department, FCSL breached its fiduciary obligation during these settlement discussions and negotiations with the Department because FCSL failed to disclose "the true nature and provisions of the proposed transaction . . . ."   <u>See</u> Affirmation of Denial at 12.   The Department explains that FCSL never disclosed that "the proposed transaction included a contractual arrangement with a servicing

entity that was designed to capture significant portions of the then-nonprofit law school's revenue to pay InfiLaw and Holding's senior secured debt of $24.8 million, most of which was associated with CSL and ASLS." Id. The Department stated that had it known about this arrangement, it would have considered it "to be a deal breaker," both as to FCSL's request for a change in ownership and the settlement negotiations to limit FCSL's liabilities. Id.

Significantly, FCSL does not dispute the Department's characterization of the PhoenixLaw Foundation transaction, and indeed the Department's summary of the transaction is supported by the ABA's findings reproduced in the Affirmation of Denial. Nor does FCSL offer any evidence to rebut the Department's representation that it would have considered the full terms of the transaction to be a "deal breaker" had it known about them at the time of the settlement negotiations. Thus, nothing in the record supports a finding that it was arbitrary and capricious for the Department to view the undisclosed aspects of the proposed transaction as material information.

In March of 2021, FCSL again relied on a potential sale of FCSL to ask the Department to act in its favor. Specifically, the day before its PPA was set to expire, FCSL informed the Department that it had signed an asset purchase agreement with Campbellsville University and "[t]he parties have agreed to expeditiously close upon completion of all regulatory and accreditation processes." See Complaint, Ex. 11. FCSL expressed its hope that the

Department would maintain FCSL's PPA, without requiring Sterling's signature, while it sought approval for the transaction.  Id.  However, FCSL failed to provide the Department with all relevant information, most notably, FCSL failed to disclose what agreement, if any, had been reached with Campbellsville University regarding the disposition of the senior secured debt. See Affirmation of Denial at 13.  As such, the Department found this communication to be a breach of FCSL's fiduciary duty to "provide complete contracts and documents to the Department and to disclose all aspects of its proposed transactions," particularly given that FCSL "was requesting that the Department extend its participation in the Title IV, HEA programs."   Id. Given the significance of the senior secured debt in the prior attempts to sell FCSL, and the central role the debt played in the ABA's review of the PhoenixLaw transaction, FCSL does not persuasively argue that it was unreasonable for the Department to view FCSL's failure to include the relevant attachments or otherwise disclose any information regarding this debt in the March 30, 2021 email as a material omission.

FCSL again attempts to characterize these findings as imposing regulatory reporting requirements that do not exist.  But, regardless of whether the regulations required FCSL to inform the Department of its preliminary plans for any sale, when FCSL chose to notify the Department of these plans, it had an obligation to do so with full candor and in a manner that

did not mislead the Department about the nature of the transaction.   As noted by the Department, in both instances, FCSL presented the proposed transactions in an attempt to convince the Department to act—agree to a settlement insulating FCSL from certain liabilities in the first instance, and approve its recertification application without requiring Sterling's assumption of joint liability in the second instance.   Given FCSL's fiduciary obligations to the Department, FCSL's contention that it did not need to disclose this information because the Department never specifically asked for it is unlikely to succeed.

In light of the foregoing, FCSL has failed to show that it has a likelihood of success on its claim that the Department's determination that FCSL violated its fiduciary duty obligations was arbitrary and capricious, contrary to law, or otherwise in violation of the APA.

### 3. Letter of Credit

Last, FCSL contends that the "Department's failure to consider FCSL's letter of credit in finding that FCSL is not financially responsible renders the May 13, [2021] decision and Affirmance arbitrary and capricious."   See Motion at 44.   According to FCSL, the Department failed to explain why the letters of credit in the amount of $5.6 million, which FCSL characterizes as equal to 78% of its Title IV funding in the previous fiscal year, were insufficient to meet the financial responsibility requirements.   Id. at 43-44.   Upon review of the

record, however, FCSL's reliance on the letters of credit appears to be unavailing.   In June of 2019, the Department notified InfiLaw that in order for it to continue to participate in Title IV, HEA programs through FCSL, InfiLaw would be required to post a letter of credit representing a percentage of the Title IV, HEA program funds received by InfiLaw in the two previous fiscal years. See June 18, 2019 Letter.   Thus, the $5.6 million letters of credit posted by InfiLaw secured not only FCSL's liabilities, but also InfiLaw's other liabilities from CSL and ASLS as well.   The Department represents that ASLS and CSL owe approximately $5,522,233 to the Department, $3,605,688 of which is uncontested.   See Frola Decl. ¶¶ 9, 12-13, 17.   According to the Department, the $5.6 million in security exceeds InfiLaw's current debts to the Department by less than $160,000.   See id. ¶ 17.   And, the Department states that InfiLaw is facing another $167 million in potential liability based on applications from former students seeking student loan discharges based on allegations of fraud. Id. ¶ 13.   As such, the mere fact that InfiLaw had previously provided the Department with letters of credit totaling $5.6 million is insufficient to establish that the Department's finding that FCSL was not financially responsible was arbitrary and capricious.[26]   Because FCSL fails to show that

---

[26] Regardless, even if FCSL could demonstrate financial responsibility, it is unlikely this would be sufficient to establish a "clear entitlement" to the relief it seeks.   As explained above, the Department also denied FCSL's request for reinstatement based on its breaches of its fiduciary duty obligation, as such it would not appear to be qualified to proceed under a letter

it is substantially likely to succeed on its challenges to the Reinstatement Decision, much less that it is clearly entitled to the relief it seeks, the Court finds that the Motion is due to be denied.[27]

## V.    Letter of Intent

Before concluding, the Court pauses to address the letter of intent mentioned for the first time in FCSL's Reply and submitted to the Court under seal.  See Minute Entry (Doc. 27); Letter of Intent (Doc. 28).  In its Motion, FCSL asserts that it needs injunctive relief in order to stay in business long enough to consummate a transaction to change FCSL's ownership to a "100-year-old nonprofit institution with more than $147 million in assets . . . ."  See Motion at 47.  At the hearing, FCSL acknowledged that this reference is to Campbellsville University.   In the Reply, FCSL asserts that injunctive relief is

---

of credit alternative.

[27] To the extent FCSL argues that, having accepted the $5.6 million letters of credit, the Department was required to approve FCSL's request for recertification on the same terms set forth in the June 18, 2019 Letter, this argument is unavailing.   FCSL points to no regulation or specific term in the letter that required the Department to issue a new provisional PPA relying solely on the letters of credit for financial security.   Indeed, the $5.6 million letters of credit appear to have operated to secure InfiLaw's liabilities during the period while the Department finished reviewing FCSL's application for recertification.   When the Department offered to allow FCSL to continue to participate in Title IV, HEA programs on those terms, FCSL was operating on the automatic month-to-month extension of its prior PPA pending a decision on its 2016 application for recertification.   Thus, it appears the Department approved FCSL's participation under those terms only until it acted on the pending application.   It was not determining what security would be sufficient to support a new provisional PPA.   In 2020, on the other hand, the Department was acting on that application, formally granting provisional certification to allow FCSL's continued participation in Title IV, HEA programs and setting the terms of the new PPPA under which FCSL could operate for a period not to extend beyond September 2023.

warranted because it has "entered into an agreement with a well-established Financial Partner . . . that will provide for the continued operations of the school so long as it is restored to Title IV." See Reply at 11.   In support, FCSL provided the court with a letter of intent signed by this Financial Partner. However, for the reasons discussed at the hearing, this letter of intent, which is "qualified in its entirety" by the terms of an agreement that has yet to be negotiated or executed, is simply insufficient for the Court to make any determination as to the merits of this transaction.   Regardless, it is not appropriate for the Court to determine in the first instance whether this letter of intent provides sufficient financial security to warrant restoring FCSL to Title IV eligibility.   That is unquestionably the role of the Department, not the Court.

## VI.   Conclusion

On the record before the Court, FCSL has failed to show that preliminary injunctive relief is warranted.   Although FCSL characterizes its request as a return to the status quo, FCSL waited over three and a half months after the expiration of its prior PPA to file this lawsuit.   During that time, Sterling relinquished its ownership of InfiLaw.   Thus, were the Court to order the Department to restore or reinstate FCSL's eligibility, it would be requiring the Department to operate under or enter into a PPA, and potentially issue millions of dollars in student loans, with an entity whose owners are unknown.

Moreover, FCSL has entered into the Teach-Out Plan with the ABA which provides for the imminent closure of the school.   The record provides no information at all as to what position the ABA would take on FCSL's desire to resume classes this fall should the Court restore its Title IV eligibility.   Thus, a return to the "status quo" existing prior to the expiration of the PPA no longer appears to be available.

Nevertheless, FCSL cannot obtain the preliminary injunction it seeks because it has failed to establish a substantial likelihood of success on the merits of its APA claim.   See Pittman v. Cole, 267 F.3d 1269, 1291-92 (11th Cir. 2001) (noting that Eleventh Circuit "cases have uniformly required a finding of substantial likelihood of success on the merits before injunctive relief may be provided").   FCSL has not shown that the Department acted contrary to the law or outside of its ample discretion in determining whether FCSL was eligible to participate in the Title IV, HEA programs or the conditions under which the Department would issue a new PPA.   Nor has FCSL shown that the reasons the Department provided for its determination were based on irrelevant factors or unsupported by the administrative record before the agency.   While it is possible that FCSL might be able to establish, at a later stage of these proceedings and upon a more complete administrative record, that the Department's reasoning was flawed, on this record the Court cannot

find that the Department's decisions were arbitrary and capricious, contrary to law, or otherwise in violation of the applicable statues or the Constitution.[28]

In the Complaint and the Motion, FCSL highlights its own accomplishments and those of its graduates.   FCSL emphasizes the value that it has brought to the community and its laudable goal of trying to bring diversity to the legal profession.   And it describes the many contributions of its graduates to both the legal community and the community at large.   The Court's decision here in no way denigrates the contributions of FCSL, the goals of its founders, or the accomplishments and contributions of its proud graduates.   In ruling on the Motion, the Court makes no attempt to assess the value of those contributions or determine whether those contributions and the attempts FCSL has made to improve its services over the last several years warrant permitting it to continue to offer legal education services.   That simply is not the question before the Court.   The question is not whether, in the Court's view, FCSL should continue.   The sole question is whether FCSL can succeed in its claim under the APA that the Department's decisions that resulted in the termination of FCSL's eligibility to participate in Title IV, HEA programs were arbitrary and capricious, an abuse of discretion, contrary to law,

---

[28] The Court notes that its findings of fact and conclusions of law do not necessarily reflect what may be established by a review of the complete administrative record.   Accordingly, the determinations in this Order are expressly limited to the record before the Court at this time and should not be interpreted as a final decision regarding any disputed issues.

or in excess of the Department's authority.  The Court must not and does not exercise its own judgment as to the value of FCSL to the community or substitute its own judgment as to whether FCSL should be permitted to continue to participate in Title IV, HEA programs.  The eligibility of FCSL to do so is for the Department to decide and where the Department's decision complies with the Department's legal obligations, the Court has not authority to displace it.

The Court recognizes that the denial of injunctive relief here may well end FCSL's battle to continue to provide legal education in the Jacksonville community.  While the school's closure has been anticipated at least since the ABA's approval of the Teach-Out Plan, no doubt some students, faculty and staff have clung to the hope that the school would find a way to reopen.  The closure may significantly jeopardize the dreams of hardworking students and the financial futures of the remaining students, faculty, staff, and investors.  But a dire outcome, no matter how devastating, cannot support the entry of injunctive relief in a case such as this where the school has made no showing that it can ultimately succeed on the merits of its attempt under the APA to obtain an order requiring the Department to reinstate its eligibility to participate in Title IV, HEA programs.  Without finding a substantial likelihood of success, the Court cannot issue the requested injunction.  See Pittman, 267 F.3d at 1292; Am. C.L. Union of Fla., Inc. v. Miami-Dade Cty. Sch.

<u>Bd.</u>, 557 F.3d 1177, 1198 (11th Cir. 2009) ("[f]ailure to show any of the four factors is fatal, and the most common failure is not showing a substantial likelihood of success on the merits."). The outcome here is certainly unfortunate for all involved, but it is the outcome required by the law. Accordingly, it is

**ORDERED:**

Plaintiff's Emergency Motion for Temporary Restraining Order and/or Preliminary Injunction and Memorandum of Law (Doc. 5; Motion) is **DENIED**.

**DONE AND ORDERED** in Jacksonville, Florida this 9th day of August, 2021.

**MARCIA MORALES HOWARD**
United States District Judge

lc28/lc11
Copies to:

Counsel of Record